Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 1 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

CASE NO. 13-80456-CIV-KAM


NORMAN HIRSCH, MATTHEW DWYER,
and RALPH WILLARD, individually
and on behalf of all others similarly
situated,

       Plaintiffs,

v.

JUPITER GOLF CLUB LLC, a Delaware
LLC d/b/a TRUMP NATIONAL GOLF
CLUB JUPITER and RBF, LLC d/b/a
THE RITZ-CARLTON GOLF CLUB &
SPA JUPITER,

       Defendants.
_____/


DEPOSITION OF NORMAN HIRSCH


Monday, February 2, 2015
10:04 - 1:02 p.m.


515 North Flagler Drive
Suite 1701
West Palm Beach, Florida 33401


Reported By:
Rachel W. Bridge, RMR, CRR, FPR
Esquire Deposition Solutions
Job #276977



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 2 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                              2

```
 1    APPEARANCES:

 2    On behalf of the Plaintiffs:

 3          SETH M. LEHRMAN, ESQUIRE
            FARMER, JAFFE, WEISSING, EDWARDS,
 4          FISTOS & LEHRMAN, P.L.
            425 North Andrews Avenue, Suite 2
 5          Fort Lauderdale, Florida  33301
            Telephone: (954) 524-2820
 6          E-mail:  Seth@pathtojustice.com

 7

 8    On behalf of the Defendant Jupiter Golf Club, LLC
      d/b/a Trump National Golf Club Jupiter:
 9
            HERMAN J. RUSSOMANNO, III, ESQUIRE
10          RUSSOMANNO & BORRELLO, P.A.
            Museum Tower, Penthouse 2800
11          150 West Flagler Street
            Miami, Florida  33130
12          Telephone: (305) 373-2101
            E-mail:  Hrussomanno@russomanno.com
13

14    On behalf of the Defendant RBF, LLC
      d/b/a The Ritz-Carlton Golf Club & Spa Jupiter:
15
            JERRY R. LINSCOTT, ESQUIRE
16          BAKER & HOSTETLER, LLP
            2300 SunTrust Center
17          200 South Orange Avenue
            Orlando, Florida  32802
18          Telephone:  (407) 649-0168
            E-mail:  Jlinscott@bakerlaw.com
19

20    On behalf of Marriott Vacations Worldwide:

21          DOUGLAS A. KELLY, ESQUIRE
            Vice President and Senior Counsel
22          6649 Westwood Boulevard
            Orlando, Florida  32821
23          (407) 513-6870
            E-mail:  Douglas.kelly@mvwc.com
24

25
```



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 3 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    3

```
 1                          -   -   -
                          I N D E X
 2                          -   -   -

 3   WITNESS:              DIRECT   CROSS   REDIRECT   RECROSS

 4   Norman Hirsch

 5      By Mr. Linscott    5                106
        By Mr. Russomanno          70
 6      By Mr. Lehrman             110

 7


 8                          -   -   -
                          E X H I B I T S
 9                          -   -   -

10   EXHIBIT         DESCRIPTION                       PAGE

11   Exhibit 14      Social & Spa Membership Agreement    7

12   Exhibit 15      Associate Membership Agreement      18
                     for Upgrading Social & Spa Members
13
     Exhibit 16      Social & Spa Membership Agreement   22
14
     Exhibit 17      Membership Plan                     27
15
     Exhibit 18      2/25/10 letter to Barbara Barbosa   45
16                   from Norman & Julie Hirsch

17   Exhibit 19      Plaintiff's Motion and Memo of Law  53
                     in Support of Class Certification
18
     Exhibit 20      12/17/12 letter to Club Golf       115
19                   Members from Trump National GC

20

21

22

23

24

25
```



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 4 of 125

NORMAN HIRSCH                                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                                    4

 1                    P R O C E E D I N G S

 2                           - - -

 3          Deposition taken before Rachel W. Bridge,

 4    Certified Realtime Reporter and Notary Public in and for

 5    the State of Florida at Large, in the above cause.

 6                           - -

 7             THE VIDEOGRAPHER:  We are now on the video

 8          record.  This is disk number one to the deposition

 9          of Norman Hirsch in the matter of Norman Hirsch,

10          Matthew Dwyer and Ralph Willard, individually and

11          on behalf of others similarly situated, as

12          plaintiffs, versus Jupiter Golf Club, LLC, et al.,

13          as defendants.

14             This matter is being heard before the United

15          States District Court for the Southern District of

16          Florida, Palm Beach division.  Today's date is

17          Monday, February 2, 2015, and the time on the video

18          monitor is 10:04 a.m.

19             This deposition is being held at 515 North

20          Flagler Drive in West Palm Beach, Florida.  My name

21          is Anthony Barbaro and I'm the videographer.  The

22          court reporter is Rachel Bridge.

23             Counsel, if you would please introduce

24          yourselves and your affiliations and then the

25          witness will be sworn.



1           MR. LEHRMAN:  Seth Lehrman appearing for

2      plaintiff, Norman Hirsch.

3           MR. LINSCOTT:  Jerry Linscott with Baker &

4      Hostetler on behalf of defendant, RBF, LLC.

5           MR. RUSSOMANNO:  Herman Russomanno, III, with

6      the law firm of Russomanno & Borrello on behalf of

7      Jupiter Golf Club.

8           MR. KELLY:  Douglas Kelly, vice-president and

9      senior counsel with Marriott Vacations Worldwide.

10  Thereupon,

11                   (NORMAN HIRSCH)

12  having been first duly sworn or affirmed, was examined

13  and testified as follows:

14           THE WITNESS:  I do.

15                DIRECT EXAMINATION

16  BY MR. LINSCOTT:

17      Q.   Would you state your full name for the record,

18  please.

19      A.   Norman Hirsch.

20      Q.   And where do you live?

21      A.   Juno Beach, Florida.

22      Q.   And what's your address?

23      A.   ████ ████ ████ ████ Juno Beach, Florida.

24      Q.   How long have you lived at that address?

25      A.   About 15 years.



NORMAN HIRSCH                                     February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                     6

1        Q.   Are you still gainfully employed?

2        A.   I am.

3        Q.   And what are you gainfully employed at?

4        A.   I'm the owner of a network security company.

5        Q.   And the name of that company is what?

6        A.   NH&A, LLC.

7        Q.   What type of network security does that

8   network company do?

9        A.   Antivirus, firewalls, intrusion, detection and

10   prevention, things to keep a network secure.

11        Q.   And that company is located where?

12        A.   In Juno Beach.

13        Q.   What is the address of the company?

14        A.   790 Juno Ocean Walk, Suite 502C, North Palm

15   Beach, Florida.

16        Q.   How many employees does the company have?

17        A.   Currently we have five, approximately.

18        Q.   And how long have you been engaged in that

19   business of network security with that company?

20        A.   Twenty-five years.

21        Q.   You joined as a member of the Ritz-Carlton

22   Golf & Spa a number of years ago; is that correct?

23        A.   Correct.

24        Q.   And you signed a membership in connection with

25   that?



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 7 of 125

NORMAN HIRSCH                                      February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                      7

1        A.    Correct.

2        Q.    Is your home in Juno, it's not located

3   adjacent to that club, is it?

4        A.    No.

5        Q.    Why did you choose to join that club?

6        A.    It looked like a nice club, and my mother and

7   my wife liked to go to spas and my wife liked to do

8   exercise and I thought about playing golf.  I used to be

9   a golfer.

10             And so we saw an ad, I saw an ad in the paper,

11   and I went over there and looked at it.  It was nice.  I

12   spoke with the person there and I liked it.

13        Q.    And that was in when, sir?

14        A.    That was in 2007, I believe.

15        Q.    And when you --

16        A.    Or '6.  '6 or '7.  Close to there.

17             MR. LINSCOTT:  Let's mark this as Exhibit

18        Number 14, please.

19             THE WITNESS:  '6, I think.

20             MR. RUSSOMANNO:  What number, 16 or 14?

21             MR. LINSCOTT:  Fourteen.  We ended the last

22        one at Exhibit Number 13.

23             MR. RUSSOMANNO:  All right.

24          (The document was marked Exhibit 14

25   for identification.)



1  BY MR. LINSCOTT:

2      Q.   Mr. Hirsch, you have been handed what has been

3  marked for identification as Exhibit Number 14.  Could

4  you turn to -- first let me explain the numbering

5  system.

6          You see the numbers at the bottom right-hand

7  corner of each page?

8      A.   Yes.

9      Q.   And the first page has a number that says TMP

10 000165?

11     A.   Yes.

12     Q.   That's what lawyers refer to as Bates numbers.

13 We number everything we get so we can keep track of it.

14     A.   Okay.

15     Q.   Oftentimes today I'll direct your attention by

16 using a Bates number, because they are all in

17 consecutive order.

18          If you would turn, sir, to the page with the

19 Bates number 168 on it.  The last three digits are 168.

20     A.   Okay.

21     Q.   Is that your signature that appears on the

22 applicant's signature line about a third of the way

23 down?

24     A.   Hold on.  Yes.

25     Q.   And it appears that a date on that line says



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 9 of 125

NORMAN HIRSCH                                        February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                        9

 1  May 12, 2006.

 2          Would that have been the date that you

 3  signed --

 4      A.   Yes.

 5      Q.   One of the things that you have just done that

 6  everybody in the world does, and that is you will say an

 7  answer before I complete the answer, because you know

 8  what the question is going to be.

 9          Here we need to have you try to wait until I'm

10  finished, and I'll do my best to wait until you are

11  finished so we're not both talking at the same time,

12  because she will kill one or the other of us if we do it

13  on a regular basis.

14      A.   Okay.

15      Q.   So the question -- I'll complete it -- would

16  you have signed this document on or about May 12, 2006?

17      A.   Yes.

18      Q.   And how much in advance of May 12, 2006, had

19  you visited with the club and become interested in

20  becoming a member?

21      A.   That's a good question.

22          I don't remember whether in fact I might have

23  done it on the same day or -- it wasn't long before

24  that, if any.

25      Q.   Do you recall who at -- I'm going to call it



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 10 of 125

NORMAN HIRSCH                                      February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                      10

1    Ritz-Carlton -- strike that.

2           Do you know the name of the corporate owner of

3    the Ritz-Carlton Golf Club & Spa?

4           MR. LEHRMAN:  Form.

5    BY MR. LINSCOTT:

6       Q.   You may answer.  He made an objection.

7       A.   I believe that it was Ritz-Carlton/Marriott.

8       Q.   Let's take a look also on the page you are on,

9    Exhibit Number 168.  Do you see the "Accepted by"

10   underneath your signature?

11      A.   Yes.

12      Q.   Do you see it says "Accepted by RBF, LLC,

13   d/b/a"?  Do you know what d/b/a stands for?

14      A.   Yes.

15      Q.   What does it stand for, sir?

16      A.   Doing business as.

17      Q.   The Ritz-Carlton Golf Club & Spa in Jupiter.

18          Were you aware of the fact that it was, the

19   entity that owned and operated that club was RBF, LLC?

20      A.   I didn't focus on that.

21      Q.   You're not surprised by seeing that that was

22   the owner, since you signed this document in 2006, are

23   you?

24      A.   No, I'm not surprised.

25      Q.   You also indicated in a prior answer you



1    thought that it was Ritz-Carlton/Marriott.

2            Where did you get the impression that Marriott

3    was involved?

4        A.   I learned later that Marriott had bought

5    Ritz-Carlton or had merged or whatever.

6        Q.   I'd like to call your attention to a couple of

7    provisions of the document that is Exhibit Number 14.

8            First I'd like to have you turn to the page

9    with Bates number ending in 166.

10       A.   Okay.

11       Q.   And on that page there's a Roman numeral

12   three, and under Roman numeral three is subparagraph (a)

13   down at the bottom of that page.  Do you see that, sir?

14       A.   Yes.

15       Q.   And that line or that section begins off

16   "Members who resign prior to 30 years."

17           Let me first ask you, when you signed this

18   agreement, did you read it before you signed it?

19       A.   I probably did.

20       Q.   Did you have anyone explain any of the

21   provisions to you before you signed it?

22       A.   I think we discussed it with the woman, Amy

23   Shayman, who was the person that sold me this.

24       Q.   What did you discuss with Amy Shayman about

25   this agreement or about your membership in the club on



 1   that date, sir?

 2        A.   That the membership fee was refundable.  That

 3   was the key thing.

 4        Q.   What else did she say about the membership fee

 5   being refundable other than the fact it was refundable?

 6        A.   I wouldn't get it back unless another member

 7   joined.  If I put my name on a resignation list, I

 8   wouldn't get it back.  I would have to wait until a

 9   member joined and then I could get it back.

10        Q.   Is it your recollection that Ms. Shayman said

11   that it only took one more member to buy a membership

12   before you got your money back?

13        A.   Yes.

14        Q.   So it was your understanding that she told you

15   that if you resigned your membership, the next member

16   who joined, you got your money back?

17             Is that what you understood?

18        A.   She said when I put my name on the resignation

19   list, each person moved up one.  My understanding was

20   one for one.

21        Q.   And Ms. Shayman said that to you on that

22   occasion, according to your recollection?

23        A.   Yes.

24        Q.   Did she give that to you in writing?

25        A.   I believe I saw it somewhere, and I think I



 1  could produce that.

 2     Q.   Have you looked for it since the date you

 3  signed it in 2006, this document --

 4     A.   Oh, yeah.

 5     Q.   -- that you said was one for one?

 6     A.   Yeah -- well, it didn't say one for one.  It

 7  said if a member joins.  It didn't say what later they

 8  claimed was five to one.

 9     Q.   Let's go back to Page No. 166 of Exhibit

10  Number 14.

11     A.   Okay.

12     Q.   And walk our way through the provisions of

13  subparagraph (a) of Roman numeral three.

14          Says "A member who resigns less than 30 years

15  after joining the club will receive a refund when the

16  resigned membership is reissued by the club to a new

17  member."

18     A.   Yeah.

19     Q.   Is that what you understood --

20     A.   That's, I believe that may be what I was

21  referring to.  There may be something else similar to

22  that that I'm referring to.

23     Q.   And if there is something else that you are

24  referring to other than that, do you know what form that

25  other document would take?



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 14 of 125

**NORMAN HIRSCH**                                     February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                        14

 1        A.   I'd have to find it and submit it if I can

 2   find it.  I'm pretty sure I can find it, but that may be

 3   it.

 4        Q.   Have you given to your lawyer all documents

 5   regarding your relationship with the Ritz-Carlton Club &

 6   Spa in connection with the initiation of this

 7   litigation?

 8        A.   I believe I have.

 9        Q.   And you've looked for all those documents and

10   have turned over to him everything you've been able to

11   find?

12        A.   I believe I have.

13        Q.   Okay.  Let's also search to Page No. 168 of

14   Exhibit Number 14.  It's the same page where your

15   signature appears.

16        A.   Okay.

17        Q.   And you see Roman numeral five, and up at the

18   top it says Membership Plan Documents.

19        A.   Yes.

20        Q.   It says, "I hereby acknowledge receipt of the

21   Ritz-Carlton Golf Club & Spa, Jupiter Membership Plan

22   and Rules and Regulations and that I have read and

23   understand them and agree to be bound by the terms and

24   conditions thereof as the same may be amended from time

25   to time by the club."



```
 1              Did you read that sentence before you signed
 2  your name to this document?
 3        A.    I probably did.
 4        Q.    You probably did or you did or you don't
 5  recall?
 6        A.    I usually trust somebody when I'm talking to
 7  them, so I don't always read every letter of the
 8  agreement, if they are saying it's what they said in
 9  conversation.  So I may not have read every word of this
10  thing.
11              I probably did, and I'm not denying that it
12  says what it says, and I'm not saying that I wouldn't
13  have signed it had I disagreed -- I mean, I mean I
14  don't, I don't disagree with that and that I signed it
15  on that day.
16        Q.    Well, the sentence I read to you indicates
17  that you received a Membership Plan and that you have
18  read and understood that document.
19              Did you receive a document called a Membership
20  Plan and did you in fact read and understand that
21  document?
22        A.    Okay, that's a different question.
23              I probably did receive the Membership Plan.
24  Maybe not before I signed this thing.
25              I think I signed -- I may have signed it
```



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 16 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                         16

1  before I got the plan.  I got a whole, a whole briefcase

2  of stuff, and that may have been whereby that plan was,

3  and I think I might have got that briefcase after I

4  signed this thing.

5       Q.   Mr. Hirsch, are you in the habit of signing

6  things that say things about you that are not true?

7            MR. LEHRMAN:  Form.

8  BY MR. LINSCOTT:

9       Q.   You may answer.

10      A.   No, I'm not in the habit of saying things

11  about me that aren't true.

12      Q.   Well, this sentence I read to you on page five

13  of Exhibit Number 14 says you have received the

14  Membership Plan and that you have read and understood

15  it.

16           MR. LEHRMAN:  Form.  You can answer.

17  BY MR. LINSCOTT:

18      Q.   Correct?

19           MR. LEHRMAN:  Same objection.  You can answer.

20           THE WITNESS:  I --

21  BY MR. LINSCOTT:

22      Q.   You may answer.

23      A.   Say the question again.

24      Q.   Certainly.  It says, the sentence I read to

25  you on page five of Exhibit Number 14, says you have



 1   received the Membership Plan and that you have read and

 2   understood it.

 3           Is that correct?

 4       A.   Yes.

 5       Q.   So you had read and understood the Membership

 6   Plan before you signed this document, correct?

 7       A.   To be honest, I don't recall reading the whole

 8   Membership Plan.  I may have.

 9       Q.   Would you have signed a document that said

10   that you had read and understood the Membership Plan if

11   in fact you had not done so at the time you signed the

12   document?

13       A.   As I said, I may have done that, but I

14   probably reviewed it, looked at something before I

15   signed it, but I believed what Amy said, and I signed

16   this thing.

17       Q.   And you believed what she said, and what she

18   said was what that you believed that caused you to sign

19   this?

20       A.   That everything was as she said, that the

21   membership fee was refundable, and we discussed a lot of

22   things.

23           MR. LINSCOTT:  I'm going to next mark as

24       Exhibit Number 15 this document.

25



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 18 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                          18

1          (The document was marked Exhibit 15

2    for identification.)

3    BY MR. LINSCOTT:

4          Q.    Sometime after you joined the Ritz-Carlton

5    Golf Club & Spa as a social and spa member, did you

6    change your membership in any way, shape or form?

7          A.    Yes.

8          Q.    And can you tell me what occasioned that

9    change?

10         A.    Okay.  What happened was the club offered to

11   25 members the ability to become a, what I think they

12   called a provisional golf member for two years at a

13   higher deposit and higher dues.

14            And it was much less money than being a full

15   golf member.  I didn't play a lot of golf, so I thought

16   I'd try it, and I did that.

17            And I became a provisional golf member and

18   paid an additional $20,000 and remained for the full two

19   years, and then went back to the spa member.

20         Q.    Okay.  Let's look at Page No. 156, Bates

21   number 156 of Exhibit Number 15 which I just handed to

22   you, sir.

23         A.    Okay.

24         Q.    And is that your signature on page 156?

25         A.    Yes.



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 19 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                   19

1       Q.   And that is approximately -- let me get the

2    exact timeframe -- about a year and ten days after you

3    initially joined as a spa member; would you agree with

4    that?  A year and nine days, to be precise.

5       A.   I believe that's close.  Let me see.

6       Q.   If you look at page 168 of Exhibit Number 14,

7    you originally joined on May 12, 2006.

8       A.   Yes.

9       Q.   And the second membership agreement, Exhibit

10   Number 15, is dated May 21, 2007.

11      A.   Correct, nine days.

12      Q.   And that is your signature on the line above

13   the applicant's signature on that page?

14      A.   Yeah, I already answered that.

15      Q.   And I'd also like to call your attention, sir,

16   on the same page where your signature appears, page 156,

17   the section Roman numeral five, it says Membership Plan

18   Documents.

19           And there the language is, and I'll read it to

20   you so it's in the record, "I hereby acknowledge receipt

21   of the Ritz-Carlton Golf Club & Spa, Jupiter Membership

22   Plan and Rules and Regulations and I have read and

23   understand them and agree to be bound by the terms and

24   conditions thereof as the same may be amended from time

25   to time by the club."



NORMAN HIRSCH                                February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                              20

1          Did you read that language before you signed
2    this document, Exhibit Number 14, on May 21, 2007?
3          MR. LEHRMAN:  Form.
4    BY MR. LINSCOTT:
5          Q.   You may answer.
6          A.   Yes.  Same situation as the prior.
7          Q.   In the event that you had not in fact read the
8    Membership Plan that is referred to in that sentence I
9    just read you when you initially signed Exhibit
10   Number 14 back in 2006, had you read that Membership
11   Plan before you signed this document in 2007?
12         A.   I likely had.
13         Q.   Would there have been any reason why you would
14   not have done so?
15         A.   No, no reason why.
16         Q.   Particularly because the year before you had
17   stated that you had already read and understood it back
18   when you signed in 2006, correct?  Yes?
19         A.   Yes.
20         Q.   And let's go back to the first page of this
21   document just to clarify what it is.  I think you've
22   already explained it, but let's look at Page No. 154
23   under Roman numeral one, the second paragraph that says
24   "I agree to pay 20,000 (upgrade amount) representing the
25   membership deposit of 75,000 for the associate



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 21 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    21

1  membership."

2          Is that the program that you explained earlier

3  to me that you were given a chance to be a golf member

4  for two years, pay higher dues, but then revert back if

5  you didn't want to go to a full golf membership?

6          Is that what this was all about?

7      A.  Yes, sir.

8      Q.  And you elected to do that, but when the two

9  years was up, you elected to revert back to a social and

10  spa member?

11      A.  Exactly.

12      Q.  Okay.  Did you use the golf privileges during

13  that two-year period of time you were paying the higher

14  dues and were entitled to the golf privileges?

15      A.  I did a few times.

16      Q.  Did you have any complaints about how the club

17  was operated or the structure of the club or the

18  agreements that you had entered into with respect to

19  your membership in the club by the time you had signed

20  this Exhibit Number 15?

21      A.  No.

22      Q.  Had you had any indication or desire to resign

23  from the club by the time you signed this agreement on

24  May 21, 2007?

25      A.  No.



1              MR. LINSCOTT:  Let's mark this as 16, please.

2          (The document was marked Exhibit 16 for

3   identification.)

4   BY MR. LINSCOTT:

5       Q.   Mr. Hirsch, I hand you what has been marked

6   for identification as Exhibit 16.

7              Let me ask you first to turn to the Bates page

8   number that ends in 149.

9              Is that your signature that appears on that

10  page?

11      A.   Yes.

12      Q.   I noticed that your signature is undated.

13             Do you have any recollection of when you

14  signed this document?

15      A.   It was sometime a little after two years of

16  when the prior.  So that date down there is probably

17  close.

18      Q.   The date down there I think you're referring

19  to is the date under the signature line for the

20  Ritz-Carlton Golf Club & Spa Jupiter?

21             Is that the date you're referring to?

22      A.   Yes.

23      Q.   The date of July 14, 2009?

24      A.   Correct.

25      Q.   And you believe that you would have signed



 1   your signature on this document at or about that same

 2   time?

 3        A.   Prior to that date.

 4        Q.   Prior to that --

 5        A.   Prior to that time or on that date.

 6        Q.   Okay.  Had you had any discussions with anyone

 7   as to your decision to revert back to your initial

 8   social and spa membership rather than into the full golf

 9   membership?

10        A.   Yes.

11        Q.   And who did you have that discussion with?

12        A.   The people at the club.  I think Amy Shayman

13   and Jennifer Barbosa probably and maybe the other

14   fellow, Tom.  I forgot his name, last name.

15             But yeah, basically I did discuss what my

16   options were at that time.

17        Q.   Did you have a discussion with the members of

18   the club that you have named and maybe others you have

19   not named in making your decision whether you were going

20   to buy a full golf membership or revert back to a spa

21   membership?

22        A.   Those were not members.  Those were employees.

23        Q.   If I said they were members, I apologize.  I

24   didn't intend to do so.

25        A.   Okay.



1    Q.   Did you have discussions with those three

2    persons you named and perhaps others who were associated

3    with the club --

4    A.   Yes.

5    Q.   -- in making your decision whether to revert

6    back to your spa membership or to get the full golf

7    membership?

8    A.   Yes.

9    Q.   And as a result of those discussions, did you

10   decide to revert back to your spa membership?

11   A.   Yes, I did.

12   Q.   Why?

13   A.   Because the full golf membership was very

14   expensive and I didn't play very much.

15          And so I mean that was enough right there,

16   but -- so I just went back to the spa.

17   Q.   And again, in Exhibit Number 16, if you would

18   look on page 149, there is a Roman numeral five up at

19   the top of the page.  Do you see that, sir?

20   A.   (Witness nods head up and down.)

21   Q.   And the first sentence there is the same

22   sentence I have read to you that appeared in both

23   Exhibit Number 14 and 15, correct?

24   A.   Correct.

25   Q.   And by the time that you signed Exhibit



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 25 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    25

1  Number 16, you surely must have read the Ritz-Carlton

2  Golf Club & Spa Membership Plan, correct?

3       A.   I hope so by then.

4       Q.   There would be no reason or excuse for not

5  having done so, correct?

6       A.   Correct.  Absolutely.

7       Q.   Thank you.  So at least by 2009, July, and

8  perhaps earlier and maybe back far as 2006, you'd know

9  what the Membership Plan provided for, you would have

10  read it and understood those provisions, correct?

11       A.   I believe that makes sense.  You know, I'm not

12  a lawyer, so when I read that stuff, it -- I don't

13  analyze it exactly, but I'm not arguing with you.

14       Q.   Did you consult a lawyer in connection with

15  any of these three agreements that we've gone through,

16  Exhibits 14, 15 and 16?

17            MR. LEHRMAN:  Form.

18            THE WITNESS:  No.

19  BY MR. LINSCOTT:

20       Q.   Do you regularly use a lawyer in connection

21  with the business of your security company?

22       A.   No.

23       Q.   Do you have a personal lawyer or did you have

24  a personal lawyer back in '06 to '09?

25       A.   No.



NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    26

```
 1        Q.   Had you ever used the services of a lawyer
 2   prior to that time --
 3        A.   My uncle.
 4        Q.   -- in connection with your business at -- and
 5   remind me the name of --
 6        A.   No, not in connection.  NH&A, LLC.
 7        Q.   In connection with the operation of that
 8   business, have you consulted with a lawyer from time to
 9   time with regard to contracts?
10        A.   No.
11        Q.   Does that company from time to time enter into
12   contracts with its customers?
13        A.   Yes.
14        Q.   Do you as a matter of fact have a form
15   contract that you use for those purposes?
16        A.   No.
17        Q.   How are those contracts prepared?
18        A.   They are usually sent to me to agree with
19   something, relationship.
20        Q.   So ordinarily the customer or consumer that
21   you're going to deal with with regard to network
22   security sends you a contract and asks you to enter into
23   that contract, your company to enter into it?
24        A.   No.  I'm referring to the products that we
25   sell.  We enter into a contract with the company that
```



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 27 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    27

1   makes the products.  We don't have any contract with our

2   customers.

3        Q.   Okay.  So you enter into, your company enters

4   into contracts with companies that sell you products

5   that you in turn resell?

6        A.   Correct.

7        Q.   And do you review those contracts before you

8   sign them?

9        A.   Pretty much the same way here.  I know the

10  people and agree to the -- pretty much.

11       Q.   Never consult a lawyer?

12       A.   No, I do not.  That is blasphemy this room, I

13  assume.

14            MR. LINSCOTT:  Number 17.

15       (The document was marked Exhibit 17

16  for identification.)

17  BY MR. LINSCOTT:

18       Q.   Mr. Hirsch, I hand you which I will represent

19  to you is the Ritz-Carlton Golf Club & Spa Jupiter

20  Membership Plan that was in effect from December 2002

21  until sometime in 2010.

22            I'm going to ask you to look through the --

23  looks like it's about 40 pages long.  I'd like to have

24  you look through this and tell me whether you recall

25  having seen this or any portion of this document before,



NORMAN HIRSCH                                         February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                        28

1   sir.

2        A.   I do remember seeing this document.

3        Q.   And do you recall when it was that you first

4   saw this document?

5        A.   I probably was given this document sometime

6   back when I joined.

7        Q.   Back in 2006?

8        A.   Correct.

9        Q.   When you signed the initial membership

10  agreement?

11       A.   Correct.

12       Q.   And this is the document, Exhibit Number 16 is

13  the document -- excuse me, Exhibit Number 17 is the

14  document that you stated in each of the three agreements

15  I've shown you that you have read and understood,

16  correct?

17       A.   No, that's not correct.  This is the, this is

18  the document that I signed that I had read and

19  understood on those documents.

20       Q.   Let's go back to Exhibit Number 14 in front of

21  you there, sir.

22       A.   Okay.

23       Q.   So we can get this straight.

24       A.   Okay.

25       Q.   You now have Exhibit Number 14 in front of



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 29 of 125

NORMAN HIRSCH                                        February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                        29

1    you, correct?

2          A.    Yes.

3          Q.    And now let's turn again to page 168 of that

4    document.

5          A.    Right.

6          Q.    And again at the top of the page, under

7    Membership Documents the sentence reads "I hereby

8    acknowledge receipt of the Ritz-Carlton Golf Club & Spa

9    Jupiter Membership Plan and Rules and Regulations."

10               Do you see that, sir?

11         A.    Yes.

12         Q.    Now keep that page open, but turn back to

13   Exhibit Number 17, which you should also have there.

14         A.    Okay.

15         Q.    Do you see that that says Membership Plan?

16         A.    Yes.

17         Q.    Is that the document that you indicated in

18   that agreement in Exhibit Number 14 that you had

19   received and read and understood?

20         A.    That is the document that I signed that I had

21   received and read and understood, I believe.

22         Q.    Well, but you were pointing at your Membership

23   Agreement as being the document that you had read and

24   understood.

25               I'm asking you, sir, whether the sentence in



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 30 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                              30

1  Exhibit Number 14, the page 168 of it that acknowledges

2  that you have read and understood the Membership Plan

3  refers to the document that is Exhibit Number 17 in

4  front of you.

5       A.   Yes, I believe that's true.

6       Q.   Okay.  So the Membership Plan in front of you,

7  you have acknowledged on three different occasions that

8  you have received it and understood it, right?

9       A.   Correct.

10      Q.   Okay.  Keep number 17 in front of you and

11 let's turn over to page 527 of that plan.

12           MR. LEHRMAN:  547?

13           MR. LINSCOTT:  527.

14 BY MR. LINSCOTT:

15      Q.   On page 527, which is page seven of the

16 document, the first section on that page reads

17 Membership Deposit Required To Acquire a Membership.

18           And it says, "Each person who desires to

19 acquire a membership will be required to pay a

20 refundable membership deposit determined by the club

21 from time to time."

22           And, in fact, you did pay such membership

23 deposits, correct?

24      A.   Correct.

25      Q.   You paid a membership deposit when you became



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 31 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                              31

1   a spa and club member, you paid an additional deposit

2   when you did an associate membership, and then you got a

3   refund of a portion of that when you reverted back to a

4   spa member, correct?

5        A.   Correct.

6        Q.   And then also on page 527 under the section

7   that reads Refund of Membership Deposit, under the

8   paragraph (a) it says, "Members who resign prior to 30

9   years."

10        It says, "A member who resigns less than 30

11   years after joining the club will receive a refund when

12   the resigned membership is reissued by the club to a new

13   member."

14        And that's the same language you remember

15   seeing in your Membership Agreement that we talked about

16   a little earlier, correct?

17        A.   Correct.

18        Q.   Now let's turn over to page 528 of Exhibit

19   Number 17.  Do you see the section at the bottom that

20   says Transfer of Membership?

21        A.   Yes.

22        Q.   And the first sentence under that, it says "A

23   member may transfer his or her membership only to the

24   club."

25        Now since you have read this document, you



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 32 of 125

NORMAN HIRSCH                                        February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                       32

1   understood that when you transferred your membership,

2   you had to transfer it to the club, correct?

3        A.   Transfer of membership, I don't even know what

4   that -- let me read this.

5        Q.   Sure.

6        A.   What was the question?

7        Q.   The question was you had read the sentence I

8   read to you back in 2006 and you understood that when

9   you wanted to transfer that membership, you had to

10  transfer it only to the club?

11       A.   I -- yeah.  I never dealt with the issue of

12  transferring a membership, so I don't know what that is

13  applicable to.

14       Q.   Okay.  Let's look at the next sentence then.

15  It says, "Should a member desire to resign from the

16  club, the member shall be required to give written

17  notice to the club."

18            It says, "The resigned membership will be

19  placed on a waiting list and will be reissued on a

20  first-resigned, first-reissued basis as follows."

21            Is that how you understood the resignation

22  process and being placed on a resignation list worked?

23       A.   Yes.

24       Q.   Okay.  That's how you understood it?

25       A.   Yes.



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 33 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    33

1        Q.   Now let's go to paragraph (a) on that same

2    page, Exhibit Number 528.  It says, "Prior to the

3    initial sale of all of the memberships in the resigned

4    member's category of membership" -- and your category

5    was social and spa for most of the period of time,

6    correct?  Yes?

7        A.   Yes.

8        Q.   -- "in the resigned member's category of

9    membership, provided there is a resigned membership on

10   the waiting list, every fifth membership issued in that

11   category will be a resigned membership from the waiting

12   list."

13          You had read that language before you signed

14   each of those three agreements, right?

15       A.   I never focused on that.  Let me see.

16          I'm reading it.  I'm not sure what it means,

17   but I think that's what you're implying, that it says

18   five people instead of one.

19       Q.   Well, are you suggesting to me, Mr. Hirsch,

20   that you are unable to understand what those words mean

21   that I have just read to you?

22       A.   Well, I'm not -- I never transferred my

23   membership, so I didn't understand, probably never read

24   that, because it's not a -- didn't -- I'm not

25   transferring it.  I didn't understand what that means.



1      Q.   Well, you do understand, sir, that the first

2  sentence on page 528 of Exhibit --

3      A.   It's not like I'm giving it to somebody else

4  or something.

5      Q.   Let's try to break this down, sir.

6      A.   Okay.

7      Q.   Page 528, first paragraph under Transfer of

8  Membership to the Club, the first sentence says, "A

9  member may transfer his or her membership only to the

10  club."

11          That's pretty clear, isn't it?

12      A.   Yes.

13      Q.   Can't transfer it to anybody else, correct?

14      A.   Correct.

15      Q.   Let me go back to help you understand that,

16  sir.

17      A.   Okay.

18      Q.   Grab any one of the 14, 15, or 16 documents

19  that we've been looking at and tell me which one you

20  have.

21      A.   Okay.

22      Q.   Which one do you have?

23      A.   Sixteen.

24      Q.   Sixteen.   Turn again to Page No. 147 of 16.

25      A.   Okay.



1    Q.   We read this language earlier, but it might

2   help you understand the Membership Plan we're going

3   through.

4             Under section (a) under Roman numeral three it

5   says "Members who resign prior to 30 years."

6             It says, "A member who resigns less than 30

7   years after joining the club will receive a refund when

8   the resigned membership is reissued by the club to a new

9   member."

10            Do you understand that?

11   A.   Yes.

12   Q.   So the resigned membership will be reissued by

13   the new club to a new member before you are entitled to

14   get your deposit back, correct?

15   A.   Correct.

16   Q.   Now let's turn back over to Exhibit Number 17

17   that we were looking at a moment ago.

18   A.   Okay.

19   Q.   Page 528.  And it says there that you can only

20   transfer your membership to the club.  And the language

21   we just saw in number 16 said the club will, you'll get

22   a deposit back when the club reissues that resigned

23   membership to a new member.  Correct?

24   A.   Say that again, please.

25   Q.   Yes.  Your Membership Agreement says that your



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 36 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                              36

1  resigned membership will get you your deposit back when

2  it's reissued by the club to a new member.

3        You understand that?

4        A.   That I understand completely.

5        Q.   Now we come back over to the Membership Plan,

6  Exhibit 17, page eight, and we see the language that

7  says "A member may transfer his or her membership only

8  to the club," and that fits in with the language in your

9  Membership Agreement that says the club has to reissue

10  that membership to somebody else before you get your

11  deposit back, correct?

12        A.   I'm just taking issue with the words transfer

13  of membership, where the word transfer was nowhere in

14  the thing that I signed.

15        So I didn't probably focus on that because I

16  didn't think of myself as transferring the membership at

17  any time.

18        I see where you're applying the words that are

19  the same to that paragraph in this paragraph, but I

20  don't put the correlation between the two as being one

21  to one.

22        Q.   Well, you also on page eight -- excuse me,

23  Exhibit Number 17, Bates page 528, saw the language in

24  paragraph (a) that refers to "the reissue of a resigned

25  member's category of memberships will be issued provided



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 37 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                              37

1   there is a resigned membership on the waiting list.

2   Every fifth membership issued in that category will be a

3   resigned membership from the waiting list."

4           You knew you were going to be on the waiting

5   list when you resigned, correct?

6       A.   Correct to that question.

7       Q.   And this sentence clearly indicates that in

8   order to get off of the resignation list, you have to

9   work your way to the top, and when four additional

10  memberships have been sold, if you were at the top of

11  the list, yours would be issued as the fifth one that

12  would be issued and you would get your money back.

13          Did you understand that?

14      A.   I understand what you're saying, but I do

15  not -- I did not and I still do not necessarily agree

16  that something that you're reading under Transfer of

17  Membership is the same area as what I read when I signed

18  this one that talks about refund of membership, which

19  doesn't say anything about four or five memberships.  It

20  just says a member, which is one.

21      Q.   But each of your agreements, Membership

22  Agreements say I, Mr. Hirsch, have read this document

23  and I have read the Membership Plan and I understand the

24  Membership Plan, and that's part of the representation

25  that you made to RBF on every one of the three



 1   memberships that you entered into, correct?

 2        A.   Correct.

 3             MR. LEHRMAN:  Form, and you can answer.

 4             MR. LINSCOTT:  I tell you what.  You can have

 5        a form objection to everything that I ask.  All

 6        objections reserved.  I'll stipulate that with you.

 7        Okay?

 8             MR. LEHRMAN:  Very good, thank you.

 9             MR. LINSCOTT:  You are welcome.

10   BY MR. LINSCOTT:

11        Q.   And you cannot deny, because it's in the

12   Membership Plan that we're looking at on page 528 of

13   Exhibit Number 17, that that plan says that when a

14   membership is on the list, "every fifth membership

15   issued in that category will be a resigned membership

16   from the waiting list."

17             The waiting list that you were on after you

18   resigned, correct?

19        A.   I cannot deny that it says that, but again,

20   it's under a category of Transfer of Membership,

21   transfer of membership to the club.

22             I'm not, I never considered that as related to

23   what I signed, which said Refund of Membership, which is

24   what I wanted to do, and where it says a member.  That's

25   the way I understood it and that's the way it was



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 39 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                          39

1   explained to me by Amy Shayman when I signed this thing

2   in the first place.

3        Q.   Well, when you read this Membership Plan,

4   Exhibit Number 17 -- and you had three opportunities to

5   do it because you signed three different contracts, and

6   each of them you assured RBF that you had read and

7   understood this document.

8             When you got down to read paragraph (a) on

9   page 528 and it was talking about, it was talking about

10  the waiting list, that's what you understood that you

11  had to go on in order to get your money back was a

12  waiting list, right?

13       A.   Yes.

14       Q.   And it was talking about if you're on the

15  waiting list, that only every fifth sale was going to be

16  of a resigned person on the membership list.

17            Did that not cause you to go ask somebody some

18  questions if that's not the way you understood it?

19       A.   I did not ask anybody questions about that

20  because I never focused on that.  I never --

21       Q.   Did you read it?  Did you read the language

22  that said "every fifth membership issued in that

23  category will be a resigned membership from the waiting

24  list (the other four memberships coming from the club's

25  unissued memberships)"?



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 40 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    40

```
 1              Until today, had you read the language?
 2      A.   I had read the language by Ritz telling me
 3  that.  When I complained that it should be one to one as
 4  I signed, they came back and said "No, it's not one to
 5  one, it's five to one."
 6              I said, "I signed something that said one to
 7  one."
 8              Now I see what they are referring to.  I asked
 9  for these documents actually after Trump took over,
10  because I brought that up, or sometime thereafter, and
11  they said they didn't have them.  Debbie said she didn't
12  have it and I had to go to RBF to get it.  That's what
13  she said.  It's in the documents there.
14              So I wanted to see it because I didn't have
15  anything to -- I didn't know where to find it, what they
16  kept saying.  I signed what I signed.  It said a new
17  member, somebody joined.
18              It's kind of a moot point anyway because, you
19  know, you're not the owner now anyway, but that was my
20  understanding.
21      Q.   Your answer to that question was "Now I see
22  what they are referring to.  I asked for these documents
23  actually after Trump took over, because I brought that
24  up, or sometime thereafter, and they said they didn't
25  have them.  Debbie said she didn't have it and I had to
```



1    go to RBF to get it.  That's what she said."

2             Do I understand that answer to mean that you

3    never ever once got a copy of the Membership Plan when

4    you signed each of those three Membership Agreements and

5    each of which you said "I received it and I have read

6    it," you never ever received it by that time?

7        A.   No, I'm not saying I never received it.  I

8    probably had received it and I probably had it in the

9    folder somewhere, but I never saw it written like that,

10   because I have never focused on that area probably of

11   transfer of membership.

12            I never had any need to read a paragraph

13   that's not related to me.  And, you know, that's just

14   the facts.

15       Q.   So if I understand your testimony correctly,

16   and tell me if I'm wrong, you read the title of that

17   paragraph on page 528 of Exhibit Number 17, the title

18   being Transfer of Membership to the Club, decided that

19   didn't apply to you, so you didn't read the rest of the

20   language?

21            Is that how I understand your testimony?

22       A.   That's probably what happened, to be honest.

23       Q.   So the first time anybody ever drew your

24   attention to it was after Trump had purchased the club

25   and you asked for where did this one in five come from?



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 42 of 125

NORMAN HIRSCH                                     February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    42

1        A.   No.  No, that isn't the first time.  It had

2    happened before when I was on the membership list, and

3    then I heard there was people talking about five to one.

4            So I had heard about it prior to Trump buying

5    the club, but I was on the -- when I was on the

6    membership list, my name didn't seem to move up.  I kept

7    calling and I'm like "Why is it taking so long?"  Blah,

8    blah, blah.

9            Later I learned that it was five to one, and

10   now you're showing me where it was.  I never, I never

11   focused on where it was in the document that I referred

12   that I read prior.

13       Q.   In that answer you on several occasions

14   referred to the membership list.

15           Were you referring to the membership

16   resignation list?

17       A.   Membership resignation list, yes.

18       Q.   You don't deny that you had received a copy of

19   the Membership Plan, Exhibit 17?

20       A.   I don't deny it.

21       Q.   So you didn't go back in your own folders and

22   start thumbing through all the documents you had

23   received and try to find out where this one in five came

24   from, correct?

25       A.   Correct.  I went back in the documents a few



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 43 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                              43

 1  times, but I've never, never found, you know, that and

 2  asked about it even.

 3      Q.   And do I understand correctly that when you

 4  made inquiry of whichever club it was, whether it was

 5  the Ritz-Carlton Club or the Trump Club, when you made

 6  inquiry after you were on the resignation list for some

 7  point in time, someone said to you "Well, it's only one

 8  in five that comes off the resignation list"?

 9      A.   Correct.

10      Q.   And that's the first time that you had

11  cognitive knowledge of that?

12      A.   Correct.

13      Q.   Because you hadn't read the language in the

14  Membership Plan that appears on page 528 in the Transfer

15  of Membership section?

16      A.   No.  I did not.  You just brought in -- the

17  last part was wrong, but everything else was right.

18      Q.   Well, let me go back and ask my question

19  again, and we'll see what portion of it is right and

20  which portion is wrong.

21      A.   Okay.

22      Q.   I said -- let me get my scrolling stopped here

23  so I can read it to you.

24           It said, "And do I understand correctly that

25  when you made inquiry of whichever club it was, whether



Case 9:13-cv-80456-KAM Document 113 Entered on FLSD Docket 03/20/2015 Page 44 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    44

 1   it was the Ritz-Carlton Club or the Trump Club, when you

 2   made inquiry after you were on the resignation list for

 3   some period of time, someone said to you 'Well, it's

 4   only one in five that comes off the resignation list?'"

 5           And to that you said "Correct."

 6           I said, "Because you hadn't read the language

 7   in the Membership Plan that appears on page 528 in the

 8   Transfer Of membership section?"

 9           And you said, "No, I did not.  You just

10   brought in -- the last part was wrong."

11       A.    Okay.

12       Q.    What part of my question was wrong?

13       A.    No, I'm sorry.  Because I did not read -- I

14   did not is correct, yeah.

15           I thought you said that I had read it.  No.

16       Q.    The point of it was you hadn't ever read the

17   one in five portion of the language on page 528 of the

18   Membership Plan because you read the title of a Transfer

19   of Membership to the club and you didn't think it

20   applied to you, so you had never read it until you

21   started making these inquiries?

22       A.    I never read it until now.  I heard it.

23       Q.    So when you started making these inquiries,

24   someone at the club told you it's only one in five, and

25   it's not until today when I brought it to your attention



1  you see where that one in five comes from, correct?

2       A.   Correct.

3       Q.   Language which you hadn't read because from

4  the title, you had determined that the information under

5  that title did not apply to you?

6       A.   Correct.

7       Q.   Thank you.

8            MR. LINSCOTT:  Why don't we take just a

9       five-minute break and we'll continue on.

10           THE VIDEOGRAPHER:  Off the video record at

11      10:57.

12             (A recess was taken.)

13           THE VIDEOGRAPHER:  Back on the record at

14      11:03.

15           MR. LINSCOTT:  Number 18.

16         (The document was marked Exhibit 18

17  for identification.)

18  BY MR. LINSCOTT:

19      Q.   Mr. Hirsch, I have handed you what has been

20  marked for identification as Exhibit Number 18.

21           Is that your signature that appears on the

22  left-hand side approximately two thirds of the way down?

23      A.   Yes.

24      Q.   Can you tell me what prompted you and your

25  wife's resignation from the Ritz-Carlton Golf Club & Spa



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 46 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                              46

 1   on February 25th of 2010?

 2        A.   Yes.

 3        Q.   What was it?

 4        A.   When we went back from being that associate

 5   provisional golf member to become back to the spa

 6   member --

 7        Q.   Yes.

 8        A.   -- we had paid 75,000 and then we were coming

 9   back to 55,000.

10        I learned shortly thereafter that the

11   membership for a spa member then at that time, after the

12   two years, had dropped to 35,000.

13        So I said to Jennifer, "Can I have my 20,000

14   back?"  And she said no.

15        I said well -- she says, "What you can do,"

16   and she told me that I could put my name on the

17   resignation list, and when it came to the top, I could

18   resign.  I'd get my 55 back and then I could rejoin at

19   35.  That's how I could get back to what was the current

20   price.  So that's what I did.

21        Q.   And were you given any assurances by this

22   Ms. Shayman, who told you this allegedly --

23        A.   Barbosa.

24        Q.   Any assurances from Ms. Barbosa that if when

25   your name got to the top of the list and you got $55,000



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 47 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                              47

 1   back, that the membership for the social and spa was
 2   still going to be 35,000?
 3        A.   That's what I understood, yeah.
 4        Q.   Well, you knew it had changed at one point in
 5   time to reduce it from 55 to 35.
 6             What was to keep the owner of the club from
 7   changing it again and making it even larger than 55?
 8        A.   Nothing would prevent them from doing that, I
 9   suppose.
10        Q.   And before you exercised your right of
11   resignation, did you go back and did you read carefully
12   all of the documents that you had signed in connection
13   with your membership at the club to make sure that what
14   Ms. Barbosa was telling you was fully inclusive of all
15   the agreements that you had signed?
16        A.   No, I didn't do this, read all the old
17   documents.  She told me what -- you know, put your name
18   on the resignation list, get your money back and rejoin.
19   You'll get your $25,000 back.
20             It seemed a no-brainer, because I could still
21   use the club, and that's what I did.
22        Q.   I'd like to have you go back to some documents
23   that we looked at earlier today, Exhibit Number 14, 15
24   and 16.  We're going to do them in order.  If you could
25   put number 14 in front of you again.



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 48 of 125

NORMAN HIRSCH                                      February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                     48

```
 1        A.    Okay.

 2        Q.    And just for context, this was your first

 3   Social and Spa Membership Agreement you signed in 2006,

 4   correct?

 5        A.    Correct.

 6        Q.    I'd like to now direct your attention to page

 7   167 of that document.  And under Roman numeral four,

 8   Acknowledgment of Membership Rights, did you read that

 9   section when you acquired any of your three membership

10   agreements with the Ritz-Carlton club?

11        A.    I probably did.  Again, the same thing.

12        Q.    There's a large paragraph immediately under

13   Roman numeral four, and I'm going to call your

14   attention -- you can call my attention to any portion of

15   it you want to that you think might be responsive to my

16   questions, but I'd like to have you look at the sentence

17   five lines from the bottom of that large paragraph, a

18   sentence that begins "In the event."

19        A.    Yes.

20        Q.    It says, "In the event that the club

21   facilities."

22              Do you understand what the reference to club

23   facilities is there?

24        A.    Yes.

25        Q.    And what do you understand the club facilities
```



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 49 of 125

NORMAN HIRSCH                                        February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                       49

1   to be?

2        A.    The clubhouse and the spa and --

3        Q.    Tennis courts, swimming pool, golf course?

4        A.    Yeah, I'm not sure I focused on golf course,

5   but pretty much the stuff around the clubhouse.

6        Q.    When you upgraded your membership the

7   following year to the associate membership, did club

8   facilities include the golf course?

9        A.    Oh, yeah.

10       Q.    So you understood the term club facilities to

11  be the physical facilities that were the club that

12  either supported the services given to the members or

13  permitted the members to get services like the spa, the

14  dining room, the tennis courts?

15       A.    Correct.

16       Q.    That sort of thing.

17       A.    Correct.  Sorry to interrupt.

18       Q.    Turning back to that sentence again, "In the

19  event that the club facilities are sold and the buyer."

20            Tell me what you understood a buyer of

21  anything that is sold to be.

22       A.    The new owner.

23       Q.    The person who purchases whatever it is being

24  sold?

25       A.    Correct.



NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                   50

1       Q.   So you would understand that to be, the

2    reference to buyer meaning the buyer of the club

3    facilities, correct?

4       A.   Correct.

5       Q.   Okay.  So "In the event that the club

6    facilities are sold and the buyer assumes liability for

7    the repayment of the membership deposit" -- the

8    membership deposit is the deposit that you made in

9    connection with this contract, right?

10      A.   Yes.

11      Q.   "the undersigned" -- that would be you,

12   correct?

13      A.   Yes.

14      Q.   -- "shall look solely to the new owner"-- the

15   person who purchased it, the buyer, correct?  Yes?

16      A.   Yes.

17      Q.   So you will look solely to the new owner for

18   repayment of the membership deposit.

19           Tell me what you understand that to mean.

20      A.   Anybody that buys in the club now has the

21   responsibility for paying me back the deposit if --

22      Q.   Now just a moment.  Let's go on now.

23      A.   That they assume liability.  Go ahead.

24      Q.   "And the seller of the club facilities shall

25   be released from all liability for the repayment



```
 1   thereof."
 2            So you're releasing the seller of the club
 3   facilities from all liability for the repayment of your
 4   deposit?
 5            MR. LEHRMAN:  Again, I have a standing
 6        objection, correct?
 7            MR. LINSCOTT:  You have a standing objection.
 8            MR. LEHRMAN:  Thank you.
 9            THE WITNESS:  Is there a question?
10   BY MR. LINSCOTT:
11        Q.   Yes.  Do you understand it that way?
12        A.   What way?
13        Q.   That upon the sale of the club facilities and
14   the assumption of the liability for the repayment of
15   your deposit, you released RBF, Ritz-Carlton, whatever
16   term you call this, the owner, referred to as the owner.
17        A.   Yes, that's pretty much right.  The "shall be
18   released," to me it just, you know, if I have anything
19   to do with that, but what I mean is -- I'll just say yes
20   for now.
21        Q.   So the real issue is whether or not the buyer,
22   the new owner of the club facilities assumed the
23   obligation to repay your membership deposit in order for
24   your release of Ritz to be effective, correct?
25        A.   Correct.
```



1    Q.   Okay.  And you don't have any personal

2    knowledge as to whether or not the Trump organization

3    did or did not assume that liability when they purchased

4    the club facilities, correct?

5         A.   Correct to a point that I understood from --

6              MR. LEHRMAN:  So you're not being asked to

7         reveal what you've discussed with counsel.

8              THE WITNESS:  Other than that, no.

9    BY MR. LINSCOTT:

10        Q.   Communications you've had with Mr. Lehrman and

11   other people in his office are what's called privileged.

12        A.   I may have heard something on the form or

13   something, somebody might have heard that, they saw the

14   agreement or something, but personally seen it myself,

15   no.

16        Q.   So we in fact have given a copy of the

17   Purchase and Sale Agreement between, that exists between

18   RBF and JGC, which is the name of the Trump

19   organization, but you haven't seen that document?

20        A.   No, I haven't.

21        Q.   So you can't speak to whether or not that

22   document does or does not in fact release Trump -- I

23   mean release -- strike that.  I'll start all over again.

24   I tied myself up.  My apologies.

25             You have no knowledge of whether or not under



1    that document the Trump organization assumed the

2    liability for the repayment of your membership deposit,

3    correct?

4         A.   I have no direct knowledge of that.

5         Q.   Okay, fine.

6         A.   Other than after the fact, with my lawyer.

7              MR. LINSCOTT:  Number 19.

8          (The document was marked Exhibit 19

9    for identification.)

10   BY MR. LINSCOTT:

11        Q.   Mr. Hirsch, I have handed you what has been

12   marked for identification as Exhibit Number 19.  The

13   first 21 pages of this exhibit is a motion that your

14   lawyers filed on your behalf with the Court I think the

15   week before last.  It's called a Motion to Certify the

16   Class.

17             Have you ever read this document before, sir?

18        A.   Yes.  Well, let me look, but I did --

19        Q.   Sure, take your time.

20        A.   I did read the one that my attorney gave me,

21   which I'm assuming is going to be the same thing.

22        Q.   Thumb through it so you can try to confirm

23   that it's either the exact one or similar to the exact

24   one you looked at.

25        A.   By the way, all those numbers on the bottom



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 54 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    54

1    that you said I'd see are not there.

2         Q.   They are not on this one, no.  This is a court

3    document, but we'll refer to this one.

4         A.   When you said 21 pages, the page numbering is

5    different on the top and the bottom.

6         Q.   We'll use the numbers at the top on this one.

7              You see the number that says 1 of 25?

8         A.   Yes.

9         Q.   We'll use those numbers.  Those are official

10   court-numbered pages.

11        A.   Okay.  So you are asking me to look at the

12   first 21 pages?

13        Q.   Well, using those numbers, I'll ask you to

14   look at the first --

15        A.   Those changed to, up to Exhibit A.

16        Q.   Look through the first 25 pages.

17        A.   Okay.  I believe this is the one I read, that

18   my attorney sent me.

19        Q.   I would like to have you turn, using those

20   same numbers up at the top of the page, turn to page 9

21   of 25 up at the top.

22        A.   Okay.

23        Q.   And actually, I'm going to start over on page

24   eight, the incomplete paragraph that begins at the end

25   of page eight which says, "On December 4, 2012, Trump



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 55 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                  55

1  purchased the club from Ritz for $5 million, and it

2  purportedly assumed the refund obligation found in

3  Plaintiffs' and Class Members' Membership Agreements.

4  The Purchase and Sale Agreement sets forth the terms and

5  conditions of the sale of the club to Trump and the

6  assumption of refund obligations."

7          Even though this motion was being filed on

8  your behalf and it references the agreement between RBF

9  or Ritz and Trump, you didn't read the Purchase and Sale

10  Agreement?

11      A.   No, I didn't read the Purchase and Sale

12  Agreement.

13      Q.   Okay.  Did your counsel offer it to you for

14  you to read if you chose to do so?

15      A.   He showed me that -- I think if I had asked

16  can I read it, he would have given it to me.  He showed

17  it to me like this.

18      Q.   Was it a great big one like this?

19      A.   It wasn't that big.  About that big.

20      Q.   Okay.  Continuing on at the top of the page 9

21  of 25 it says "Under it," and the "it" is the Purchase

22  and Sale Agreement; you would agree with me, correct?

23      A.   You mean is "under it" referring to the

24  Purchase and Sale Agreement?  I would, of course.

25  That's what it says.



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 56 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                          56

1        Q.    Okay.   Under the Purchase and Sale Agreement,

2   "Trump agreed to refund membership deposits and to honor

3   the refundable membership categories Ritz had sold to

4   plaintiffs and class members."

5           This is the part I'm going to ask you

6   questions about.   "But, as set forth in the First

7   Amended Complaint, Ritz failed to determine if Trump had

8   the financial wherewithal and good-faith intention to

9   satisfy the assumed refund obligations under the

10  Membership Agreements and Membership Plans."

11          And my question to you, sir, is why does Ritz

12  have or why did Ritz have an obligation to determine if

13  Trump had financial wherewithal and good-faith intention

14  to satisfy the refund obligations?

15       A.    That's a good question.

16          I would say that as a businessman, if I'm

17  dealing with a customer and the customer needs something

18  that another vendor can provide that I can't, I'll

19  certainly want to make sure that that other vendor is

20  going to handle my customer well.

21       Q.    My question is more to the point than that.

22          My question is in those agreements that you

23  signed on three different occasions with RBF doing

24  business as the Ritz-Carlton Club & Spa, was there any

25  provision in any of those that imposed, to your



1   knowledge, an obligation upon Ritz to determine if the

2   buyer of the club, whether it be Trump or anybody else,

3   had the financial wherewithal to pay the refund

4   obligations?

5        A.   Let me look back at that paragraph that we

6   looked at.

7        Q.   Take your time.

8        A.   Or that sentence that you pointed before where

9   it said --

10        Q.   I'll even tell you where it is.  I think you

11   are looking at Exhibit Number 17.  And let me get my

12   copy of Exhibit Number 17.

13        A.   No, it wasn't 17.

14        Q.   It's not 17.  I think it's going to be 16.

15   It's going to be 16.

16        A.   Yeah.  It was 148, I think.

17        Q.   It is 148, exactly, of Exhibit Number 16.

18        A.   "Buyer assumes for the" --  okay, I have

19   refreshed myself on that.  What was the question?

20        Q.   My question was turning your attention back to

21   Exhibit Number 19, page 9 of 5, where in any of those

22   agreements did RBF/Ritz undertake an obligation to

23   determine if the buyer of the club facilities, whether

24   it be Trump or anybody else, had the financial

25   wherewithal and good-faith intention to pay the refund



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 58 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                   58

1  deposits to the membership?

2      A.   It doesn't say that.

3      Q.   And other than what you might have learned

4  from your lawyer, do you know of any other source that

5  would impose that obligation to RBF/Ritz, an obligation

6  to make sure that the buyer of the club facilities has

7  the wherewithal to repay the deposits to the membership

8  when they are due and the intention so to do?

9      A.   A legal document?  You mean a written

10  document?

11      Q.   Any document that would impose that obligation

12  upon RBF.

13      A.   That's a good question.  I don't know.  I

14  don't know of any document.

15      Q.   Okay.

16      A.   I would --

17      Q.   Go ahead.

18      A.   No, that's Okay.

19      Q.   And then following after the semicolon of that

20  same sentence we were just on on page 9 of 25, and it

21  says that "Ritz unfairly exercised its discretion under

22  the Membership Agreement to sell the club to Trump

23  without ensuring the membership rights of class members

24  would be protected."

25          And my question was what agreement or other



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 59 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                         59

1   source of legal obligation between you and RBF imposed

2   upon Ritz discretion to be exercised by it in selling

3   the club facilities to Mr. Trump?

4        A.   Okay.  There is nothing that was between me

5   and Ritz that I signed or RBF that says that, that they

6   were, would have to exercise discretion when they sell

7   it.  But as I said, just seems like common business, you

8   want to be good with your customers.

9             So I don't know what your internal policies

10  say, if you say something, whether you should exercise

11  discretion or that you should make sure that whoever you

12  sell it to treats the people that were your customers

13  the way they should.  I don't know what that might be.

14  So as far as I'm concerned, I didn't see anything like

15  that.

16       Q.   Well, what I understand you to be saying, and

17  let me know if I'm hearing you correctly, what you're

18  saying is you think it might be good business practices

19  to exercise discretion in that fashion, even though it's

20  not a legal obligation; is that correct?

21       A.   It's what I do.

22       Q.   Because it's good business practice?

23       A.   It's good business practice and it's just

24  good, period.

25             And I don't know, I work for some big



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 60 of 125

NORMAN HIRSCH                                              February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                              60

1   companies and they have -- I worked for Procter &

2   Gamble.  They have rules and procedures for just about

3   everything.

4           So I don't know whether you have anything for

5   when you do that, and if you do, then maybe that's

6   valid.  I don't know what my attorney knows about your

7   company.  So I don't know why those words -- from my

8   point of view, it's just good business.  I don't know

9   specifically what that's referring to.

10      Q.   You made specific reference to the fact that

11  Procter & Gamble is a customer of yours.

12      A.   No, no, they are not a customer.  I worked for

13  them at one time.

14      Q.   Oh, you worked for them at one time?

15      A.   Yes.

16      Q.   Do you have customers that impose upon you in

17  supplying your internet security services, give you

18  significantly long contracts for you to sign?

19      A.   No.  Customers don't, no.

20      Q.   Okay, how about any of the goods and services

21  you buy from major vendors that you then pass on to

22  people, do you have long and detailed contracts for the

23  purchase of that?

24      A.   I wouldn't call them long and detailed, no.

25      Q.   None of them?



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 61 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                         61

1        A.    No.  I would say that this would be about the

2    length of the biggest one right here.

3        Q.    And you are pointing to one of the copies of

4    the agreements that you have in this case?

5        A.    Yeah.

6        Q.    And what do you understand the purpose of

7    those vendors from whom you're buying computer

8    technology and equipment to get a contract from you?

9    Why are they doing that?

10        A.    Well, they want -- a couple of things.  They

11    want to make sure that we focus on selling their

12    product, number one.  That's the most concern.

13            And they want to make sure that we don't say

14    anything we're not supposed to in terms of the

15    performance of what their products can do, that it may

16    not be able to do, that we'll be, you know, good with

17    them.

18        Q.    Well, as I understand it, they don't -- they

19    want to outline in a contract with you exactly what

20    their obligations, responsibilities and benefits are of

21    a contractual relationship with you, correct?

22        A.    Yes.  They do that too.  They also tell us

23    their obligation is to provide you with the product when

24    you order it and keep it up to date and do their best

25    efforts to make sure it's state-of-the-art, that kind of



 1   thing.

 2       Q.   And did you understand that, in your dealings

 3   with RBF with respect to the purchase of a Membership

 4   Agreement the purpose of having a contract with you was

 5   to outline the responsibilities it owed to you and you

 6   owed back to it?

 7       A.   Yes, I think that's generally with anybody.

 8       Q.   And you understood that in that contract, the

 9   obligations between the parties were as set forth in

10   those contractual arrangements, those membership

11   agreements?

12       A.   Yes, I think that's their intent.

13       Q.   And that brings me back to the paragraph we

14   were on, the sentence we were on before on page 9 of 25

15   of Exhibit Number 19, and asking you where it was in

16   those agreements that Ritz had to determine -- excuse

17   me, that Ritz unfairly exercised its discretion under

18   the Membership Agreement.

19            Where in the Membership Agreement was the

20   confines of that discretion outlined?

21       A.   It wasn't in the Membership Agreement that I

22   could, would say I saw.

23            I guess that refers to maybe what happened

24   afterward that seemed that way.

25       Q.   Was there anything in the Membership Plan that



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 63 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                   63

1   was incorporated in your Membership Agreement that

2   defined the nature of that discretion that Ritz had?

3        A.   No, not that I'm aware of.

4        Q.   Okay.  Was there anything in the rules and

5   regulations that defined the nature and confines of the

6   discretion that Ritz had in that regard?

7        A.   No, not that I'm aware of.

8        Q.   I'd next like to have you turn to page 20 of

9   25.

10       A.   Okay.

11       Q.   Of Exhibit Number 19.

12       A.   Nineteen?

13       Q.   Exhibit Number 19, which is the class

14  certification.

15            MR. LEHRMAN:  Front of the document.

16            THE WITNESS:  Yes, yes.

17  BY MR. LINSCOTT:

18       Q.   Thanks.  And on that page, it might be better

19  to start over on page 19 of 25, before we go on.  Maybe

20  that's actually where I told you to start.

21            At the bottom of page 19 of 25, the last two

22  lines above the footnote say "Here, all class members,

23  by definition, purchased class memberships" -- are you

24  with me?

25       A.   Yes.



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 64 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                   64

1              MR. LEHRMAN:  I think he is correcting you

2          because you said class membership, not club

3          membership.

4              MR. LINSCOTT:  I beg your pardon.

5    BY MR. LINSCOTT:

6       Q.   "Here, all class members, by definition,

7    purchased club memberships, paid refundable deposits,

8    did not sign the Trump Legacy Addendum, and have not

9    received a refund.  The common proof for plaintiffs'

10   class members' claims consist of the uniform Ritz

11   memberships, the Ritz Membership Plan, the Trump

12   December 17 letter to members, the Trump Legacy Addenda,

13   the class list that identifies every class member, and

14   the amount of their deposit."

15             Then it goes on to say, "The predominant

16   contractual duty plaintiffs are claiming defendants

17   violated here arises from the language of the Membership

18   Agreement and Plan regarding refund rights, which is

19   substantially identical for every member.  The

20   predominant liability question (for breach of contract)

21   is whether or not defendants have a legal duty under the

22   Membership Agreement and Plan to refund deposits and

23   have breached this duty because Trump and Ritz failed to

24   secure class members' refund rights under the terms of

25   their sale of the club."



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 65 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                         65

1            And my question is with regard specifically to

2    that last phrase I just read is what obligation did

3    Ritz/RBF fail to observe in securing the refund rights

4    to club members under its contract with Trump?

5            What was it supposed to do that it did not do?

6        A.   I don't know.

7        Q.   Do you know of any contractual obligation that

8    RBF entered into with you and the other members of your

9    putative class that they violated in the language of the

10   contract that RBF entered into with Trump for the sale

11   of the club facilities?

12       A.   I don't know of any -- say the last part.  I'm

13   sorry, I started to answer before you finished and then

14   I realized you may have said something at the end that I

15   didn't get right.

16       Q.   Do you -- I'm going to repeat it if I can.

17           Do you know of any contractual obligation that

18   RBF entered into with you and the other members of your

19   putative class that it violated in the language of the

20   contract that it entered into with Trump for the sale of

21   the club facilities?

22       A.   Can I ask you to repeat it one more time?

23       Q.   Sure.  In connection with the contract that

24   Trump, that RBF entered into with Trump to sell Trump

25   the club facilities --



1      A.    Okay.

2      Q.    -- what did RBF fail to do to protect the

3  interests of the members that it had a contractual

4  obligation with the membership to protect?

5      A.    That's something I can't answer.  I never read

6  that agreement.

7      Q.    Well, can you tell me what obligation you

8  believe that RBF had in connection with the sale of club

9  facilities that may have been violated in its agreement

10 with Trump?

11          What was it supposed to do to protect the

12 interests of you and the other members in selling the

13 club facilities to Trump that it did not do?

14     A.    Well, I would think that, I mean I would

15 assume that Trump had enough money to pay the refundable

16 deposits myself, but I would think that whoever they

17 sold it to, they should pretty much be assured that the

18 buyer of those refundable deposits that you are kind of

19 offloading when you sell it could repay them.

20 Otherwise, you could just say "I sold it to, you know,

21 this guy on the street.  He's responsible."

22          So how do -- what happens to my thing?  I

23 don't see anything that he now has -- you know what I'm

24 saying?

25     Q.    And I do know what you're saying and we're



1   going to delve into that further.

2        A.   Okay.

3        Q.   But you have already agreed with me that the

4   Membership Agreement that you entered into with RBF

5   outlined its responsibilities to you and your

6   responsibilities to it.  Correct?

7        A.   Correct.

8        Q.   And in that agreement you will agree with me,

9   because we read the language, that when RBF sold those

10  club facilities to Trump, you released RBF from

11  liability so long as the Trump organization assumed and

12  agreed to pay those deposits to you and the other

13  members, correct?

14       A.   Pretty much so.

15       Q.   No other obligation was contained in that

16  sentence or anywhere else in the contract, for that

17  matter, with regard to RBF's obligation of either

18  exercising discretion or investigating Trump's

19  wherewithal?

20       A.   Correct, those words were not in there that I

21  saw.

22       Q.   Thank you.

23            And as a matter of fact, you said you believe

24  that Trump would have the ability to pay -- you have no

25  understanding that the Trump organization that purchased



```
 1    this does not have either the desire, the intent, or the
 2    wherewithal to pay those deposits back to the members if
 3    and when they become due?
 4         A.   I have serious doubts about any intent to do
 5    that right now, to be honest with you.
 6         Q.   Well, do you have any knowledge as to whether
 7    or not the Trump organization, since it's owned, it has
 8    not paid membership refunds regularly when they were
 9    due?
10         A.   No, I don't know -- in my opinion, they owe me
11    now, so I would say yes.
12         Q.   Well, let's talk about that.  You say they owe
13    you now.
14         A.   Yes.
15         Q.   You knew that you were on the resignation list
16    when the club facilities were sold to Trump.
17         A.   Correct.
18         Q.   Did you believe that you were entitled to the
19    refund of your membership deposit the day before the
20    club was sold to Trump?
21         A.   No.
22         Q.   So why do you believe that you are entitled to
23    your money the day after the club was sold to Trump?
24         A.   Not the day after.  Thirty days after.
25         Q.   Why do you believe that you were entitled to
```



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 69 of 125

NORMAN HIRSCH                                        February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                      69

1  your money 30 days after the club was sold to Trump?

2       A.   Because I was shut off from the use of the

3  club, having not done anything, and the agreement that I

4  signed with you, which was transferred to them, said

5  that if they stopped letting me have access to the club,

6  that I'll get a refund in 30 days.

7            So they stopped giving me access to the club,

8  but they didn't give me the refund in 30 days.

9       Q.   So just so I'm clear, whether or not you are

10  correct legally, it's your understanding that Trump

11  undertook the obligation of giving your payment back to

12  you within 30 days after it took over and it did not do

13  so, and that's why you are entitled to your deposit now,

14  correct?

15       A.   Correct.

16       Q.   Not because of anything RBF did?

17       A.   Correct.

18       Q.   Okay.

19            (Discussion held off the record.)

20            MR. LEHRMAN:  Could we take a quick break?

21            THE VIDEOGRAPHER:  Off the record at 11:40.

22            (A recess was taken.)

23            THE VIDEOGRAPHER:  Back on the video record at

24       11:44.  This is the beginning of disk two.

25



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 70 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                   70

1            CROSS-EXAMINATION (NORMAN HIRSCH)

2    BY MR. RUSSOMANNO:

3        Q.    Good morning.  My name is Herman Russomanno.

4    I'm one of Donald Trump's lawyers.  In this case it's

5    Jupiter Golf Club.  I'm going to ask you some questions.

6    I'm going to try not to ask you questions that

7    Mr. Linscott has already covered.

8        A.    Okay.

9        Q.    I'm going to take pauses between my questions

10   because I'm going to go through my notes and outline to

11   see what has not been covered.  I'm going to ask you

12   questions geared more toward the Trump side of the case

13   as well.

14            Brief description.  Did you attend and

15   graduate college?

16       A.    Yes.

17       Q.    What school?

18       A.    Rensselaer Polytechnic Institute.

19       Q.    And you got a specialization and a degree in

20   what?

21       A.    Wasn't really a specialization.  It was more

22   of a general engineering degree.

23       Q.    Are you an engineer?

24       A.    I guess so.

25       Q.    You don't know?



NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                   71

1       A.   Well, how do you define an engineer?  I've got
2   a diploma that says I'm an engineer.
3       Q.   Did you get any post undergraduate degrees?
4       A.   Yes.
5       Q.   Where?
6       A.   University of Miami.
7       Q.   And what did you study there?
8       A.   Master's in engineering.
9       Q.   Anything else other than that?
10      A.   I worked toward a Ph.D. there.
11      Q.   And how many years did you do that?
12      A.   Just about a year.
13      Q.   Ph.D. in what?
14      A.   Ocean engineering.
15      Q.   Any certifications?  For example, lawyers have
16  bar licenses.  We have all them in our wallets.  Do you
17  have any licenses or certifications?
18      A.   I do.
19      Q.   What are they in?
20      A.   Professional engineer.
21      Q.   Anything else?
22      A.   Two states.
23      Q.   Are you still working as an engineer in your
24  day-to-day operations?
25      A.   Again, I could say yes, I could say no.



1  Depends on how you define engineer.

2       Q.   Other than this club that we've been talking

3  about, have you ever been a member of any other country

4  clubs?

5       A.   Country club.  No.

6       Q.   You paused when I said country club.  What

7  about other clubs?

8       A.   Yeah, clubs.

9       Q.   What types?

10      A.   Flying club, scuba club.  I think that's about

11 it.  I might think of one later.

12      Q.   Did any of those clubs require you to enter

13 into contracts and agreements such as the membership

14 plan that Mr. Linscott showed you?

15      A.   No.

16      Q.   Other than this lawsuit, any other lawsuits

17 where you've been a plaintiff?

18      A.   Custody of my son.

19      Q.   Other than that lawsuit, has there ever been a

20 lawsuit that you've been a defendant?

21      A.   I think I was -- defendant, no, not that I --

22      Q.   You were a party in that lawsuit.  Let me

23 rephrase.

24           Have you ever been a party to any other

25 lawsuit other than that matter and this litigation?



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 73 of 125

NORMAN HIRSCH                                                February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                              73

1          A.   Probably have in 70 years, but not that I can

2     recall.  Not in the last 20 anyway.

3          Q.   When you provided -- I want to go to this

4     case.  We talked about the deposit.  What was the amount

5     of the deposit again?

6          A.   55,000 initially.

7          Q.   And you paid that to -- just for ease of

8     reference, we'll phrase it as Ritz and Trump.  I know

9     there is legal entities, but just to make this go

10    faster, you paid your deposit to Ritz, correct?

11         A.   Correct.

12         Q.   Not Trump?

13         A.   Correct.

14         Q.   And when did you resign from the club?

15         A.   I resigned in 2010, I believe was that

16    document.  Just saw it.

17         Q.   Exhibit 18.  If you look at Exhibit 18, it's a

18    one-page fax.

19         A.   Correct.

20         Q.   Was there any other written communications on

21    or around that time which memorialized your resignation

22    from the club?

23         A.   Yes.

24         Q.   Can you recall what they may have said?

25         A.   I got a letter back that said that they have



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 74 of 125

NORMAN HIRSCH                                        February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                      74

1  got the letter of resignation and that I'm put on the

2  list and that I can continue to use the club facilities.

3       Q.   That was from Laura Tuzi, correct?

4       A.   I believe so.

5       Q.   And when you resigned from the club, Trump did

6  not acquire the club at that time, correct?

7       A.   Correct.

8       Q.   And you testified earlier that the reason why

9  you went on the resignation list is because you wanted

10  your deposit back of the 55,000, correct?

11       A.   I wanted the difference back between the

12  current 55 and what -- or the current 35 and what I had

13  paid, 55.

14       Q.   That's what I want to ask you, because I'm

15  still a little bit unclear.

16            Didn't you expect them to give you a refund of

17  your $55,000 deposit and then it would have been up to

18  you to either purchase this new membership at a lower

19  rate?

20       A.   Correct.

21       Q.   They weren't just going to cut you a check for

22  the difference, correct?

23       A.   Correct.  They could have, but they did it

24  when I resigned from the provisional, they did cut me

25  the check, but in this case they weren't going to do



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 75 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                        75

1  that.

2      Q.   And I thought it was interesting you mentioned

3  that there was a reduction in the membership amount.

4  And this was of the spa membership?

5      A.   Correct.

6      Q.   So you would agree with me that in terms of

7  the membership of the spa, Ritz amended its membership

8  to change the price, correct?

9          MR. LEHRMAN:  Form.

10         THE WITNESS:  I don't know that it amended its

11     membership to change the price, but they changed

12     the price for what was basically the same

13     membership.

14 BY MR. RUSSOMANNO:

15     Q.   It was a change, right?

16     A.   It was a price change, yes.

17         MR. RUSSOMANNO:  And we have the same standing

18     objection for form as well.  I understand why

19     Mr. Linscott does it.

20 BY MR. RUSSOMANNO:

21     Q.   Any other changes in the membership that you

22  can recall with Ritz at the property?

23     A.   Well, for me?

24     Q.   Yes.

25     A.   I changed from the one I mentioned before, I



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 76 of 125

NORMAN HIRSCH                                      February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                     76

1  changed to associate member for golf for two years and

2  then went back to the spa.

3       Q.   Is there anything different about your

4  membership that you could or couldn't do at any time

5  when Ritz had the club?

6       A.   Other than when I was a golf and I went back

7  to the spa, I couldn't play golf after I was back after

8  to the spa, but other than that, not that I can recall

9  or am aware of.

10      Q.   You testified earlier that you would agree

11 that the basis in which you get a refund of your deposit

12 is when you reach the top of the resignation list,

13 right?

14      A.   If somebody else then buys a membership, yes.

15      Q.   Do you have any evidence or proof that you

16 ever reached the top of the resignation list?

17      A.   No.

18      Q.   And it's your understanding that you have not

19 reached the top of the resignation list, correct?

20      A.    I asked so many times where I was on the list.

21 At one point I was 46, if I recall.  And then later I

22 was 61 or something.

23           So I honestly don't believe that the

24 resignation list was a real thing.

25      Q.   Answer my question.



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 77 of 125

NORMAN HIRSCH                                              February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                             77

 1      A.    Sorry.

 2      Q.    My question was it's your understanding, even

 3 as you sit here today, that you still have not reached

 4 the top of the resignation list?

 5      A.    Absolutely my understanding.

 6      Q.    And you understand that there is -- strike

 7 that.

 8            The reason why you resigned was for the

 9 reduction of the membership?

10      A.    Correct.

11      Q.    Are you aware that -- and I'm going to refer

12 to you, the Membership Plan is Exhibit 17.  It's in

13 front of you.

14            And you didn't read this in detail when you

15 signed, when you signed up with Ritz as a member,

16 correct?

17      A.    Correct.

18      Q.    So were you ever aware -- and if you're not, I

19 can show you -- were you ever aware in this Membership

20 Agreement, and I'm going to refer to you the page --

21            MR. LEHRMAN:  Plan?

22            MR. RUSSOMANNO:  Sorry, you are right, Plan.

23 BY MR. RUSSOMANNO:

24      Q.    -- that the owner of the company has the right

25 to modify, alter, change the terms of the membership?



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 78 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                         78

1    Are you aware of that?

2         A.    I do remember reading that.

3         Q.    If you go to R531.

4         A.    Okay.

5         Q.    The very bottom -- tell me when you are there.

6         A.    Okay.

7         Q.    531 says Acknowledgment of Membership Rights.

8    Look at the very last sentence where it says "The club

9    reserves."

10        A.    Okay.

11        Q.    I know it's hard to read, but if you keep

12   reading that paragraph, it says, "The club reserves the

13   right, in its sole discretion, to terminate or modify

14   the Membership Plan and the Rules and Regulations, to

15   discontinue the operation of any and all club

16   facilities," and it goes on and on.

17        A.    Uh-huh.

18        Q.    Were you aware that the owner of the club can

19   change essentially the membership prior to filing this

20   lawsuit?  Did you ever see this paragraph?

21        A.    Yes.

22        Q.    You knew?

23        A.    Yes.

24        Q.    Did you know that at the time you signed the

25   document that you said okay, here's my 55 grand, were



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 79 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                          79

1   you aware of this provision?

2        A.   Probably not.

3        Q.   When, if you can recall, when did you learn

4   about this paragraph?

5        A.   I certainly learned about it about the time

6   when, before you acquired, before Trump acquired the

7   club.  I learned about it then when there was a bunch of

8   stuff going on.

9        Q.   Okay.  I'll follow up on that comment.  But

10  let me ask you, so before Trump acquired the club, you

11  knew that whoever owned the club has the right to modify

12  the membership, right?

13       A.   Correct.

14       Q.   And you think that was in what year,

15  approximately, 2012?

16       A.   Before, before you purchased the club.

17       Q.   What year is your understanding that Trump

18  acquired the club?

19       A.   Probably in 2000 and -- what was the question?

20       Q.   What is your understanding of what year Trump

21  acquired the club?

22       A.   When Trump acquired the club?

23       Q.   Yes.

24       A.   Oh.  At the end of 2012.

25       Q.   You said stuff was happening.



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 80 of 125

NORMAN HIRSCH                                        February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                       80

1       A.    Yeah.

2       Q.    What stuff?

3       A.    The, there was an attempted member buyout

4  prior to selling -- prior to Ritz selling the club to

5  Trump, and during that period of time, I learned a lot

6  then.

7       Q.    And based upon what was going on, you looked

8  at your Membership Agreement to refresh your

9  recollection of what your rights were?

10      A.    Correct.

11      Q.    And what rights the owner would have had?

12      A.    Correct.

13      Q.    At the time that was going on, did you ever

14  think to yourself I want to have my deposit back?

15      A.    I already wanted my deposit back prior to

16  that.

17      Q.    So you were already on the resignation list

18  because you wanted your refund?

19      A.    Correct.

20      Q.    And nothing that was occurring at that time

21  caused you to file a lawsuit or send a demand for a

22  refund, correct?

23      A.    Well, when it was happening at that time, no,

24  I didn't file a lawsuit or anything.  I started looking

25  into what, you know, risk about getting my money back.



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 81 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    81

1   It didn't look like -- you know, where I was on the

2   resignation list was not moving and I was concerned

3   about that.

4           I'm not sure I understand where you are going

5   or what specifically you want to know about that.

6       Q.   When Trump acquired the club, did you ever

7   review the Trump Plan and Legacy Addendum?

8       A.   I did.

9       Q.   And you read that in detail?

10      A.   Well, I knew enough to know that I didn't want

11  to sign it and I knew enough to know that I wanted to

12  continue to want my money back based on what I learned.

13      Q.   Did you believe that you were required to sign

14  the Legacy Addendum?

15      A.   I don't think anybody has a, can make me

16  required to sign anything.  I believe they wanted me to

17  sign it.

18      Q.   Who, did you speak to anyone at the club about

19  that issue, signing the Legacy Addendum?

20      A.   I -- let me look at the Legacy Addendum again

21  and then I can tell you, because it will probably

22  trigger what I would have --

23      Q.   If you look at -- sorry to interrupt you.  If

24  you look at Exhibit 19.

25      A.   Okay.



 1        Q.   I'm going to find it, but I know it's attached
 2   to the paperwork.
 3        A.   Okay.
 4        Q.   So if you look at --
 5        A.   Near the end, right?
 6        Q.   We'll find it.  I have an extra copy of your
 7   complaint.  Either way, I can show it to you.  Let's do
 8   that.  I'm not going to mark it.  I'm just going to show
 9   this to you.
10        A.   Okay.
11        Q.   This is the addendum and this is the plan.
12   There is two separate documents.  And that came from
13   your complaint, the lawsuit that you filed in federal
14   court.
15             MR. LEHRMAN:  Counsel, do you want the Trump
16        letter attached to the Legacy Addendum?
17             MR. RUSSOMANNO:  No.
18             MR. LEHRMAN:  I'm just going to take that off.
19             THE WITNESS:  Okay.
20             MR. RUSSOMANNO:  I'm just going to reference
21        to it.
22   BY MR. RUSSOMANNO:
23        Q.   I'm just going to ask you generally, but you
24   can take a look through and let me know if you've
25   ever -- first of all, if you've ever seen those



1    documents.

2          A.    Yes, I have.

3          Q.    And do you recall if you've ever read them in

4    detail?

5          A.    I don't -- you know, similar to the other

6    ones, I look at it, I kind of get the gist of what it

7    is, and I knew I didn't want to get involved in it.

8          Q.    Why?

9          A.    Pardon?

10         Q.    Why?

11         A.    What I was being offered was not suitable to

12   me.

13         Q.    Explain in more detail, please.  What would

14   have been suitable?

15         A.    Well, it's not related to -- maybe it's

16   related to the plan.  Let me look at the plan.  It

17   wasn't related to the Legacy.  I was assuming I already

18   did something.  Hold on.

19              Because in order to be either one of these

20   things, you had to agree to something that I didn't want

21   to agree to.  So these things were kind of irrelevant to

22   me.

23         Q.    What did you not want to agree to?

24         A.    I didn't want to agree to relinquishing my

25   refundable deposit.



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 84 of 125

NORMAN HIRSCH                                         February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                        84

1      Q.   Did anyone at Trump ever tell you that they

2   were not going to refund your deposit when you reached

3   the top of the list?

4      A.   No one ever told me that I wouldn't -- you are

5   correct, no one ever said that you will not get your --

6   first of all, you don't get it when you reach the top.

7   You have to get off the top, right?  Then you get it.

8   But nobody ever told me that.

9      Q.   And what about in writing?  Did anyone ever

10   write to you from Trump and said when you get off the

11   top of the list, we're not going to give you back your

12   deposit?

13      A.   No, nobody ever wrote me that, but it's kind

14   of not even a question in the sense that, in the sense

15   that I wasn't even in that position anymore kind of

16   thing.

17      Q.   Why?

18      A.   Because, because I -- well, yeah, I was still

19   on the resignation list.  They did tell me that they had

20   paused the resignation list and it wasn't moving.  They

21   did give me a number which was higher than lower, if you

22   will, on the list than what I was prior.

23           And so nobody ever said that I couldn't get

24   off the list once I reached the top, but it was pretty

25   obvious that I wasn't going to get to the top, and at



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 85 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    85

1    least in a couple of lifetimes if it would go that long.

2        Q.   So you choose not to exercise the Legacy

3    Addendum, which you have every right to do?

4        A.   Correct.

5        Q.   You're still on the resignation list?

6        A.   Correct.

7        Q.   No one has told you you're not going to get

8    your money when you get off the top of the list?

9        A.   Correct.

10        Q.   So what's the problem?  What's the basis for

11    the refund of your deposit?

12        A.   Well, I was on the resignation list to start

13    with.  I wouldn't want to take my name off the

14    resignation list because the cost of a membership was

15    less money, so if I wanted to rejoin I could always

16    rejoin.  Then I'd get my money back.

17            So that's another reason I wouldn't want to

18    take my -- but suddenly I couldn't use the club anymore.

19        Q.   And that became a surprise to you?

20        A.   Yes.

21        Q.   Can you tell me -- we'll get to it.  I know

22    the answer, but can you tell me the reason why Trump had

23    an issue with you using the club anymore?

24        A.   I assumed, I'm guessing --

25            MR. LEHRMAN:  He's not asking you to guess.



Case 9:13-cv-80456-KAM Document 113 Entered on FLSD Docket 03/20/2015 Page 86 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    86

1        He is asking you to answer the question if you know

2        the answer.

3            THE WITNESS:  Why he did that?  It was his own

4        decision to do that, I think.

5    BY MR. RUSSOMANNO:

6        Q.    Did it have to do with the fact that you owed

7    dues?

8        A.    That what?

9        Q.    That you owed dues.

10       A.    No, had nothing to do -- I always paid my

11   dues.

12       Q.    You were never behind on your dues?

13       A.    Oh, I was slightly behind dues when the club

14   was taken over, because we were waiting to see what was

15   going to happen.  And it was not very much.  I think it

16   was about 1,000 bucks.

17           But the answer, no.

18       Q.    Do you currently owe any money in terms of

19   dues?

20       A.    Absolutely not, in my opinion.

21       Q.    Well, in your opinion, is there a zero balance

22   or not a zero balance?

23       A.    No, no, because Trump told me -- i.e., Debbie

24   Shulman, Tony Servideo -- that I would not have to pay

25   dues in 2013, by phone, by e-mail, but they kept sending



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 87 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    87

1  me bills for dues.

2       Q.   Isn't it true --

3       A.   And I couldn't use the club.

4       Q.   Isn't it true that what they may have told you

5  is that you didn't have to pay dues if you exercised the

6  Legacy Addendum?  Isn't that what the offer was?

7       A.   No.

8       Q.   So it's your understanding that you didn't

9  have to pay dues regardless if you were going to execute

10  the Legacy Addendum or not?

11       A.   No.  I wasn't going to exercise the Legacy

12  agreement.  I wasn't going to opt in or opt out of those

13  two choices.  I just wanted to leave my name on the

14  resignation list.  I just wanted to continue using the

15  club.  I wanted to continue paying the dues.

16            But they changed that.  I couldn't, I couldn't

17  remain on the resignation list anymore and still use the

18  club and still pay dues.  It was gone.  Suddenly they

19  just removed that.

20            That's the whole thing about this whole club,

21  this whole lawsuit.  That's the basis in my mind what

22  the whole thing is about.

23       Q.   I'm going to show you -- I'm not going to

24  introduce it.  I'm going to show you Bates-stamped

25  documents 54, 53 and 52.  I just want to ask you a



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 88 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    88

 1   general question.

 2          THE WITNESS:  These are copies of the same

 3      thing?

 4          MR. LEHRMAN:  Hand them to Mr. Linscott first.

 5   BY MR. RUSSOMANNO:

 6      Q.   Take your time and look at them.

 7      A.   Okay.

 8      Q.   But my general question is aren't those March

 9   and April letters from Trump in regard to your

10   outstanding dues that were owed?

11      A.   Those are letters, yes.

12      Q.   In regard to outstanding dues that were owed?

13      A.   That's what the letters are saying.

14      Q.   And you dispute that you ever owed those

15   moneys?

16      A.   Absolutely.

17      Q.   Okay.

18      A.   Even Trump themselves disputes it in their own

19   e-mail, in their own writing.

20      Q.   When did you pay, when did you satisfy that

21   debt?

22      A.   I don't acknowledge these in the first place,

23   nor was I told these would ever even happen, nor did I

24   use the club.  So why am I being asked to pay dues?

25      Q.   I understand.



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 89 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    89

1          Was that debt ever satisfied?

2     A.    That's not debt, in my opinion.

3     Q.    I understand.

4     A.    No.  Not according to their, your

5  satisfaction.

6     Q.    Did you know that part of the Membership Plan

7  provided that if you did not pay your dues, you could be

8  prevented from using the club?

9     A.    I think that's valid.  I think that may have

10  been the case.

11     Q.    So if there were outstanding dues owed and

12  Trump decided, as the new owner, decided to exercise its

13  contractual rights with you not to allow you to use the

14  club, you believe that -- strike that.

15          Do you believe that Trump had the right not to

16  allow you to use the club by exercising his contractual

17  rights due to the fact that there was outstanding dues

18  owed?

19     A.    I don't acknowledge outstanding dues owed.

20     Q.    Regardless if you incurred --

21     A.    If -- I don't know if I -- if someone owed

22  dues and they didn't want to pay the dues and they were

23  obligated to pay the dues, then obviously it makes sense

24  that he could prevent somebody from using the club.

25     Q.    But that's not you?



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 90 of 125

NORMAN HIRSCH                                        February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                       90

1          A.    No, that was not what happened.

2          What happened was I was using the club.  I was

3    paying dues for years.  When he bought the club and I

4    didn't want to sign any of this stuff, dues were paid.

5    I didn't take my name off the resignation list.

6          Suddenly I couldn't use the club.  I couldn't

7    get in the club because I -- because he didn't want

8    anybody in the club who didn't, who had their name on a

9    resignation list.  That was the reason.

10          And, and, and I was told, which kind of made

11   sense, we won't charge you for dues while you're not

12   using the club.  In 2013 it was written and it was told

13   to me on the phone, which kind of made sense.  I'll

14   leave my name on the resignation list.  I'll wait for it

15   to go up.  I won't use the club.

16          Fine, made sense, but they kept charging me

17   dues.  That's what these are about, even though they

18   said they wouldn't, even though I couldn't use the club.

19          Q.    Who told you that again?

20          A.    Who told me that?  This guy who signed it and

21   Debbie Shulman, Tony Servideo.

22          Q.    What day did he tell you that?

23          A.    December 26, followed up by e-mail,

24   December 26, 2012, followed up by e-mail, which are in

25   your own files, which are in that package right there.



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 91 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                         91

1      Q.   So your understanding is the reason why you
2  were prevented from using the club was because you
3  didn't sign the resignation, you didn't take your name
4  off the resignation list?
5      A.   Correct.
6      Q.   Despite the fact that the letters show that
7  you had an outstanding debt?
8      A.   No.  These outstanding debts have to do with
9  them adding dues and penalty and late charges on
10  something they said they weren't going to even charge
11  me.  Even if you look in your own file, there's a
12  document that says from one of your people to the other
13  people, says don't charge him for dues on 2013.
14          Even after telling me you can see in your own
15  documents, I didn't know that until I saw that, you can
16  see your own people telling people, and they're still
17  charging me and trying to add all this up.
18          And now this year, they added a whole year of
19  dues plus penalty plus interest, plus -- and the
20  required minimum of what you have to pay at the club to
21  use, buy dinners or whatever, $1,800, added that, and I
22  can't use the club.
23          I mean it's, it's ludicrous really.
24      Q.   Did you ever go to the club and were prevented
25  from going inside the club?



```
 1        A.   Yes.

 2        Q.   What day?

 3        A.   My wife went there.  She was -- it's in the

 4   documents.  My wife went there and a member had asked

 5   her to come.  And she went in there and the transponder

 6   didn't work.  And she talked to Harold, and Harold told

 7   her he was asked to turn off our transponders.

 8        Q.   When were you denied access, you?

 9        A.   Myself?

10        Q.   Yes.

11        A.   I never went there.  I was told that I wasn't

12   a member.  I didn't want to embarrass myself to go there

13   and they told me I couldn't use the club.  I didn't want

14   to go over there, but my wife confirmed it and Harold

15   told her so.

16        Q.   Your wife is not a plaintiff in this lawsuit,

17   correct?

18        A.   I don't know whether that's correct or not.

19        Q.   A named plaintiff.  There is three named

20   plaintiffs, three gentlemen.

21        A.   No, she's not one of those, correct.

22        Q.   What is your understanding of how a member may

23   get a refund of their deposit other than reaching and

24   getting off the top of the resignation list?

25        A.   In the agreement it says if you're denied use
```



1  of the facility within 30 days, you have to get a

2  refund.  That's what I'm believing.  That's what I

3  signed.  That's what I assumed you took as a

4  responsibility, and it's not happening.

5      Q.   Any other reasons other than that that is your

6  understanding of how you get a refund?

7      A.   If you change the plan, which you did, because

8  I've been going along for years paying dues, being on

9  the resignation list, using the club.

10          Suddenly I'm on the resignation list, I can't

11  pay dues.  I'm not going to pay dues.  I can't use the

12  club.  I'm not going to pay dues, because they told me I

13  wouldn't have to pay dues.

14          So it changed.  Everything changed after Trump

15  bought the club.

16     Q.   And didn't Trump have the right to do that

17  because your Membership Plan allows the owner of the

18  club to modify and change the plan?

19     A.   He has the right to change it, but he also has

20  the responsibility to refund me if he denies the use of

21  the club.  It's in the document that I signed, or if he

22  changes the plan.

23     Q.   Did the dues ever get increased while Ritz

24  owned the property?

25     A.   While Ritz owned the property.



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 94 of 125

NORMAN HIRSCH                                     February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    94

1          Yeah, I think they increased it somewhat.

2      Q.   Do you believe that Trump terminated your

3  category of membership?

4      A.   Yes.

5      Q.   How?

6      A.   Well, my category of membership, I'm assuming

7  you mean before he took over, did it get terminated

8  after he took over?

9      Q.   What I mean category, I mean your spa --

10  there's different memberships, as you know.

11      A.   Yes.

12      Q.   So your membership is the spa membership.

13      A.   Correct.

14      Q.   How was that terminated by Trump?

15      A.   I didn't do anything and suddenly I couldn't

16  use the club at all.

17      Q.   Any other reasons?

18      A.   Yeah.  When Tony Servideo and Debbie called me

19  on December 26 and explained to me the new membership

20  plans and stuff, there was an opt-in and an opt-out, and

21  then there was a leaving your name on the resignation

22  list and not using the club and not paying dues, and

23  then there was another one that I discussed with them,

24  which was since I had a $55,000 deposit and the new

25  nonrefundable deposit for the golf was going to be 50,



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 95 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                   95

1   they would allow me to give up the 55 for the 50, right?

2           And that was like the best deal, because I

3   only lost 5,000, except -- and I might have taken that,

4   except the dues were 20-some-odd thousand dollars a

5   year.  So I couldn't afford it.  Didn't use golf, so

6   that option was off the table also.

7           So there were four kind of options that I was

8   given.  The first two were similar to the way the

9   golf --

10      Q.   Isn't it true there remains spa members of the

11  club?

12      A.   Yes.  And again, if you mean that by they can

13  use the spa and they are called spa members, yes, as far

14  as I know.

15      Q.   Other than what you already told me, do you

16  have any other reasons as to why you believe Trump

17  changed the terms of your membership?

18      A.   I have a reason to believe that he changed the

19  terms of everyone's membership so he didn't have to pay

20  the refundable deposits back.  It was --

21      Q.   What other terms were changed?  That was my

22  question.

23          Is there any other terms of your memberships

24  that have changed?

25      A.   Well, other than everything?  I mean I can't



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 96 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    96

 1 | use the club anymore.

 2 |       Q.   That I get.

 3 |       A.   I can't pay dues anymore and remain on the

 4 | resignation list anymore.

 5 |            The whole thing changed.

 6 |       Q.   You're being prevented from paying the dues

 7 | that are owed?

 8 |       A.   No.  And remain on the resignation list?  No.

 9 | I'll back off on that.  It was a different membership to

10 | do that.  You had to pay extra and you didn't get --

11 | that was opt out.  That was opt out.

12 |            No, no, that was another possibility, but I

13 | didn't accept that.

14 |       Q.   Okay.  So just to clarify, because we want to

15 | have a clean record and the lawyers in the room are

16 | going to want to make sure we get your testimony

17 | clear --

18 |       A.   Okay, yeah.

19 |       Q.   Isn't it true that no one prevented you from

20 | staying on the resignation list?

21 |       A.   Correct.

22 |       Q.   And it's true that no one has prevented you

23 | from paying your outstanding dues?

24 |       A.   No one has prevented me from, me and my wife

25 | are going to pay -- well, first of all, we don't owe



 1  outstanding dues.

 2      Q.   I understand.  I understand that you don't

 3  agree you owe it, but has anyone ever prevented you from

 4  cutting the check of the amount that Trump believes you

 5  owe?

 6      A.   Mr. Common Sense.

 7      Q.   Anyone other than Mr. Common Sense?

 8      A.   No, nobody that I could --

 9      Q.   Do you believe that your membership was

10  recalled?

11      A.   Recalled?  I wouldn't call it recall.

12      Q.   How far is Juno from the club?

13      A.   About two miles.  Maybe three.  You mean my

14  house?

15      Q.   That's correct, that's correct.

16      A.   Yeah.

17      Q.   Okay, you blog, right?  You are a blogger?

18      A.   Uh-huh, if you want to call it that.

19      Q.   Are you the person who is the anonymous admin

20  on the server blog or whatever program you use?  You run

21  it?  Is that you?

22      A.   The website, yes.

23      Q.   And briefly, tell me why you created this blog

24  or website.

25      A.   Okay, when -- this goes back prior to Trump.



1   When, when RBF started to have the member buyout fiasco,

2   I'll call it, plan or they tried to push on the members

3   for the members to buy, some members to buy the club, it

4   was some type of change, big change.

5            And it was not advantageous.  And they were

6   very much controlling of how they let -- members

7   couldn't really -- it was all handled by them and Trump

8   and -- not Trump, RBF, and the company they hired to do

9   it.  So it was not easy to talk to members about it, to

10   get their opinion about it, to understand about it.

11            So one day Debbie or somebody from the club

12   accidentally sent an e-mail that had everybody's e-mail

13   address on it.  So I looked at it as an opportunity to

14   create a website where we could communicate with each

15   other, and I used the e-mail addresses that suddenly I

16   had now of all the members, and I sent it out to

17   everybody and I said here, here's a place where you can

18   all talk about it.

19            And that's how I created that.  And then I

20   created myself my own name, N. Hirsch, as the user.  And

21   I tried to keep the admin thing out of the opinion

22   world, but just keeping it administered and not let

23   people know that I was both guys, because, just to keep

24   it, you know, my opinion away from admin of the thing,

25   even though I was the admin.



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 99 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    99

 1        Q.    Let me ask a couple of follow-ups.  Did you

 2   have permission from Ritz at the time to take those

 3   e-mails and do what you wished with it?

 4        A.    No.

 5        Q.    Did you have any indication to say hey, as you

 6   truthfully admitted it was an accident, hey, you sent me

 7   this by accident, I'm going to send it back to you by

 8   accident, or FYI, you copied the world on this e-mail?

 9   Did you ever tell Ritz that?

10        A.    No -- well, yes.  Yes, I did, by having that

11   website that I created open for everybody to see, and I

12   said it on the website.

13        Q.    Why the secrecy?

14        A.    What secrecy?

15        Q.    You said you wanted to keep your name out of

16   it.  Why are you being anonymous?

17        A.    Because there is two functions.  One is I'm in

18   there saying my own opinion, and then the other function

19   is just keeping it -- people can't log in.  You know,

20   they don't -- lost their user name.  That stuff I wanted

21   to keep as an admin function.

22             I could have made it me, but I wanted to keep

23   it separate.  I wanted the admin to be like a firewall

24   between admin and the person in terms of -- if you want

25   an admin question answered, talk to admin.



```
 1        Q.    But you are the admin?

 2        A.    I am.

 3        Q.    Is this still an active website?

 4        A.    It is.

 5        Q.    And you're ██████@████████████████.net?

 6        A.    Correct.

 7        Q.    And then are you also

 8   ████████████████@Comcast.net?

 9        A.    No.

10        Q.    Who is that?

11        A.    I don't know who that is.

12        Q.    What's the name of website?

13        A.    RitzCarltonJupiter.net.

14        Q.    What's ████████@Gmail.com?  Do you know what

15   that is?

16        A.    That is, I think it's the same as admin, only

17   it doesn't make sense.

18        Q.    To who, you?

19        A.    No, that's me, but it was, I had to create a

20   Gmail account, so you can't have a Gmail account --

21   that's Gmail, right?

22        Q.    Yes, Gmail.

23        A.    Yeah, yeah.

24              So I created RitzCarltonJupiter and then the

25   zip code at Gmail.com.
```



1        Q.    And you talk about the lawsuit on this blog or

2   website, whatever it is?

3        A.    Correct.

4        Q.    I have seen some of these things, you are like

5   trying to recruit other people to join the cause?  Is

6   that what your purpose is?

7        A.    Not really.  Partly maybe.  If they want to do

8   that, then this was a way of doing it.  There were other

9   people involved.

10            We got a similar, same letter, same e-mail

11  list from another lawyer saying it to everybody.

12            MR. LEHRMAN:  He's not asking you to disclose

13       what communications you have had with other

14       lawyers, okay?

15            THE WITNESS:  Well, this lawyer said --

16            MR. LEHRMAN:  I'm just clarifying, you are not

17       being asked to disclose communications you had with

18       myself, any of the lawyers in my firm, or any other

19       lawyers by this question.

20            THE WITNESS:  Okay.  Ask me again.

21            MR. RUSSOMANNO:  The record reflects I didn't

22       ask for that, and I never try to invade that

23       privilege.

24  BY MR. RUSSOMANNO:

25       Q.    What I do want to know is what is the name of



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 102 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                              102

1  that lawyer?

2       A.    Willis.

3       Q.    Doug Willis?

4       A.    Yes.

5       Q.    Do you play golf with Doug?

6       A.    No, I never met him, but he sent an e-mail to

7  the whole group.

8             MR. LEHRMAN:   Again, you are not being asked

9        to disclose communications you had with Mr. Willis

10       or any other lawyer.

11  BY MR. RUSSOMANNO:

12       Q.    And talking about the lawsuit and trying to

13  engage people's interest, this was your idea?

14       A.    It might have been his idea.  I mean I think I

15  got -- I don't remember the timing, to be honest with

16  you.  I don't remember -- it just seemed like something

17  that had to happen.  Not just to me from me, but to many

18  people.

19       Q.    You started this when Ritz still owned the

20  club?

21       A.    Correct.  So we used that same forum to

22  transition into this, that's correct.

23       Q.    If you look at -- let me back up.

24             Look at the document.  I'm just going to show

25  you two provisions, the Trump Legacy Addendum.



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 103 of
125

NORMAN HIRSCH                                      February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                  103

```
1          A.    You never gave me that one.

2          Q.    It's okay.

3          A.    I'm sorry.

4          Q.    Look at section 3A.

5          A.    Which page, right there, 4 of 8?

6          Q.    Uh-huh.

7          A.    Yes.

8          Q.    You can look at it if you want, but I just

9    want to ask you generally, what's the title of 3A?

10         A.    Refund of Membership Deposit, generally.

11         Q.    Strike the question.

12               Tell me why -- tell me why you are suing Trump

13   for breach of contract.

14         A.    Okay.  He could probably do a better job, but

15   the reason I'm suing Trump for breach of contract,

16   hopefully for the whole group, is that at least in the

17   group that I'm talking about, I was a member.  I was

18   using the club.  I was paying dues.  I was on the

19   resignation list in order to get the difference back.

20               And then suddenly I can't use the club

21   anymore.  And I'm told I didn't have to pay dues,

22   though.  But they charged me for dues.

23               So it seems like a pretty obvious reason to

24   sue somebody.

25         Q.    Any other reason?
```



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 104 of
125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                  104

1      A.   No.  I mean I might think of something, but

2   that's basically the reason.

3           MR. RUSSOMANNO:  What I'd like to do is take a

4       brief break.  I'm going to confer with Jerry.

5       Jerry may have some follow-up.  We can go off the

6       record for two minutes.

7           THE VIDEOGRAPHER:  Off the record, 12:31.

8           (A recess was taken.)

9           THE VIDEOGRAPHER:  Back on the video record at

10      12:43.

11   BY MR. RUSSOMANNO:

12      Q.   Mr. Hirsch, I just have a couple of questions

13   to follow-up.

14           In regard to the blogs and the website, I know

15   there was a lot of back and forth between the members.

16   You agree there was differences of opinion, everybody

17   had their own view as to what Trump's new club was or

18   was not or what was happening?

19      A.   Yes.

20      Q.   And everybody had their own reason or reason

21   to not ask for the deposit back versus ask for the

22   deposit back, correct?

23      A.   I'm trying to think of anybody that didn't

24   want to take the deposit back.  I don't know of anybody.

25   There may have been.



1        Q.    So every single member --

2        A.    Every member had a right to say whatever they

3    thought, and you know the internet.  They could say

4    whatever they thought.

5        Q.    But is it your understanding that every member

6    has asked for their deposit back?

7        A.    No, I'm not saying that.  I know one couple

8    that didn't.  But on that blog there weren't a lot of

9    people that were saying why they didn't want their

10   deposits back, that I recall.

11       Q.    And it's your understanding a lot of people

12   executed the Legacy Addendums, correct?

13       A.    That I don't know.  I know one couple must

14   have, but other than that, I don't know who did.

15       Q.    Did you know that a lot of people signed the

16   Legacy Addendum?

17       A.    No, I didn't know that.  I'm not surprised.

18       Q.    Why?

19       A.    Well, a lot of people signed the prior one

20   too, and a lot of people, but it wasn't enough to make

21   it past.  The prior attempt to buy the club was the

22   offer that was made by the people wanting to buy the

23   club from RBF, a lot of people.  A number of people

24   signed the other agreement, but it didn't happen.

25            So I think it's probably the same with Trump.



1    I guess you could poll them and find out.

2        Q.   You haven't done that?

3        A.   No.

4             MR. RUSSOMANNO:  No further questions at this

5        time.

6                  REDIRECT (NORMAN HIRSCH)

7    BY MR. LINSCOTT:

8        Q.   Mr. Hirsch, in response to a question

9    Mr. Russomano asked of you, your response was "This is

10   what the lawsuit is all about."

11            And the question, the subject of that

12   discussion was you were being charged dues but not able

13   to use the golf course or use the club facilities.

14            And I think your response was "That's what

15   this lawsuit is all about."

16            Do you remember that testimony?

17       A.   Yes.

18       Q.   And the trigger for that "This is what the

19   lawsuit was all about" were the actions that Trump took

20   after Trump took over the club, charging you dues and

21   not letting you use the club, correct?

22       A.    Correct.

23       Q.   Why then did you sue RBF or Ritz?

24       A.   I am not the guy who picked who to sue, but my

25   understanding, it wasn't a surprise for when somebody



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 107 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                        107

 1  sues, they typically sue everybody, right?  And see who

 2  falls out, but that's my -- you know, I'm not a lawyer.

 3          But I understand that, like I said before, you

 4  know, if your obligation is passed on to the buyer, no

 5  disrespect to Trump, but you could have picked anybody

 6  and then sold it and then that person can't pay, they

 7  don't have the wherewithal to pay it back.  You just

 8  dumped 40 million or whatever liability, and there is

 9  something wrong with that.

10          So I think that's part of the reason.  You

11  asked the question, so that's what I think was part of

12  the reason.

13      Q.   And we did that earlier.

14      A.   Yeah.

15      Q.   And the discussion we had at that point in

16  time was you couldn't identify any legal obligation that

17  Ritz/RBF had to do that.

18      A.   Correct.  I didn't see any.

19      Q.   But to you, it was good business practices to

20  do that?

21      A.   Yes.  I didn't see anything in the documents.

22  I don't know what, what internal things you may have for

23  that kind of circumstance.

24      Q.   So at the end of the day, even though you

25  believe it would be good business practices, you can't



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 108 of
125

NORMAN HIRSCH                                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                                  108

 1  identify any legal obligation that RBF had to make sure

 2  that the buyer, Trump or anyone else, had the resources

 3  to be able to pay those obligations that Avendra took?

 4      A.   Correct.  In looking at the documents, I

 5  didn't see anything, but hindsight has 20/20.

 6          Now that I have seen what happens, there sure

 7  as heck should be something very clear so that wouldn't

 8  happen in the future with anybody, for that matter.

 9      Q.   You mentioned the name of a lawyer in your

10  testimony earlier, Doug Willis.  Do you know Mr. Willis?

11      A.   No, I don't know Mr. Willis.

12      Q.   Has he ever represented you?

13      A.   No.

14      Q.   Have you had conversations with him?

15          MR. LEHRMAN:  He's not asking you to describe

16      the conversation, just whether you have ever had a

17      had a conversation.

18          THE WITNESS:  I might have called his office

19      one time.  I don't ever remember really speaking to

20      him, because I got the letter.

21  BY MR. LINSCOTT:

22      Q.   If you have had conversations, I was going to

23  ask about it, because you said I did not hire him, is my

24  point.  You can talk to lawyers without having it be

25  privileged.



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 109 of 125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                        109

```
 1              MR. LEHRMAN:  If you are seeking legal

 2        counsel, we would contend the conversation is

 3        privileged.

 4              MR. LINSCOTT:  It's a moot point.  He didn't

 5        talk to him.  So I would differ with you, but it's

 6        a moot point.  We won't arm wrestle.

 7              MR. LEHRMAN:  We'll write rival Law Review

 8        articles.

 9              THE WITNESS:  I did show his --

10              MR. LEHRMAN:  He's not asking you to describe

11        any conversations you had with Mr. Willis, so wait

12        for the next question.

13              THE WITNESS:  No, I didn't have any

14        conversations.

15    BY MR. LINSCOTT:

16        Q.   As far as you know, the club is still

17    operating, the Trump Club?

18        A.   Yes, as far as I know.

19        Q.   The facilities that -- it's two miles from

20    your home.  Do you ever go by there?

21        A.   Yeah.

22        Q.   Your transponder has been deactivated, as I

23    understand.

24        A.   Correct.

25        Q.   Would you still be able to drive onto the
```



NORMAN HIRSCH                                                February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                            110

1  grounds as a guest?

2       A.    I don't know.

3       Q.    You haven't tried?

4       A.    No, I haven't tried.

5       Q.    So far as you know, the spa is still

6  operating, the dining room is still operating?

7       A.    As far as I know.

8       Q.    Tennis courts still operating?

9       A.    As far as I know.

10       Q.    Pool is still open?

11       A.    As far as I know.  I don't know, I haven't

12  been there, so I'm assuming.

13            I have a couple that goes there, so it must be

14  still going.

15       Q.    And you know from friends who still are

16  members that continue to use the club?

17       A.    Yes.

18            MR. LINSCOTT:  Okay.  I have no further

19       questions.

20            CROSS-EXAMINATION (NORMAN HIRSCH)

21  BY MR. LEHRMAN:

22       Q.    Mr. Hirsch, when you were being questioned by

23  Mr. Russomano, you were asked about what the basis is of

24  your claims that you've brought against Trump, the

25  Jupiter Golf Club.



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 111 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                  111

1          I'm going to direct your attention to

2   Exhibit 16.

3        A.    Okay.

4        Q.    You can move this out of the way.  So

5   Exhibit 16 is the Membership Agreement you entered into

6   with Ritz in or about June of 2009, and I direct your

7   attention to Bates page 148.

8        A.    Okay.

9        Q.    And on Bates 148, section four, Acknowledgment

10  of Membership Rights, do you see that heading?

11       A.    Uh-huh.

12       Q.    If you follow down towards the bottom of the

13  paragraph that says, there is a sentence that reads, "In

14  the event of termination of the Membership Plan,

15  termination of any category of membership, recall of the

16  membership or the discontinuance of operation of all or

17  substantially all of the club facilities, the members

18  affected will be entitled to a refund of the membership

19  deposit paid within 30 days."

20          Do you see that sentence?

21       A.    Yes.

22       Q.    Okay.  Did you, do you believe that there was

23  something that, if anything, that Trump did that

24  terminated your category of membership?

25       A.    Yes.



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 112 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                    112

1      Q.   What was it in your view that Trump did that
2    terminated your category of membership?
3      A.   Well, from -- the basic obvious answer is that
4    I had been using the club and paying dues, and suddenly
5    after Trump took over, without me signing anything or
6    doing anything, I couldn't use the club anymore.  And I
7    was told I didn't have to pay dues, but they were still
8    charging me dues.  So they basically terminated my
9    membership to the club.
10     Q.   In December 17 -- sorry, in December 2012 you
11   indicated that you had some communication with Debbie
12   Shulman and Tony Servideo, correct?
13     A.   Correct.
14     Q.   The communications you had with them were
15   following Trump's acquisition of club, correct?
16     A.   Correct.
17     Q.   At that time when you communicated with Tony
18   Servideo and Debbie Shulman and what was then the Trump
19   National Golf Club in Jupiter, did they advise you as to
20   what your options were?
21     A.   Yes.
22     Q.   And what was it that -- what were the options
23   that were presented to you with respect to your
24   membership at that time in December 2012?
25     A.   Okay.  They provided me -- and I've documented



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 113 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                  113

1  this on that blog, if you want to call it that.  It's on

2  their summary of what we went over.  They -- in an

3  e-mail afterward and before, and from them and from me.

4          They told me I had, I had four options now, or

5  I had, I had -- I had two options basically.  And the

6  other two kind of fell out of the first two.

7          I had an option to opt in.  Opt in meant that

8  I now, there was a new, a membership where I could still

9  remain a member, give up the refundable deposit, pay

10  20 percent less dues, have reciprocal membership, or

11  something like that.  But basically lose my $55,000, and

12  that was one.

13      Q.   So just to be clear, the opt-in option was,

14  involved agreeing to convert your refundable deposit to

15  a nonrefundable deposit, correct?

16      A.   Correct.

17      Q.   The opt-in option also provided some discount

18  for some period of time for dues that would be charged,

19  correct?

20      A.   Correct.

21      Q.   Okay.  What was the next option?

22      A.   The next option was an opt-out.  Opt out was

23  if I didn't want to give up my refundable deposit, but I

24  couldn't remain on the resignation list, dues would be

25  more.  No reciprocal privileges.  That was the second



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 114 of
125

NORMAN HIRSCH                                      February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                      114

```
 1   option.
 2        Q.    Okay.
 3        A.    I didn't want to do that because --
 4        Q.    I'm not asking you whether you wanted to do
 5   that.
 6              So there were two options presented, to opt in
 7   or opt out?
 8        A.    Correct.
 9        Q.    These were the options that were presented to
10   you by both Tony Servideo and Debbie Shulman in December
11   2012, correct?
12        A.    Correct.
13        Q.    These options were presented to you at a time
14   when Trump was operating the club as Trump National
15   Jupiter?
16        A.    Correct.
17        Q.    I'm going to show you --
18              MR. LEHRMAN:  Counsel, this may have been
19        previously marked as an exhibit.  It's the Trump
20        December 17, 2012 letter.
21              MR. RUSSOMANNO:  We haven't marked that yet.
22              MR. LEHRMAN:  It hasn't been marked yet?
23              MR. LINSCOTT:  I don't think so.
24              MR. LEHRMAN:  If it hasn't been marked yet,
25        then we'll mark it as the next exhibit, which I
```



1       think is 20.

2           (The document was marked Exhibit 20

3   for identification.)

4               MR. LINSCOTT:  Do you have copies?

5   BY MR. LEHRMAN:

6       Q.   Mr. Hirsch, I'm showing you what has been

7   marked as Exhibit 20.  It's a letter dated December 17,

8   2012.  Appears to be signed by Donald Trump, correct?

9       A.   Correct.

10      Q.   This is a letter that you at some point

11  received, correct?

12      A.   Correct.

13      Q.   This letter sets out these opt-in, opt-out

14  options, correct?

15      A.   Yes.

16      Q.   You've read this letter before?

17      A.   Yes.

18      Q.   Does this letter, in the way it sets out the

19  opt-in and opt-out options, is the presentation of those

20  opt-in, opt-out options in the letter consistent with

21  what was communicated to you by Ms. Shulman and

22  Mr. Servideo in December 2012?

23      A.   Yes.  The opt-in and opt-out are basically

24  what I just said.

25      Q.   Okay.  Now at the bottom of this first page of



 1   this letter, the opt-out provision, there is a statement

 2   that if you don't let them know what option you elect,

 3   that they will treat you as an opt-out.

 4          Do you see that?

 5      A.   No.

 6      Q.   I apologize.  It's the, it's the

 7   second-to-last paragraph on the second page, which is

 8   Bates-stamped TMP 299.  And it says there they request

 9   that you submit your signed form by December 31st.  "If

10   your letter is not received by that time, we will assume

11   you have opted out and bill you accordingly."

12          Do you see that?

13      A.   Yes.

14      Q.   You've seen that before, correct?

15      A.   I've seen the letter before, yes.

16      Q.   You've seen that language before that I have

17   just highlighted to you?

18      A.   It wasn't exactly like that when I spoke to

19   them, because I didn't want to do either opt-in or

20   opt-out, because I wanted to remain on the resignation.

21      Q.   Prior to Trump's acquisition of the club, you

22   were a social and spa member?

23      A.   Correct.

24      Q.   That was your membership category that you

25   held then?



```
 1        A.    Correct.

 2        Q.    Prior to Trump's acquisition of the club, was

 3   there such a membership category as social and spa

 4   opt-in?

 5        A.    No.

 6        Q.    Prior to Trump's acquisition of the club, was

 7   there a membership category that was social and spa

 8   opt-out?

 9        A.    No.

10        Q.    Prior to Trump's acquisition of the club, was

11   there a membership category that was social and spa, did

12   not sign Legacy Addendum?

13        A.    No.

14        Q.    Okay.  Is it consistent with your

15   understanding that prior to Trump's acquisition of the

16   club, that all social and spa members were members that

17   held the same category of membership?

18        A.    Yes.

19        Q.    Okay.  When Trump presented this option to you

20   to opt in or opt out, you indicated that you did not opt

21   in, correct?

22        A.    Correct.

23        Q.    You refused to sign the Trump Legacy Addendum,

24   correct?

25        A.    Correct.
```



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 118 of
125

NORMAN HIRSCH                                          February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                        118

1       Q.   You maintained your placement on the

2  resignation list, correct?

3       A.   I hoped to have, yes.

4       Q.   People who -- and Trump's actions, okay, you

5  indicated that you considered Trump's actions to have

6  terminated your membership category.

7            Do you consider that Trump has terminated your

8  membership category by the presentment of the opt-in and

9  opt-out options that we've reviewed?

10      A.   Yes, I guess you could say that, yeah.

11      Q.   Well, let me ask you this.  The social and spa

12  membership category of membership that you held prior to

13  Trump's acquisition, does that membership category exist

14  now?

15      A.   No, not as it was.

16      Q.   Before Trump's acquisition of the club, you

17  paid the same dues as other social and spa members,

18  correct?

19      A.   Yes.

20      Q.   Prior to Trump's acquisition of the club, you

21  had the same rights and privileges as other social and

22  spa members, correct?

23      A.   Yes.

24      Q.   As a result of these opt-in and opt-out

25  provisions, would you agree that now there are at least



1  three different membership categories for social and spa

2  membership?

3          Would you agree there is a social and spa

4  opt-in category?

5      A.   Yes.

6      Q.   Would you agree there is a social and spa

7  opt-out category?

8      A.   Yeah.

9      Q.   Would you agree that there is a social and spa

10 category for people who are on the resignation list --

11 well, strike that last question.

12          MR. LEHRMAN:  That's all I have.

13          MR. LINSCOTT:  No more questions.

14          MR. RUSSOMANNO:  Do you have a copy of the

15      letter that Doug Willis sent you?

16          THE WITNESS:  Probably somewhere.

17          MR. RUSSOMANNO:  I would just ask that you

18      keep it and provide it to your lawyer and then

19      he'll give it to us.

20          THE WITNESS:  Everybody has one of those.

21          MR. RUSSOMANNO:  Not me.  I want it.

22          THE WITNESS:  You don't?  Okay.

23          MR. RUSSOMANNO:  Okay.  No further questions.

24      Thank you.

25          MR. LEHRMAN:  Just to be clear, we're not



```
 1   agreeing to produce it.  I haven't seen the letter,

 2   so it's difficult for me to assert if there is a

 3   privilege.

 4        (Discussion held off the record.)

 5        MR. LEHRMAN:  I'm reserving the right to

 6   object and reserve all privileges.

 7        He will read.

 8        THE VIDEOGRAPHER:  This is the end of the

 9   deposition.  We're off the record at 1:02.

10        (Discussion held off the record.)

11        THE REPORTER:  You are ordering the original?

12        MR. LINSCOTT:  Yes.

13        MR. LEHRMAN:  I'll have a copy, please.

14        MR. RUSSOMANNO:  And a copy.

15        MR. LINSCOTT:  Can I get it by next Monday for

16   half rush?

17        (Witness excused.)

18        (Deposition was concluded at 1:02 p.m.)

19

20

21

22

23

24

25
```



Case 9:13-cv-80456-KAM Document 113 Entered on FLSD Docket 03/20/2015 Page 121 of 125

NORMAN HIRSCH                                              February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                            121

1                        CERTIFICATE OF OATH

2     THE STATE OF FLORIDA)

3     COUNTY OF PALM BEACH)

4

5              I, the undersigned authority, certify that the

6     aforementioned witness, Norman Hirsch, personally

7     appeared before me and was duly sworn on Monday,

8     February 2, 2015.

9

10             Dated this 6th day of February, 2015.

11

12             _____

13

14             RACHEL W. BRIDGE, RMR, CRR
               Notary Public - State of Florida
15             My Commission expires:  1-15-19
               My Commission No.:  FF 159892

16

17

18

19

20

21

22

23

24

25



1                           C E R T I F I C A T E

2     THE STATE OF FLORIDA)

3     COUNTY OF PALM BEACH)

4

5              I, Rachel W. Bridge, Registered Professional
      Reporter and Notary Public in and for the State of
6     Florida at large, do hereby certify that I was
      authorized to and did report said deposition in
7     stenotype; and that the foregoing pages are a true and
      correct transcription of my shorthand notes of said
8     deposition.

9              I further certify that said deposition was
      taken at the time and place hereinabove set forth and
10    that the taking of said deposition was commenced and
      completed as hereinabove set out.

11

12             I further certify that I am not attorney or
      counsel of any of the parties, nor am I a relative or
      employee of any attorney or counsel of party connected
13    with the action, nor am I financially interested in the
      action.

14

15             The foregoing certification of this transcript
      does not apply to any reproduction of the same by any
      means unless under the direct control and/or direction
16    of the certifying reporter.

17             Dated this 6th day of February, 2015.

18

19

20    _____

21    RACHEL W. BRIDGE, RMR, CRR
      Notary Public - State of Florida
22    My Commission expires:  1-15-15
      My Commission No.:  EE 026333

23

24

25



Case 9:13-cv-80456-KAM  Document 113  Entered on FLSD Docket 03/20/2015  Page 123 of 125

NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                                   123

```
 1                    DEPOSITION ERRATA SHEET

 2

 3        Our Assignment No.  276977

 4        Case Caption:   Norman Hirsch, et al.

 5        vs.  Jupiter Golf Club, LLC, et al.

 6

 7          DECLARATION UNDER PENALTY OF PERJURY

 8

 9            I,Norman  Hirsch, declare under penalty of

10      perjury that I have read the entire transcript of

11      my Deposition taken in the captioned matter

12      or the same has been read to me, and

13      the same is true and accurate, save and

14      except for changes and/or corrections, if

15      any, as indicated by me on the DEPOSITION

16      ERRATA SHEET hereof, with the understanding

17      that I offer these changes as if still under

18      oath.

19            Signed on the _____ day of

20      _____, 20____.

21

22      _____

        Norman Hirsch
23

24

25
```



NORMAN HIRSCH                                    February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                              124

1              DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____
              Norman Hirsch
25



Case 9:13-cv-80456-KAM   Document 113   Entered on FLSD Docket 03/20/2015   Page 125 of 125

NORMAN HIRSCH                                February 02, 2015
HIRSCH vs. JUPITER GOLF CLUB                             125

```
1              DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to:_____

3      _____

4      Reason for change:_____

5      Page No._____Line No._____Change to:_____

6      _____

7      Reason for change:_____

8      Page No._____Line No._____Change to:_____

9      _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23

24     SIGNATURE:_____DATE:_____

25          Norman Hirsch
```

