UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 13-80456-CIV-MARRA

NORMAN HIRSCH, MATTHEW DWYER
and RALPH WILLARD, individually and on
behalf of all others similarly situated,

    Plaintiffs,

vs.

JUPITER GOLF CLUB, LLC a Delaware LLC
d/b/a TRUMP NATIONAL GOLF CLUB JUPITER
and RBF, LLC d/b/a THE RITZ-CARLTON
GOLF CLUB & SPA JUPITER,

    Defendants.
_____/

**DEFENDANT JUPITER GOLF CLUB, LLC'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Following a non-jury trial, which took place on August 15 and 16, 2016 (the "Trial"), and based upon the testimony of the witnesses, the evidence presented during the Trial, the arguments of counsel, the designated portions of the deposition transcripts, and the post-Trial submissions by the parties, and being otherwise duly advised in the premises, Defendant Jupiter Golf Club, LLC d/b/a Trump National Golf Club Jupiter ("Trump Jupiter") hereby submits its Findings of Fact and Conclusions of Law in accordance with the Court's August 16, 2016 oral order, as amended.

**FINDINGS OF FACT**

1.    In or about 2002, Defendant RBF, LLC ("Ritz") developed and opened the "Ritz-Carlton Golf Club & Spa, Jupiter" in Jupiter, Florida, a luxury residential condominium development built around a Jack Nicklaus designed signature 18-hole golf course and 68,000 square foot clubhouse housing a high end spa, fitness center and pool (the "Club").

2. Between 2002 and 2012, RBF sold primarily four (4) types of memberships: full memberships, golf memberships, Ritz-Carlton club golf memberships and social & spa memberships.

*The Membership Documents*

3. Every new member who joined the Club entered into a membership agreement with Ritz (the "Membership Agreement;" [Plaintiffs' Trial Exhibits 7-9]), in which they agreed to be bound by the Club's membership plan, as amended as of October 2010 (the "Membership Plan;" [Trump Jupiter Trial Exhibit 1(a)]) and rules and regulations (the "Membership Rules; [Trump Jupiter Trial Exhibit 1(b)]) (collectively, the "Membership Documents") and paid either a refundable or non-refundable deposit ranging from $35,000 to $210,000, either in lump sums or over time.

4. There are several sections in the Membership Documents that are relevant to this proceeding, as they distinguish between the rights of "members" and "resigned members."

5. For instance, Page 2 of the Membership Plan states that "each person who acquires a membership will be entitled to use the Club Facilities in accordance with his or her category of membership and the terms and conditions of this Membership Plan." Notably, nowhere in the Membership Documents does it afford resigned members the right to use the Club.

6. Further, Page 3 of the Membership Plan provides that "[i]n order to enhance the recreational and social pleasure of members and their guests, the Club reserves the right to establish or modify rules, regulations, policies, guidelines, or systems governing access or reservation of the Club Facilities."

7. For those members interested in resigning, Page 8 of the Membership Plan states that "[a] member may transfer his or her membership only to the Club."

8. The Membership Plan also provides that a member wishing to resign must give written notice to the Club:

> Should a member desire to resign from the Club, the member shall be required to give written notice to the Club. The resigned membership will be placed on a waiting list and will be reissued on a first-resigned, first-reissued basis ....

*Id*.

9. As far as membership deposits are concerned, Section III(a) of the Membership Agreement provides that a member who resigns less than 30 years after joining will receive a refund when their membership is reissued:

> A member who resigns less than 30 years after joining the Club will receive a refund when the resigned membership is reissued by the Club to a new member. Provided that the member has paid his or her entire membership deposit in full, the amount of the refund will be the greater of: (i) the amount of the membership deposit previously paid by the resigning member, without interest, or (ii) seventy percent (70%) of the then-current membership deposit charged by the Club to the new member acquiring the membership.

10. With regard to members who continue their memberships for 30 years, Section III(b) of the Membership Agreement provides:

> A member who continues to remain a member in good standing for 30 years will receive a refund 30 years after the member joined the Club. The amount of the refund will be the amount of the membership deposit previously paid by the member, without interest. The member or the member's estate will not receive any additional refund when the membership is eventually resigned and reissued by the Club to a new member, or acquired by a spouse or heir of the member.

11. Section IV of the Membership Agreement, on the other hand, identifies four (4) instances in which a member's deposit will be refunded immediately:

3

> In the event of termination of the Membership Plan, termination of any category of membership, recall of the membership or the discontinuance of operation of all or substantially all of the Club Facilities the members affected will be entitled to refund of the membership deposit paid within 30 days.

12. Page 11 of the Membership Plan requires resigned members to continue to pay their dues until their membership is reissued:

> A resigned member shall be obligated to continue to pay dues, fees and other charges associated with the resigned membership until the reissuance of the membership by the Club to a new member.

13. In addition, the Membership Plan provided that "[t]he payment of dues [would] not be abated for any reason."  [Membership Plan, p. 10.]

14. Section III of the Membership Agreement, however, gives the Club the right to deduct from the membership deposit any amounts that are owed to the Club.

15. In Section V of the Membership Agreement, each member acknowledged receiving the Membership Plan, agreed to be bound by its terms, and acknowledged that they were not relying on any oral representations:

> I hereby acknowledge receipt of The Ritz-Carlton Golf Club & Spa, Jupiter Membership Plan, and Rules and Regulations and that I have read and understand them, and agree to be bound by the terms and conditions thereof as the same may be amended from time to time by the Club.  I further acknowledge that I am not relying on any oral representations in acquiring a membership in the Club.

16. Consistent with the Membership Agreement, the Membership Plan [at page ii] warns that any information or representations not contained in the Membership Plan "**MUST NOT BE RELIED UPON**":

> **NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS NOT CONTAINED IN THIS MEMBERSHIP PLAN AND THE REFERENCED DOCUMENTS AND, IF GIVEN OR**

     **MADE, SUCH INFORMATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE CLUB. IN THE EVENT OF A CONFLICT BETWEEN THE TERMS OF MEMBERSHIP CONTAINED IN THE MEMBERSHIP PLAN, RULES AND REGULATIONS AND MEMBERSHIP AGREEMENTS WITH OTHER PRINTED MATERIALS, THE MEMBERSHIP PLAN, RULES AND REGULATIONS AND MEMBERSHIP AGREEMENTS SHALL GOVERN."**

*Ritz's Financial Difficulties*

  17. After selling off all of the residential real estate in the community, Ritz began experiencing financial difficulties at the Club.

  18. Indeed, at Trial, multiple witnesses testified that under Ritz's ownership, the Club had fallen into a state of disrepair, was on the verge of filing for bankruptcy and lacked the funds necessary to pay back the more than $40 million in deposits it owed to its members.  [*See* Pages 10 and 14-15 of Deposition of Donald J. Trump ("Mr. Trump") (which was played/read into the record at Trial); *see also* Eric Trump Testimony, Trial Tr. Volume II of II (DE 239), pp. 109-10 and 114.]

  19. In response, Ritz began experimenting with different ways to generate additional revenue at the Club.

  20. First, to increase membership, Ritz began offering full members (a/k/a full golf members) the opportunity to sign what they referred to as a "Vesting Addendum," giving them (i) the right to receive a refund of their membership deposit "sooner" than other members "on a 1 in 2 basis instead of a 1 in 5 basis" and (ii) the right to "use the club facilities" for a period of "twelve (12) months after [the member] resigns" their membership from the Club so long as they continue to pay dues during that period.  [*See* Vesting Addendum, Defendant's Trial Exhibit 2.]

  21. Under the Membership Documents, resigned members had no right to use the Club after resigning.

22.     The Vesting Addendum provided, in relevant part, as follows:

> If I resign after my membership vests, my resigned membership will be reissued and I will receive a refund on a 1 in 2 basis instead of a 1 in 5 basis, so that I will receive my refund sooner. If I resign after my membership has vested, I will be obligated to pay dues until the earlier of: (i) twelve (12) months after I resign; or (ii) the reissuance of my resigned membership to a new member. I will be able to use the Club Facilities as long as I am paying dues.

23.     Second, Ritz began allowing resigned members to use the Club in the hope that they would spend money on food and drink, golf, spa and other amenities. [Tony Servideo Testimony, Trial Tr. Volume I of II (DE 238), p. 112.]

24.     Ultimately, however, Ritz's efforts were not enough for Ritz to keep the Club.

***Trump Jupiter Buys the Club***

25.     In response, on or about November 14, 2012, Ritz entered into an agreement (the "PSA") to sell the Club to Trump Jupiter. [Plaintiff's Trial Exhibit 1.]

26.     Pursuant to Section 13.1(d) of the PSA, the parties agreed that Trump Jupiter's purchase of the Club was solely "an asset purchase" and that Trump Jupiter was "not assuming any liabilities" except for those set forth in the Membership Documents together with the obligation to repay each member their refundable deposit in accordance therewith.

27.     On December 4, 2012, Trump Jupiter closed on its purchase of the assets of the Club and renamed it the "Trump National Golf Club Jupiter." [Plaintiff's Trial Exhibit 1.]

28.     On December 14, 2012, Trump Jupiter held a town hall style meeting for the members to present Trump Jupiter's plans for improving the Club. At the meeting, Trump Jupiter, among other things, unveiled its plan to invest more than $20 million to improve the Club's facilities. [Eric Trump Testimony, Trial Tr. Volume I of II (DE 239), pp. 116-19.]

29. The plan was warmly received, but numerous members expressed significant concerns with the way Ritz had operated the Club -- most notably, Ritz's practice of allowing resigned members to continue to use the Club's facilities.

30. According to Trump Jupiter's General Manager, Tony Servideo, several members complained that Ritz's decision to allow resigned members to continue to use the Club had effectively turned membership in the Club into a "joke", encouraging new members to quit the Club almost immediately after joining so they could put their name on the resignation list as a "placeholder" in order to get their deposit back sooner. [Tony Servideo Testimony, Trial Tr. Volume I of II (DE 238), p. 105.]

31. As Mr. Servideo explained:

> Apparently, people were joining the club when it was the Ritz-Carlton, towards the latter part, I would say, from maybe 2010 to '12, where they would join the club, put up the deposit and then automatically put their name on the resignation list as a placeholder. So that was kind of a little bit of an ongoing joke for those that were on the resignation list as placeholders to people that had joined the club in good faith and wanted to be there and spend the time there.

*Id.*

32. In other words, members were gaming the system by joining the Club and resigning shortly thereafter, thus creating a *de facto* membership category comprised of resigned members with full privileges, which was never contemplated by the Membership Documents. The distinction in the Membership Documents between the rights of members and non-resigned members had, in practice, been eliminated.

33. In response, on December 17, 2012, Trump Jupiter sent a letter to all of the Club's members and resigned members explaining that, going forward, resigned members would no

longer be permitted to use the Club's facilities, but that any resigned members who wished to return to the Club would be allowed to do so:

> … it became clear based on the overwhelming applause at Trump International, that if a person is on the resignation list, the membership does not want them to be an active member of the club – likewise as the owner of the club, I do not want them to utilize the club nor do I want their dues. In other words … if you choose to remain on the resignation list, you're out. On the other hand, for those many members who are on the resignation list due to the frustration and the before mentioned problems, we would be honored to give you the ability to return to your original status …

[Plaintiff's Trial Exhibit 11]

34. The next few months were very much a transition period for both Trump Jupiter and the Club's membership. At the same time as Trump Jupiter was adjusting to operating the Club, many of the members were left with questions as to the status of their memberships in the Club going forward.

35. In the end, however, after much consideration, Trump Jupiter decided that it was in the best interests of both the Club and its members to reverse course from Ritz's prior practices that were not provided for under the Membership Documents and simply enforce the Member Documents as they were written by not allowing resigned members to use the Club's facilities -- despite the fact that the Member Documents required resigned members to "pay dues, fees and other charges associated with the resigned membership until the reissuance of the membership." [Eric Trump Testimony, Trial Tr. Volume II of II (DE 239), pp. 130-31.]

36. As Eric Trump testified at Trial:

> [The December 17, 2012 letter] was written three days after we purchased the club, three days. … We were still getting our feet wet at that point.
>
> * * *

8

> In practice, we ended up doing a lot of things different than this letter. And, again, we were getting our feet wet, you know. All the boxes of documentation from this asset had just fallen on our lap. We're brand new to it. So, yes, I mean, listen, I'll be the first one to admit, we followed the membership agreements by the letter of the law. Those are the documents that we ended up letting govern, and I think that's a very important point to note.

[Eric Trump Testimony, Trial Tr. Volume I of II (DE 239), p. 155.]

*<u>Plaintiffs File This Lawsuit</u>*

37. On May 3, 2013, Plaintiffs commenced this class action lawsuit seeking the refund of their membership deposits on the grounds that Trump Jupiter had denied their refund requests in contravention of the Trump Jupiter's duties and obligations under the Membership Documents.[1] [DE 1]

38. On May 13, 2015, the Court granted Plaintiffs' motion for class certification. [DE 124]

39. On October 14, 2015, the Court approved Plaintiffs' revised class action notice [DE 172], restricting the class to members who resigned from the Club **prior** to December 4, 2012. Specifically, the Court defined the class as follows:

> [P]ersons who (i) purchased a Full Golf, Fractional Golf or Social or Spa membership to The Ritz-Carlton Golf Club & Spa – Jupiter (the "Club") from RBF, LLC ("RBF"), (ii) paid a refundable Membership Deposit, (iii) were placed on the club resignation list prior to December 4, 2012, (iv) have not received a refund of any portion of their Membership Deposit, and (v) have not executed the Legacy Addendum.

[DE 171-2]

---

[1] On or about January 22, 2016, the Court issued an Order approving Plaintiffs' request to withdraw its claims against Ritz.

9

40. On July 6 and 7, 2015, Plaintiffs moved for leave to amend the First Amended Complaint to add additional jurisdictional allegations [DE 134 and 135], which the Court granted.

41. On August 18, 2015, Plaintiffs filed their Second Amended Complaint. [DE 146] However, rather than simply adding additional jurisdictional allegations, Plaintiffs removed all previously pled allegations that their memberships had been recalled.

42. On or about September 25, 2015, Trump Jupiter moved for summary judgment seeking dismissal of the Second Amended Complaint. [DE 159]

43. In response to Trump Jupiter's motion, Plaintiffs not only argued that "recall" was "not at issue" in the litigation, but stated that the "fundamental legal issue [was] whether Trump [Jupiter] terminated Plaintiffs' refundable membership categories." [*See* DE 177, pp. 7 and 11]

44. On July 25, 2016, the Court denied Trump Jupiter's motion for summary judgment finding "that Defendant did not terminate the Membership Plan", did not "terminate any category of membership" and that "Plaintiffs are not entitled to a refund based on a discontinuance of operation of all or substantially all the Club Facilities," but, that a "genuine issue of material fact exists as to whether there was a 'recall of the membership' of the class of members on the resignation list." [DE 216]

45. On August 4, 2016, Trump Jupiter moved for reconsideration of the Court's denial of summary judgment. [DE 224-25]

46. On August 15 and 16, 2016, Plaintiffs' only remaining claim, *i.e.*, that Trump Jupiter recalled Plaintiffs' memberships, was tried before the Court.

## CONCLUSIONS OF LAW

A. **BY FILING THE SECOND AMENDED COMPLAINT, PLAINTIFFS WAIVED THEIR CLAIM THAT TRUMP JUPITER "RECALLED" PLAINTIFFS' RESIGNED MEMBERSHIPS**

47. It is well settled that where a plaintiff amends his or her complaint, the amended complaint supersedes the prior complaint, the prior complaint is abandoned and the prior allegations are no longer part of the plaintiff's claims against the defendant. *Hoefling v. City of Miami*, 811 F.3d 1271 (11th Cir. 2016) (once plaintiff "filed the second amended complaint, the first amended complaint (and its attached exhibits) became a legal nullity"); *Dresdner Bank AG v. M/V Olympia Voyager*, 463 F.3d 1210 (11th Cir. 2006) (plaintiff waived the claims alleged in the original complaint where the original complaint was "wholly superseded by the amended complaint which proceeded under a different theory"). This is because once a complaint is amended, the amended complaint becomes the "operative pleading." *Royal American Management, Inc. v. WCA Waste Corporation*, 154 F. Supp. 3d 1278 (N.D. Fla. 2016). From that point forward, F.R.C.P. 15 mandates that the court evaluate the action by reference to the amended complaint, instead of the original complaint as the "prior pleading becomes a nullity." *Koger v. Circuit County Court*, 2007 WL 2460736 (S.D. Fla. 2007) (granting motion to amend and holding that "Plaintiff may not rely on his original complaint as that complaint has become a nullity").

48. Here, Plaintiffs waived any claim that their resigned memberships were allegedly "recalled" by filing the Second Amended Complaint. [DE 146]

49. While Plaintiffs' First Amended Complaint included specific *factual* allegations that Plaintiffs' resigned memberships were allegedly recalled [s*ee* DE 23 specifically at ¶¶ 6-7,

11

53, 67, 69, 71 and 85(a)], Plaintiffs' Second Amended Complaint [DE 146] <u>removed</u> all of these allegations.

50. In fact, the word "recall" appears in only 2 of the 118 paragraphs in the Second Amended Complaint and, only then, for the sole purpose of quoting language in the Membership Documents. [DE 146 at ¶¶'s 17 and 36]

51. Plaintiffs confirmed their intention to abandon the "recall" claim in their response to Trump Jupiter's motion for summary judgment, stating that "recall" was "not at issue" in the case and that the "fundamental legal issue is whether Trump [Jupiter] terminated Plaintiffs' refundable membership categories." [*See* DE 177, pp. 7 and 11]

52. In short, once the Second Amended Complaint was filed, "recall" was no longer part of Plaintiffs' claims against Trump Jupiter. *See Hoefling, supra.*

53. Accordingly, Final Judgment should be entered in favor of Trump Jupiter.

B. **PLAINTIFFS' MEMBERSHIPS WERE NEVER RECALLED**

54. Assuming, *arguendo*, Plaintiffs did not waive their recall claim, Plaintiffs still have not presented evidence that Trump Jupiter recalled their memberships.

55. Plaintiffs' claims are all premised on an alleged breach of contract. Thus, the Court must look to the Membership Documents to determine if a breach occurred. *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996) ("[I]f the terms of a[ ] ... contract are clear and unambiguous, a court must interpret the contract in accordance with its plain meaning, and, unless an ambiguity exists, a court should not resort to outside evidence ... to construe the contract") (citations omitted)).

56. Pursuant to the Membership Plan, there are only three (3) scenarios in which the Club can "recall" a membership:

- [i]f a member sells his or her whole ownership or fractional interest in a property in the Community, does not resign from the Club and does not acquire another property or fractional interest in a property in the Community…[at 9];

- if the member holds an associate membership (such category of membership was not established by Ritz until 2007 by amendment to the Membership Plan); or

- if the Club is converted to an equity member-owned club [at 14].

57. Here, there is no evidence that any of the foregoing scenarios occurred.

58. Even if Plaintiffs had presented such evidence, the Membership Plan states that if a membership is recalled by the Club, "the membership will be treated as being resigned." *Id.* at 12. Thus, once a member resigns, the membership can no longer be recalled. This is because pursuant to the Membership Plan, upon resigning, "[a] member may transfer his or her membership only to the Club," [page 11 of the Membership Plan], and as Laura Tuzi, the former membership administrator under Ritz confirmed, once a member resigns, their membership automatically transfers back to the Club so that it can be reissued to a new member. [Trial Tr. Volume I of II (DE 238), p. 33.][2]

59. In this case, it is undisputed that Plaintiffs all resigned their memberships <u>prior</u> to the date on which Trump Jupiter closed on its purchase of the assets of the Club from Ritz. [DE 171-2] As a result, Plaintiffs' argument, that their memberships were recalled by Trump Jupiter on or after the date on which Trump Jupiter closed on its purchase of the assets of the Club from Ritz, is without merit.

---

[2] Merrian-Webster defines "resign" as "to give up (a job or position) in a formal or official way" (http://www.merriam-webster.com/dictionary/resign) while Oxford English Dictionary defines "resign" as "to relinquish, give up (an office, position, right, claim, etc.)" (http://www.oed.com/view/Entry/163595?rskey=uuf8ZM&result=2#eid).

60. Also unpersuasive is Plaintiffs' claim that that their memberships were recalled once Trump Jupiter began denying them access to the Club. Not only had Plaintiffs already resigned from the Club, but Trump Jupiter was under no obligation to continue Ritz's informal practice of allowing resigned members to use the Club's facilities, as no such rights were specified or afforded in the Membership Documents. *See Rose v. M/V "Gulf Stream Falcon,"* 186 F.3d 1345, 1350 (11th Cir. 1999) (citing *Green v. Life & Health of Am.*, 704 So. 2d 1386, 1391 (Fla. 1998) ("the actual language used in the contract is the best evidence of the intent of the parties"); *Ellinger v. U.S.*, 470 F.3d 1325, 1338 (11th Cir. 2006) (". . . court will not look beyond the four corners of the document to determine the parties' intent"); *Philadelphia American Life Ins. Co. v. Buckles*, 350 Fed. Appx. 376, 380-81 (11th Cir. 2009), citing *Shipner v. Eastern Air Lines, Inc.*, 868 F.2d 401, 405 (11th Cir. 1989) ("a Florida court may not consider extrinsic evidence to interpret a contract which is clear and unambiguous," including "course of performance").

61. As discussed above, when Trump Jupiter purchased the assets of the Club from Ritz, Trump Jupiter only agreed to assume the express obligations of Ritz under the Membership Documents. [*See* PSA, Section 13.1(d).] Trump Jupiter never agreed to be bound by anything Ritz may have agreed to or otherwise allowed outside of the four corners of the Membership Documents.

62. Plaintiffs, sophisticated parties who paid anywhere from $35,000 to $210,000 to join a Ritz Carlton golf and country club, also acknowledged in the Membership Documents that they were "<u>not</u> relying on any oral representations in acquiring a membership in the club" (Section V of the Membership Agreement) and that "**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY**

14

**REPRESENTATIONS NOT CONTAINED IN THIS MEMBERSHIP PLAN AND THE REFERENCED DOCUMENTS AND, IF GIVEN OR MADE, SUCH INFORMATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE CLUB."** (Page ii of the Membership Plan).

63. Regardless, pursuant to the terms of the Membership Plan, Trump Jupiter reserved for itself the right to "modify rules, regulations, policies, guidelines, or systems governing access … of the Club Facilities" [Membership Plan, p. 3], and Florida law is well settled that a court should not interfere with a private club's interpretation of its rules. *Dadurian v. Mar-A-Lago Club, L.L.C., L.C.*, Case No. 502009CA016841 (Fla. 15th Cir. Ct. June 10, 2010) ("Florida law is clear that this Court should not interfere with the Club's interpretation of its Rules"), *aff'd*, 94 So. 3d 690 (Fla. 4th DCA 2012); *Boca West Club, Inc. v. Levine*, 578 So. 2d 14, 16 (Fla. 4th DCA 1991) (courts "will not interfere with [a club's] authority to construe [its bylaws]"); *Susi v. St. Andrews Country Club, Inc.*, 727 So. 2d 1058, 1061 (Fla. 4th DCA 1999) ("a well[-]established proposition in Florida law that ordinarily courts will not intervene in the internal affairs of ... voluntary associations") (internal citation omitted); *Shumrak v. Broken Sound Club, Inc.*, 898 So. 2d 1018, 1020 (Fla. 4th DCA 2005). As such, Trump Jupiter was well within its rights under the Membership Plan to reverse course from Ritz's prior policies and not allow resigned members to use the Club's facilities – especially since the Membership Documents did not even give resigned members the right to use the Club facilities in the first place.

64. Interpreting the Membership Documents as affording resigned members the same rights as members is also not only counterintuitive, but would render meaningless virtually all of the provisions specific to resigned members. *Vital Pharm., Inc. v. Balboa Capital Corp.*, No. 14-

15

62469-CIV, 2016 WL 4479370, at *5 (S.D. Fla. Aug. 25, 2016) (granting summary judgment in favor of defendant where plaintiffs' interpretation of the agreement "would violate a fundamental rule of contract interpretation…[which] would render other portions of the contract meaningless"); *Winn-Dixie Stores, Inc. v. Big Lots Stores, Inc.*, No. 9:11-CV-80601-DMM, 2016 WL 2918152, *5 (S.D. Fla. May 18, 2016) ("under Florida law, courts will not interpret a contract in such a way as to render provisions meaningless when there is a reasonable interpretation that does not do so. Instead, courts must strive to interpret a contract in such a way as to give meaning to all provisions while doing violence to none.") (*citing Bethany Trace Owners' Ass'n, Inc. v. Whispering Lakes I, LLC*, 155 So. 3d 1188, 1191 (Fla. 2d DCA 2014), *reh'g denied* (Jan. 23, 2015) (internal citations and quotations omitted)); *see also City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000) ("[W]e rely upon the rule of construction requiring courts to read provisions of a contract harmoniously in order to give effect to all portions thereof."); *see also Moore v. State Farm Mut. Auto. Ins. Co.*, 916 So. 2d 871, 877 (Fla. 2d DCA 2005) (noting that courts will not interpret a contract in a manner that renders provisions meaningless if a reasonable interpretation is otherwise available).

65. As Trump Jupiter's General Manager, Tony Servideo testified, people "would join the club, put up the deposit and then automatically put their name on the resignation list as a placeholder." [Tony Servideo Testimony, Trial Tr. Volume I of II (DE 238), p. 112.] In other words, members were trying to game the system by creating a new category of membership – not afforded under the Membership Documents -- made up of resigned members with full access to Club facilities. Clearly, this is not what was intended.

66. While the Membership Documents clearly state that "members" are entitled to access the Club's facilities, nowhere do they afford "resigned members" the right to use the

16

Club's facilities. The only exception was for members who executed Vesting Addendums; they were given the right "use the club facilities" for a period of "twelve (12) months after [the member] resigns." [Trump Jupiter Trial Exhibit 2.]

67.     In short, while Ritz may have at one time believed that it was in its best interests to simply allow resigned members the same exact rights as non-resigned members -- whether for financial reasons or otherwise -- there was nothing in the PSA or the Membership Documents that contractually obligated Trump Jupiter to continue that same informal and unwritten policy.

68.     When Plaintiffs resigned their memberships, they made an affirmative representation that they no longer wished to remain members and were transferring their memberships back to the Club so that their memberships could be re-issued to new members and have their membership deposits returned. From that point forward, Plaintiffs' memberships were no longer subject to recall by the Club and Trump Jupiter could not have breached the terms and conditions of the Membership Documents.

69.     Accordingly, Final Judgment should be entered in favor of Trump Jupiter.

## CONCLUSION

Based upon the foregoing Findings of Fact and Conclusions of Law, Trump Jupiter is entitled to judgment in its favor and against Plaintiffs. Plaintiffs shall take nothing from this action.

[*Note - **In the alternative to a Final Judgment in favor of Trump Jupiter on all issues, if the Court were to find that it would be inequitable for Plaintiffs to be invoiced for dues, fees, and other charges while not being permitted to use the Club Facilities, then Trump Jupiter respectfully requests that the Court grant the following relief***:

Based upon the foregoing Findings of Fact and Conclusions of Law, although Trump Jupiter did not breach the agreements by "recalling" the resigned memberships, the Court exercising its equitable powers determines that Plaintiffs are entitled to the following: (i) a credit on Plaintiffs' accounts at the Club for all dues, fees and other charges billed by Trump Jupiter since the date Trump Jupiter acquired the assets of the Club and denied the Plaintiffs access to the Club's facilities, and (ii) from the date of judgment forward, Plaintiffs shall be allowed to use the Club's facilities in accordance with their respective membership categories until such time as their resigned memberships are reissued to new members, provided that during the time Plaintiffs use the Club facilities, Trump Jupiter shall be permitted to bill Plaintiffs for all dues, fees and other charges in accordance with the terms of the Membership Documents.]

Dated: October 7, 2016

Respectfully submitted,

RUSSOMANNO & BORRELLO, P.A.
Museum Tower, Penthouse 2800
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 373-2101
Facsimile: (305) 373-2103

By: /s/ Herman J. Russomanno III
Herman J. Russomanno (Fla. Bar No. 240346)
hrussomanno@russomanno.com
Robert J. Borrello (Fla. Bar No. 764485)
rborrello@russomanno.com
Herman J. Russomanno III (Fla. Bar No. 21249)
herman2@russomanno.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Herman J. Russomanno III