UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 13-80456-CIV-MARRA/MATTHEWMAN

NORMAN HIRSCH, MATTHEW DWYER,
and RALPH WILLARD, individually
and on behalf of all others similarly situated,

       Plaintiffs,

v.

JUPITER GOLF CLUB LLC, a Delaware
LLC d/b/a TRUMP NATIONAL GOLF
CLUB JUPITER and RBF, LLC d/b/a
THE RITZ-CARLTON GOLF CLUB &
SPA JUPITER,

       Defendants.

_____/

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried before the Court. Based upon the evidence presented during the bench trial, the record in this matter, the argument of counsel,[1] and otherwise being duly advised in the premises, the Court issues these findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.  INTRODUCTION

Plaintiffs Norman Hirsch, Matthew Dwyer and Ralph Willard ("Plaintiffs") purchased refundable memberships in the Ritz-Carlton Golf Club & Spa Jupiter, n/k/a Trump National Golf Club Jupiter ("Club").  The underlying dispute arises out of their contention that the current Club owner—Defendant, Jupiter Golf Club, LLC d/b/a Trump National Golf Club Jupiter

---

[1] The Court notes that it has considered the arguments of counsel raised in the previous summary judgment motion, the motion for reconsideration of the Court's order on summary judgment, and counsels' statements and stipulations made in the pretrial stipulation and on the record at trial.

("Defendant")—failed to refund their membership deposits under the terms of the agreements they executed to become Club members.

On May 3, 2013, Plaintiffs filed a three-count class action Complaint (DE 1) for declaratory judgment (count one), breach of contract (count two) and injunctive relief (count three). On August 8, 2013, Plaintiffs filed an amended complaint (DE 23).  The Court certified this action as a class action on May 13, 2015 (DE 124), identifying the class claim as the breach of contract claim in the amended complaint and appointing Plaintiffs and their counsel as Class Member representatives (Id.).

The former Club owner, RBF, LLC d/b/a Ritz-Carlton Golf Club & Spa Jupiter ("RBF" or "Ritz"), was originally a co-defendant is this action (DE 1).  Plaintiffs later settled with RBF (DE 184), which the Court approved granting dismissal of RBF with prejudice in accordance with Plaintiffs' and RBFs' stipulation of dismissal (DE 187 at 3). The Court's order approving RBF's dismissal did not dispose of Plaintiffs' and Class Members' claims against Defendant and likewise did not resolve RBF's cross-claim against the Club (DE 52 and DE 59), which was severed from the Court's trial of Plaintiffs' action (DE 200).

On August 15, 2015, Plaintiffs filed a Second Amended Complaint for breach of contract, declaratory relief and injunctive relief against Jupiter Golf Club, LLC as sole Defendant (DE 146). The declaratory and injunctive claims for relief were premised on the breach of contract claims (DE 216 at 11), arising from allegations that after Defendant acquired the Club it took actions that triggered the return of Plaintiffs' and Class Members' membership deposits within 30 days, and Defendant failed to return the deposits as required.  Thereafter, on September 21, 2015, the Club moved for summary judgment (DE 159), on the grounds that as a matter of law none of the four circumstances that would give rise to a return of Plaintiffs' deposits within 30 days had occurred

(DE 216 at 6).  On July 25, 2016, the Court issued an order denying Defendant's Motion concluding that "a genuine issue of material fact exist[ed] as to whether there was a 'recall of the membership' of the class of members on the resignation list" (DE 216 at 9).  In reaching that conclusion, the Court observed that "recall" was defined by Merriam-Webster as "cancel" or "revoke;" by the New Oxford Dictionary as "revoke" or "annul;" and by Black's Law Dictionary as "removal…from office" (DE 216 at 9-10).  The Court found that there was a disputed issue of fact as to whether "Defendant canceled or revoked Plaintiffs' memberships, or removed Plaintiffs from membership in the Club," based on differing evidence concerning Club access (Id. at 10). Plaintiffs produced evidence that Defendant denied Class Members access to the Club, while Defendant presented evidence that no one was denied access (Id. at 11). The parties stipulated that whether Defendant recalled Plaintiffs' and Class Members' memberships was a factual issue to be litigated at trial (DE 227 at 5).  The parties tried the issue before the Court over a two-day period, August 15-16, 2016 (DE 227 at 5).

## II.  FINDINGS OF FACT[2]

1.      Plaintiffs are members of the Class ("Class Members") that the Court certified and whose rights to refunds the parties tried before the Court (DE 227 at 4). The Class contains sixty-five identified members including Plaintiffs (Id. at 4-5).

2.      Class Members purchased Club memberships and became Club members by executing the Ritz Membership Agreement that defined the member's relationship and categories of membership and granted them associated access of the Club (Trial Tr. Vol. I at 18-19, 25-27, 29-30; Trial Tr. Vol. II at 9; Plaintiffs' Trial Ex. 10 at R000000958; Ex. 6, Ex. 7-9 and Ex. 59-61).

---

[2] To the extent that any conclusions of law constitute findings of fact and vice versa, they are respectively adopted as such.

The membership categories Class Members purchased were Full Golf, Fractional Golf, or Social and Spa memberships (DE 146 at 17; Plaintiffs' Trial Ex. 7-9 and Ex. 59-61). These categories of memberships were "Refundable Memberships," entitling them to a refund of the membership deposit they made when joining the Club (Id.; Plaintiffs' Trial Ex. 10 at R000000958; DE 227 at 4). The deposit amount each Class Member paid with respect to the member's category of membership is uncontested (DE 227 at 4).

       3.     Plaintiffs and Class Members' Refundable Memberships entitled them to use the Club facilities according to their membership categories (Trial Tr. Vol. I at 39, 50; Vol. II at 24). According to testimony presented at trial, use of Club facilities is a "fundamental ingredient" of Club membership (Trial Tr., Vol. II at 23-24). The Membership Agreement expressly granted Plaintiffs and Class Members "a revocable license to use the Club Facilities in accordance with the terms and conditions of the Membership Plan and Rules and Regulations…" (Trial Tr. Vol. II at 20-21, 23; Plaintiffs' Trial Ex. 7 at R0000008174-8175; Ex. 8 at R0000001216; Ex. 9 at R0000001199-1200; Ex. 56 at TMP 000005; Ex. 58 at TMP 000155; Ex. 59 at TMP 000148; Ex. 60 at TMP 000265; Ex. 61 at TMP 000254). According to witness testimony, Club membership is permission to use the Club (Trial Tr. Vol. I at 51–52, 195; Trial Tr. Vol. II at 23–24, 63).

       4.     In addition to executing a Membership Agreement, the Club provided Class Members Membership Plans ("Plan") and Rules and Regulations ("Rules") upon their admissions to Club membership (Trial Tr. Vol. I at 30-31). Under Section V of the Membership Agreement, a member including each Class Member agreed not only to be bound by the Membership Agreement, but also to be bound by the terms and conditions of the [Ritz] Membership Plan and Rules and Regulations (Plaintiffs' Trial Ex. 7 at R0000008175; Ex. 8 at R0000001216; Ex. 9 at

R0000001200; Ex. 56 at TMP 000005; Ex. 58 at TMP 000156; Ex. 59 at TMP 000149; Ex. 60 at

TMP 000266; Ex. 61 at TMP 000255).

*The Dispute*

5.     The relevant terms and conditions of the Membership documents were materially

similar.[3] Consistent with the allegations of the Second Amended Complaint and as the Court found

in its order denying summary judgment, the documents governing operation of the Club provide

four circumstances, which if any occurred, afforded Class Members the right to a return of their

deposit within 30 days: [1] termination of the Membership Plan, [2] termination of any category

of membership, [3] recall of the membership or [4] the discontinuance of operation of all or

substantially all of the Club Facilities…" (Plaintiffs' Trial Ex. 7 at R0000008174; Ex. 8 at

R0000001216; Ex. 9 at R0000001199; Ex. 56 at TMP 000005; Ex. 58 at TMP 000155-56; Ex. 59

at TMP 000149; Ex. 60 at TMP 000266; Ex. 61 at TMP 000255; DE 146 at ¶¶ 17, 36, 80d, 103-

104; DE 216 at 6, 9).

6.     Of these four conditions, the issue tried in this case is whether or not Defendant

recalled the memberships of members of the Class the Court has certified for class treatment (DE

124). Defendant contends (and its lead attorney for its acquisition of the Club testified at trial) that

"recall" is limited to three instances referenced in the membership Plan (Trial Tr. Vol. II at 63-65).

The Membership Agreement, however, specifies that Defendant has the right "in its discretion" to

recall memberships "at any time for any or no reason whatever…" (Plaintiffs' Trial Ex. 7 at

---

[3] By stipulation, the Membership Agreements and Plan produced by Ritz in discovery were
sufficient evidence of the subject contracts for Plaintiffs and Class Members alike (DE 227 at 6).
Bates stamped exemplars of the Membership Agreements for refundable membership categories
were admitted into evidence without objection, as Plaintiffs' Trial Exhibits 7-9 (Trial Tr. Vol. I at
29-30). A bates stamped exemplar of the 2010 Plan was admitted into evidence without objection
as Plaintiffs' Trial Exhibit 10 (Trial Tr. Vol. I at 38). Plaintiffs' executed Membership Agreements
were admitted into evidence without objection as Plaintiffs' Trial Exhibits 59-61.

R0000008174; Ex. 8 at R0000001216; Ex. 9 at R0000001199; Ex. 56 at TMP 000005; Ex. 58 at TMP 000155; Ex. 59 at TMP 000148; Ex. 60 at TMP 000265; Ex. 61 at TMP 000254; Trial Tr. Vol. II at 67).  Defendant's attorney who also served as its corporate representative confirmed under oath that the latter provision would allow Defendant to recall a membership for any reason (Trial Tr. Vol. II at 4, 68, 81).

*Defendant's Assumption of Ritz's Obligations*

7.     Defendant purchased the Club through a Purchase and Sale Agreement ("PSA") dated November 14, 2012, through which it assumed the existing contractual rights and obligations then existing between the original contracting parties, Ritz and Class Members, including those rights arising from provisions on deposit refunds (Plaintiffs' Trial Ex. 1, 7-9, 59-61; Trial Tr. Vol. II at 5; DE 141 at ¶¶ 24, 26; DE 227 at 5). In the Membership Agreement, Club members agreed, "[i]n the event that the Club Facilities are sold and the buyer assumes liability for the repayment of the membership deposit, the[y]…shall look solely to the new owner for repayment of the membership deposit and the seller of the Club Facilities shall be released from all liability for the repayment thereof" (Plaintiffs' Trial Ex. 7 at R0000008174; Ex. 8 at R0000001216; Ex. 9 at R0000001199; Ex. 56 at TMP 000005; Ex. 58 at TMP 000155; Ex. 59 at TMP 000148; Ex. 60 at TMP 000265; Ex. 61 at TMP 000254).

8.     The PSA transaction "centered around [Defendant's] assuming certain obligations contained within the membership plan and agreements" (Trial Tr. Vol. II at 52-54; Plaintiffs' Trial Ex. 13 at R000017422). Under the PSA, Defendant assumed the obligations of Ritz under the Membership Agreement and Plan including the contracting parties' intent evidenced by their performance of their agreement and the refund obligations in force and applicable to Class Members when Defendant purchased the Club. The PSA defined "Club Documents" as the

"Membership Agreements,[4] the Membership Notes, the Membership Plan and rules and regulations of the Club" (Plaintiffs' Trial Ex. 1 at R000000004). Defendant took title to the Club subject to the 2010 version of the Plan and other Club Documents applicable to Class Members (Trial Tr. Vol. II at 26; Plaintiffs Trial Ex. 10, Ex. 7 at R0000008175; Ex. 8 at R0000001216; Ex. 9 at R0000001200; Ex. 56 at TMP 000005; Ex. 58 at TMP 000156; Ex. 59 at TMP 000148; Ex. 60 at TMP 000265; Ex. 61 at TMP 000254). Defendant expressly assumed "the right, title, interest and obligations of Seller [Ritz] in the Delivered Club Documents including the Refund Obligations" pursuant to "the Club Document Agreement" (Plaintiffs' Trial Ex. 1 at R000000028-29; Trial Tr. Vol. II at 7). The Club Document Agreement states in Paragraph 3: "Assignor [Ritz] hereby assigns to Assignee [Defendant], and Assignee hereby assumes from Assignor the right, title, interest and obligations of Assignor in the Delivered Club Documents including the Refund Obligations" (Plaintiffs' Trial Ex. 2 at R000000098). Defendant also expressly assumed the "non-financial obligations" arising out of the Membership Agreements and Plan (Plaintiffs' Trial Ex. 1 at R000000030).

9.      Class Members paid a total of $4,849,000 in refundable membership deposits, which Defendant assumed through the PSA to repay according to the terms and conditions of the Delivered Club Documents (DE 227 at 5-6). One of these terms and conditions Defendant assumed is the following: "In the event of termination of the Membership Plan, termination of any category of membership, recall of the membership or the discontinuance of operation of all or substantially all of the Club Facilities, the members affected will be entitled to a refund of the membership

---

[4] The PSA defines "Membership Agreements" as "the agreements, addenda and amendments contained in the Delivered Club Documents, in each case fully executed and entered into between Club Members and Seller relating to a Club Member's right to use the Club and obligations of Club Members, and obligations of Seller with respect to refund of a Club Member's deposits, as applicable" (Plaintiffs' Trial Ex. 1 at R000000007).

deposit paid within 30 days" (Plaintiffs' Trial Ex. 7 at R0000008174; Ex. 8 at R0000001216; Ex. 9 at R0000001199; Ex. 56 at TMP 000005; Ex. 58 at TMP 000155-56; Ex. 59 at TMP 000148; Ex. 60 at TMP 000265; Ex. 61 at TMP 000254; DE 146 at ¶¶ 17, 36, 80d, 103-104; DE 216 at 6, 9).

10.     The PSA further contained several attached schedules including a Schedule C and a Schedule T.  Defendant assumed Schedule C to the PSA—the "Club Document Agreement" — by which Ritz formally assigned to Defendant the title, interests, liabilities, and the obligations of the Club Documents, including the refund obligations owed to Plaintiffs and Class Members (Plaintiffs' Trial Ex. 2 at R000000098; Trial Tr. Vol. II at 6-7).  Defendant also assumed in its entirety Schedule T—the member matrix—containing a list of Club members, including Class Members (Plaintiffs' Trial Ex. 6; Trial Tr. Vol. II at 12). The PSA defines "Club Members" as "those Persons who have purchased or been provided a license to use the Club and are currently a member of the Club, whether as a delinquent member or a member in good standing, listed on the attached Schedule T…" (Plaintiffs' Trial Ex. 1 at R000000004).  Schedule T further defines the liabilities of Club members including Plaintiffs and Class Members that Defendant assumed (Plaintiffs' Trial Ex. 6; Trial Tr. Vol. II at 12).  The "Total Case Received ($)" column reflects the amount of the membership deposit paid by the Club member (DE 141 at ¶ 25). The "status" column of Schedule T (Plaintiffs' Trial Ex. 6) indicates the member's status as active by the letter "A" (Plaintiffs' Trial Ex. 6; Trial Tr. Vol. II at 8, 13-14; DE 241-2 at 67-68, 73).  Plaintiffs and Class Members were listed in Schedule T as active Club members (Plaintiffs' Trial Ex. 6; Trial Tr. Vol. II at 14).

*Consideration for Club Membership*

11.     The amount of dues paid by each Club member was and is dictated by the Club member's membership category, which in turn dictated the level and type of Club access[5] (Trial Tr. Vol. I at 50, 169, 198; Vol. II at 79).

12.     Based on evidence presented at trial, dues were and are regular payments made to be a member of the Club (Trial Tr. Vol. I at 39; Vol. II at 23-24, 36).  As consideration for their memberships entitling them access to and use of the Club, Plaintiffs and Class Members paid dues, and they made refundable membership deposits with the expectation they be returned in the future (Trial Tr. Vol. I, at 18-19, 49, 53, 141-42, 151, 159, 169, 172; Vol. II at 36; DE 164 at ¶ 2). To this effect, each Membership Agreement in Section I under the heading, "Purchase of Membership," articulates the consideration for Club membership stating, in relevant part, that Plaintiffs and Class Members "agree[d] to pay to the Club the membership deposit and the membership dues… for the category of membership selected, on or before the Closing Date, at which time [they] w[ould] have use of the Club Facilities provided for under th[e] Agreement"(Plaintiffs' Trial Ex. 8 at R0000001215; Ex. 9 at R0000001198; Ex. 56 at TMP 000004; Ex. 58 at TMP 000154; Ex. 59 at TMP 000147; Ex. 60 at TMP 000264; Ex. 61 at TMP 000253).  Accordingly, in performing their mutual obligations under the Membership Agreement, Plaintiffs' and Class Members made on-going payments of annual Club dues to Ritz, and in exchange the Club permitted Plaintiffs and Class Members on-going access to the Club commensurate with their membership categories (Trial Tr. Vol. I at 38-39, 50, 53-54, 141-142, 172, 198; Vol. II at 23-24, 151).

---

[5] In addition, Plaintiff Matthew Dwyer had access to the Club except the golf course, because he owned a fractional interest in a timeshare located at the Club (Trial Tr. Vol I at 80, 133-36).  His golf membership afforded him access to the Club's golf facilities (Trial Tr. Vol. I at 133-36).

*Fees and Charges*

13.      In addition to dues and refundable deposits, Club members under Ritz including

Class Members were obligated to pay and did pay fees and charges (Trial Tr. Vol. I at 36-37, 39-

40, 54, 125, 142, 154, 172). Fees and charges were and are associated with actual use of the Club

facilities and were and are paid in consideration for some form of actual Club usage (Trial Tr. Vol.

I at 39-40, 54, 169-170, 172, 191; Plaintiffs' Trial Ex. 10 at R000000959-0960, R000000962). A

person having no access to the Club facilities would not incur a fee owed to the Club (Trial Tr.

Vol. II at 95). Examples of usage fees include cart, caddie, range, greens, and guest fees (Trial Tr.

Vol. I at 39-40, 54, 112, 125-126; Plaintiffs' Trial Ex. 10 at R000000959-0960).   Examples of

usage charges include charges for use of the ballroom, spa, or for consumption for food and

beverages at the Club (Trial Tr. Vol. I at 54, 126, 142, 169-171).

*Membership Status While on the Resignation Waiting List*

14.      The Membership Plan described the refundable deposit as a "Special Benefit" for

members joining the Club (Trial Tr. Vol. I at 53; Plaintiffs' Trial Ex. 10 at R000000952). The

benefit was that at some point in time after expressing a desire to resign from the Club and spending

time on a resignation waiting list, the member would receive a return of the full deposit upon

reissuance of their membership (Trial Tr. Vol. I at 53).

15.      The Plan provides, "[s]hould a member desire to resign from the Club, the member

shall be required to give written notice to the Club, which notice must be signed by all parties on

the membership application" (Plaintiffs' Ex. 10 at R000000967).   Prior to Defendant's acquisition

of the Club, under the Membership Agreement and Plan, Club members including Class Members

could and did express a desire to resign their Club memberships by informing Ritz of their desire

to resign in writing (Trial Tr. Vol. I at 19-20, 22-23; Plaintiffs' Trial Ex. 10 at R000000966,

R000000967; Ex. 14 at TMP 001135, Ex. 18, Ex. 21, Ex. 22a-22f). In return, the Club placed their "Refundable Membership[s]…on a waiting list" responding with a standard form letter consistent with the intent of the parties to the original Membership Agreements, informing them of that placement, advising them of the standard resignation procedures, including that they would be notified upon reissuance of their memberships and in the meantime their memberships remained active (Trial Tr. Vol. I at 23-24, 37-38, 40; Plaintiffs' Trial Ex. 10 at R000000967; Plaintiffs' Trial Ex. 22a-22f; DE 141 at ¶¶ 11-13).

16.     No Plaintiff and no Class Member has reached the point of membership reissuance, and none has received a refund of the member's membership deposit.  Under the Plan, if the Club were to have a membership available for sale in the resignation waiting list member's membership category and one existed on the list in that category, then every fifth membership sold in that category would be one from the resignation waiting list (Plaintiffs' Trial Ex. 10 at R000000953, R000000967; Trial Tr. Vol. II at 172; D. Trump Dep. at 14).  Reissuance of a membership from the resignation waiting list can and could under Ritz and Defendant take ten years or more (Trial Tr. Vol. I at 127-28; Vol. II at 176; Plaintiffs' Trial Ex. 11 at R000017415).[6] Once the member reached the top of the list, his or her membership would be refunded (DE 141 at ¶¶ 11-13).

17.     Ritz and Class Members were the contracting parties under the Membership Agreement (Plaintiffs' Trial Ex. 59-61).  Their course of performance of the agreement manifested their intentions that their refundable memberships remain active until reissued and that the member's obligations to the Club and the Club's obligations to the member remain intact until the

---

[6] However, members who signed "Vesting Addendums" could benefit from a "1 in 2" rather than a "1 in 5" basis of reissuance (Defendant's Trial Ex. 2).  These addendums were not referenced in any of the governing documents; they were simply amendments agreed to between an individual member and the Club under Ritz (Trial Tr. Vol. II at 102-103).

date of reissuance. According to the contracting parties' performances of the agreement, resignation under the Membership Agreement and Plan was not complete until reissuance of the resignation waiting list member's membership (Trial Tr. Vol. I at 19). Nothing in the Membership Agreement and Plan applicable to Plaintiffs and Class Members states that after expressing a desire to be placed on the resignation waiting list they must pay dues, fees, and charges but would no longer have permission to access the Club (Trial Tr. Vol. I at 125, 158).  As a matter of course and routine practice, Ritz considered memberships of Club members including Plaintiffs and Class Members on the resignation waiting list active, allowing them continuing access to Club facilities as they had previously (Trial Tr. Vol. I at 22-25, 37-38, 40, 81, 95, 142, 169, 172-173, 188; Plaintiffs' Trial Ex. 22a-22f). When purchasing the Club and shortly thereafter, Defendant was aware of Ritz's polices regarding and treatment of members on the resignation waiting list, including that under Ritz resignation list members were active members who paid dues and had access (Trial Tr. Vol. I at 97, 188, 209-10; Vol. II at 54). Defendant continued the employment of Ritz employees who were familiar with the membership documents, Ritz policies, and members, and made one of them, Debbie Schulman, the point of contact on membership refund issues (Trial Tr. Vol. I at 49, 64).

18.     Moreover, the Plan specified that Club members on the resignation waiting list must still pay consideration for their memberships and use of the Club.  Under the Plan, members on the resignation waiting list remained obligated "to continue to pay dues, fees and other charges" until reissuance (Trial Tr. Vol. I at 40; Plaintiffs' Trial Ex. 10 at R000000970, R000000982).  The Plan further specified, "[i]f a membership [wa]s reissued during a membership year, the resigned member shall be entitled to a refund of a pro rata portion of any dues and other fees paid in advance for which services have yet to be rendered" (Plaintiffs' Trial Ex. 10 at R000000970).

19.     Members paid dues to the Club to be able to use it (Trial Tr.  Vol. I at 38).  Dues are the consideration paid for permission to use the Club according to the member's category of membership (Trial Tr.  Vol. I at 50). Ritz therefore billed resignation waiting list members including Plaintiffs and Class Members for dues that they paid in exchange for Club access while on the list; and Class Members likewise continued to incur fees, which, according to the evidence adduced at trial, are associated with their actual uses of the Club Facilities(Trial Tr. Vol. I at 39-40, 54, 95, 169-170, 172, 191; Trial Tr. Vol. II at 79; Plaintiffs' Trial Ex. 10 at R000000970,R000000982; ¶ 13 above). The "Vesting Addendums" introduced at trial also confirmed that as long as the member on resignation waiting list continues to pay dues, the member "will be able to use the Club Facilities" (Defendant's Trial Ex. 2). Failure to pay dues or other amounts owed to the Club could lead to termination or suspension of the member's membership (Trial Tr. Vol. I at 99; Plaintiffs' Trial Ex. 10 at R000000999).

*Defendant's New Club Policies and Operations*

20.     After closing on its purchase of the Club on December 4, 2012(DE 141 at ¶ 24), Defendant held a town-hall-style meeting on December 14, 2012, to discuss amendments to Club Documents and changes to aspects of Club (Trial Tr. Vol. I at 55, 173; D. Trump Dep. at 11-12).[7] Donald Trump holds the top position at Defendant's company (Trial Tr. Vol. II at 47). After the December 14, 2012 meeting, under Trump's authority, Defendant disseminated a letter to all Club members including those on the resignation waiting list (Trial Tr. Vol. I at 55-56; DE 227 at 7; D. Trump Dep. at 16). The letter was dated December 17, 2012, and bore the signature of Donald

---

[7] A videotape of the deposition of Donald J. Trump ("D. Trump Dep.") was played during the trial in its entirety (Trial Tr. Vol. I at 44-45).  Plaintiffs later filed the transcript of the deposition (DE 240-1).

Trump, as owner of the Club (Trial Tr. Vol. I at 55-56; Plaintiffs' Trial Ex. 11; D. Trump Dep. at 16, 24).

21.     Defendant expected that recipients of the December 17, 2012 letter would read it and understand it (D. Trump Dep. at 35). The text of the letter was materially the same for all Class Members.[8] The letter intentionally and unequivocally communicated to Plaintiffs and Class Members three options that they must choose by December 31, 2012: opt-in; opt-out; or remain on the resignation waiting list, but pay no Club dues and have no Club access (Trial Tr. Vol. I at 57-62, 64, 145; Vol. II at 496-4; D. Trump Dep. at 19, 25-26, 35; Plaintiffs' Trial Ex. 11). These options were implemented for the first time by Defendant and not contained in the terms of the Membership Agreement, Plan, or Rules.

22.     Those members who opted in were afforded a reduction in Club dues for three years and reciprocity with the other Trump-owned clubs, in exchange for forfeiting their rights to refunds (Trial Tr. Vol. I at 56-57, 63-64, 198; Vol. II at 38, 167; Plaintiffs' Trial Ex. 11; D. Trump Dep. at 17). Those members who opted out kept their rights to refunds and Club access, but could not be on the resignation waiting list and would incur an increase in Club dues with no cap on the amount of Club dues (Trial Tr. Vol. I at 58-61, 64; D. Trump Dep. at 18; Plaintiffs' Trial Ex. 11). Class Members fell into the third category communicated by the December 17, 2012 letter, which Ritz counsel disputed as not contemplated by the membership documents (Trial Tr. Vol. II at 52-56; Plaintiffs' Trial Ex. 13 at R000017421-7422). Because they chose to remain on the resignation waiting list, Defendant under the authority of its top executive mandated that as of December 31, 2012, Class Members would be denied the only two ingredients of Club membership identified at

---

[8] By stipulation, the December 17, 2012 letter from Donald Trump to Plaintiffs and Class Members produced in discovery was sufficient evidence of the subject letter for Plaintiffs and Class Members alike (DE 227 at 7).

trial—permission to use the Club in exchange for dues (Trial Tr. Vol. II at 24, 151). In the letter, Trump, on behalf of Defendant, expressly and clearly communicated to Class Members "as the owner of the club, I do not want them to utilize the club nor do I want their dues. In other words…if you choose to remain on the resignation list, you're out" (Trial Tr. Vol. I at 56, 62, 64, 67, 69-70, 76, 135, 145; Vol. II at 50; D. Trump Dep. at 25-26;Trial Tr. Vol. II at 45. 50-51; Plaintiffs' Trial Ex. 11 at R000017416, and Ex. 27-28, 36, 43).[9]  Defendant's general manager testified that the third category was clear from the letter that members remaining on the resignation waiting list after December 31, 2012, were out of the Club (Trial Tr. Vol. I at 46, 62, 64; Plaintiffs' Trial Ex. 11).  Defendant's director of memberships likewise testified that Defendant's message in the letter to Class Members was clear that if they remained on resignation waiting list as of December 31, 2012, they would no longer be Club members and would no longer have access to the Club (Trial Tr. Vol. I at 173, 175, 183, 200; Plaintiffs' Trial Ex. 11, Ex. 33 at TMP 000396).

    23.    After December 31, 2012, Defendant systematically enforced the terms communicated in the December 17, 2012 letter, routinely denying Class Members Club access (Trial Tr. Vol. I at 70, 76, 175, 187-88; Vol. II at 53; Plaintiffs' Trial Ex. 27-28, 36, 43).  Defendant consistently and clearly delivered the letter's message to Class Members that if they chose to remain on the resignation waiting list they were out of the Club and no longer had membership in the Club (Trial Tr. Vol. I at 175, 183-84, 187-88, 200).  Starting January 1, 2013, Defendant as a matter of course and corporate policy in fact did not allow Club access to Class Members solely

---

[9] Plaintiff Dwyer separately retained access to the Club based on his fractional timeshare interest in property there (Trial Tr. Vol I at 80, 133-36).  However, because he remained on the resignation waiting list, Defendant deprived him of the access to the golf course he had based on his Club membership (Trial Tr. Vol I at 135; Plaintiffs' Trial Ex. 31).

because they remained on resignation waiting list, rather than because they failed to pay dues[10] or some other reason[11] (Trial Tr. Vol. I at 16, 148, 159-160, 163, 175-176, 183-84, 194-195, 211, 215; Vol. II at 56, 61-62, 147, 149-150, 165; Plaintiffs' Trial Ex. 31).

24.     But after January 2013, Defendant's policy on dues payments from Class Members shifted from Defendant's original message in the December 17, 2012 letter.  Initially, Defendant asserted that Class Members would not have access, but would not be obligated to pay dues (Trial Tr. Vol. I at 70, 74; Plaintiffs' Trial Ex. 32-33, 38, 41).  As of February 2013, Defendant's policy and practice was and remains to charge Class Members annual Club dues in an amount according to their respective categories of membership (which had formerly dictated their type and extent of Club usage), even though Defendant in fact denied and would continue to deny them access to the Club (Trial Tr. Vol. I at 75 77-79, 81, 89, 95, 97, 200, 213; Vol. II at 69, 79; Plaintiffs' Trial Ex. 16-17, 43, 50-53, 93-94). Based on the evidence presented at trial, Defendant maintains that because Class Members remained on the resignation waiting list after December 31, 2012, they are not Club members and have no rights as Club members, yet must continue to pay annual Club dues in amounts tied to their prior Club usage category indefinitely (Trial Tr. Vol. I at 94-95, 160, 213; Vol. II at 82, 178-180; Plaintiffs' Trial Ex. 15 at TMP 000014, Ex. 94).  Moreover, Defendant has asserted Class Members owe minimum food and beverage charges (amounting to $1800 per year), even though those charges are imposed to ensure member's consumption of food and beverages at the Club and Defendant denies them Club access, which entirely prevents those

_____

[10] Defendant's membership director at the time it took ownership of the Club testified that the denial of access to resignation waiting list members after January 1, 2013, was a direct consequence of being on the list, as opposed for nonpayment of dues (Trial Tr. Vol. I, at 175-176]. Eric Trump testified to the same effect (Trial Tr. Vol. II, at 165).

[11] Because of the December 17, 2012 letter, Plaintiffs stopped paying dues after December 31, 2012 (DE 216 at 5 n. 7).

members from the ability to consume food and beverage at the Club (Trial Tr. Vol. I at 100-101, 159).  To that end, Defendant maintains running invoices for dues and charges purportedly owed by Class Members showing cumulative amounts in arrears since January 1, 2013, to present, and offered an example of this practice at trial (Trial Tr. Vol. I at 126, 160-161).

25.     Defendant's corporate policy has thus effectively negated any "special benefit" of the refundable deposit represented in the Plan: Because the Class Member may wait up to 10 years or perhaps longer to receive a refund but under Defendant have no Club use for that period; additionally, the amount Defendant asserts are owed for cumulative dues and charges could exceed and has exceeded the refundable deposit amount, resulting in Class Members' purportedly owing the Club more than their refund amount, with no membership rights (i.e.— permission to use the Club and other privileges of membership) provided in exchange (Trial Tr. Vol. I at 121-122, 126, 128-131; Plaintiffs' Trial Ex. 48; Defendant's Trial Ex. 4-6).  Defendant's lead attorney handling Defendant's acquisition of the Club confirmed under oath at trial that membership in a Club does not exist without Club access (Trial Tr. Vol. II at 24).  Ironically, even though it maintains they are not Club members and have no access to the Club, Defendant has sent one or more Plaintiffs collection letters threatening to suspend their membership privileges, when according to Defendant they had none (Trial Tr. Vol. I at 99-100, 213; Plaintiffs' Trial Ex. 54).

26.     In sum, the evidence adduced at trial shows and the Court finds that the contracting parties (Ritz and Class Members) intended that under the Membership Agreement members on the resignation waiting list including Class Members would be considered active, and Club members would continue to have access to the Club premises and facilities in exchange for their payment of dues, fees, and charges, pending reissuance of their memberships. The Court finds that the evidence shows that an active Club member is defined by payment of dues in exchange for Club

17

access, which as stated above, was the interpretation the contracting parties ascribed to the membership of Class Members under the Membership Agreement and Plan text and their conduct.

27.     The Court also finds that by its December 17, 2012 letter, Defendant clearly, intentionally, and unequivocally communicated to Club members including Class Members, that they would be denied the two ingredients of Club membership identified at trial—permission to use the Club in exchange for dues. The Court further finds that Defendant's denial of access goes to the essence of the benefits stated in the Membership Agreement for which the Class Members bargained.  Defendant's letter intentionally communicated that if Class Members remained on the resignation waiting list as of December 31, 2012, they would no longer be Club members, effectively and intentionally revoking their memberships and licenses to access and use Club facilities.  Defendant sent Club members no subsequent extension or qualifications of the deadlines or text of the letter.  In fact, Defendant established the terms of the letter informing those that remained on the resignation list that "you're out," as an on-going Club practice. Defendant, starting January 1. 2013, continued to communicate that resignation list members were no longer permitted use of the Club facilities as of that date and in fact denied Class Members Club access and membership because they remained on the resignation waiting list.  Communication that resignation members were no longer permitted to use the club was not because they failed to pay dues or failed to fulfill other obligations of the Membership Agreements.  They fulfilled them. The Court further finds that at least as early as February, 2013, Defendant has additionally systematically demanded that Class Members continue to pay annual Club dues and mandatory minimum charges accumulating against Class Members indefinitely.

28.     Based on the forgoing findings of facts, the Court resolves the factual dispute regarding the recall of Club members identified in its order on summary judgment (DE 216 at 9).

The evidence demonstrates that Class Members had not relinquished their memberships and had rights to Club access when Defendant took over, and they have the right to claim that Defendant recalled their membership after Defendant's purchase of the Club. The Court finds that Defendant has in fact recalled the memberships of Class Members as of December 31, 2012, which under their Membership Agreements entitled them to refunds of their deposits within 30 days of that date, which to date Defendant has failed to provide.  Because Defendant categorically denied Class Members permission to access the Club facilities and did not refund Class Members' deposits within that time, it committed a material breach of the Membership Agreement, defeating a fundamental purpose of the contract to allow members access in return for dues and to provide Class Members a refundable deposit when it recalled them. Defendant's duty to permit access when members paid dues and to refund their deposits under the contract—a special benefit of membership—goes to the essence of the contract.  The breach caused Class Members damage and excused Class Members' payments of any further dues or mandatory minimum charges accruing on or after January 1, 2013.

### III. CONCLUSIONS OF LAW

The Court has jurisdiction over the parties and this action based on diversity of citizenship. Club membership as defined by the Membership Agreement and related documents gives rise to contractual rights and obligations (DE 227 at 5).  *See Feldkamp v. Long Bay Partners, LLC*, 773 F. Supp. 2d 1273 (M.D. Fla. 2011), aff'd, 453 Fed. Appx. 929 (11th Cir. 2012).  All counts of the Second Amended Complaint are premised on Plaintiffs' allegation that Defendant breached the Membership Agreement, which by its terms is to be construed under Florida law.[12]

---

[12] Plaintiffs' Trial Ex. 7 at R0000008174-8175; Ex. 8 at R0000001216; Ex. 9 at R0000001199-1200; Ex. 56 at TMP 000005; Ex. 58 at TMP 000156; Ex. 59 at TMP 000149; Ex. 60 at TMP 000266; Ex. 61 at TMP 000255; DE 227 at 5. Absent a Florida Supreme Court decision on point,

"The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." *Merin Hunter Codman, Inc. v. Wackenhut Corr. Corp.*, 941 So. 2d 396, 398 (Fla. 4th DCA 2006) (internal quotations and citations omitted).   The Membership Agreement is a valid contract, and the parties have not contended otherwise.  Save for any prejudgment interest, the amount of potential damages—Class Members' membership deposits — is uncontested (DE 227 at 5-6).

Plaintiffs' claim of breach is the claim left to be resolved.  Plaintiffs allege that Defendant breached the following provision of the Membership Agreement: "In the event of termination of the Membership Plan, termination of any category of membership, recall of the membership or the discontinuance of operation of all or substantially all of the Club Facilities, the members affected will be entitled to a refund of the membership deposit paid within 30 days."[13]  The parties tried the case before the Court over whether Defendant breached the Membership Agreement by recalling Class Members' memberships, entitling them to a refund under this provision of the Membership Agreement within thirty days, when they remained on the resignation waiting list but were no longer permitted to use Club facilities after December 31, 2012.   The legal disputes between the parties center on the meaning of "recall,"[14] the refund obligations under membership documents,

---

the Court is bound to follow the decisions of the state's intermediate appellate courts unless there is "some persuasive indication" that the Florida Supreme Court would decide the issue differently. *McMahan v. Toto*, 311 F.3d 1077, 1080 (11th Cir. 2002).

[13] Plaintiffs' Trial Ex. 7 at R0000008174; Ex. 8 at R0000001216; Ex. 9 at R0000001199; Ex. 56 at TMP 000005; Ex. 58 at TMP 000155-56; Ex. 59 at TMP 000148; Ex. 60 at TMP 000265; Ex. 61 at TMP 000254; DE 146 at ¶¶ 17, 36, 80d, 103-104; DE 216 at 6, 9.

[14] Defendant has contended that a recall of memberships was not pleaded in the Second Amended Complaint.  The Court rejects this argument on its merits.  The record including Defendant's own filings and previous arguments contradict this argument.  Moreover, even if the argument had merit, the parties stipulated that this was an issue to be tried (DE 227 at 5), and the Court therefore treats the issue "in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2).

and the status of persons on the resignation waiting list. The Court must therefore interpret the membership documents to determine these issues and apply that interpretation to the evidence.

### A.  General Rules of Contract Interpretation

The agreement for Club membership is found in the Membership Agreement, the Plan, and Rules.  The PSA is also relevant to understand the obligations at issue.  Before construing the provisions of the relevant membership documents on resignation, recall, and refunds, and the PSA, it is helpful to review general principles of contract interpretation that guide the analysis.  The Court must draw certain reasonable inferences from contract terms with a view toward effectuating the intent of the contracting parties.

### 1.  The Plain Meaning of Contract Terms Apply.

Under Florida law, contract interpretation begins with plain meaning of words used, and words are "to be given their natural, ordinary meaning." *See Ferox, LLC v. ConSeal Int'l, Inc.*, No. 14-60048-CIV, 2016 WL 1242165, at *5 (S.D. Fla. Mar. 30, 2016).  "In order to determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001). Where the contract is unambiguous, it must be interpreted in accordance with its plain meaning so as to give effect to the contract as a whole. *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So.3d 943, 948 (Fla.2013). The Court may draw reasonable inferences from unambiguous contract language to determine what the parties intended. *Bombardier Capital Inc. v. Progressive Mktg. Grp., Inc.*, 801 So. 2d 131, 134 (Fla. 4th DCA 2001). If a contract is "susceptible to more than one reasonable interpretation" and cannot be reasonably reconciled, the contract is deemed ambiguous. *State Farm Mut. Auto. Ins. Co. v. Menendez*, 70 So.3d 566, 570 (Fla.2011).  To the extent a term in a contract is ambiguous term, it must be construed against the drafter, including the drafter's

successors and assigns. *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000). "Any ambiguity in the terms should be resolved in favor of upholding the purpose of the agreement and giving effect to every term in the agreement." *Id*. at 83 (citation omitted).

### 2. Intent of the Contracting Parties Controls.

"It is well-established that the parties' intent governs contract construction and interpretation." *Whitley v. Royal Trails Prop. Owners' Ass'n*, 910 So.2d 381, 383 (Fla. 5th DCA 2005); *Royal Oak Landing Homeowner's Ass'n, Inc. v. Pelletier*, 620 So.2d 786, 788 (Fla. 4th DCA 1993). "A court should strive to give effect to the intent of the parties in accord with reason and probability as gleaned from the whole [membership] agreement and its purpose." *Feldkamp*, 773 F. Supp. 2d at 1280–81 (citation omitted); *see also Maines v. Davis*, 491 So. 2d 1233, 1235 (Fla. 1st DCA. 1986)(citing *Blackshear Mfg. Co. v. Fralick*, 88 Fla. 589, 102 So. 753, 754 (Fla.1925)). The Membership Agreement and incorporated documents, as any contract, embody obligations that legally are to be implied from their purposes, wording, and the relationship of the parties although perhaps not actually specified in their texts. *Bankest Imports, Inc. v. ISCA Corp*., 717 F. Supp. 1537, 1540 (S.D. Fla. 1989)(imposing a contractual duty although the opposing party argued the agreement at issue did not expressly impose the duty)(citing *Heredia v. Safeway Trails, Inc*., 369 So. 2d 418, 420 (Fla. 3d DCA 1979)); *Nautica Int'l, Inc. v. Intermarine USA, L.P*., 5 F. Supp. 2d 1333, 1340 (S.D. Fla. 1998); *cf.* Restatement (Second) of Contracts § 204 (1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."). The contracting parties are Ritz and Club members, including Plaintiffs and Class Members. Therefore, the Court should endeavor to determine their intent, which will in turn direct the Court's interpretation.

22

###### 3.  The Parties' Interpretation and Course of Contract Performance Evidence Intent.

"Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."  *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118 (1913). Contract interpretation begins with a review of the plain language of the agreement because the contract language is the best evidence of the parties' intent at the time of the execution of the contract. *Royal Oak Landing Homeowner's Ass'n, Inc. v. Pelletier*, 620 So.2d 786, 788 (Fla. 4th DCA 1993).  But "'Intention', as the term is used in connection with contracting parties…when not clearly expressed, may be demonstrated by conduct." *Smart v. Brownlee*, 195 So. 2d 4, 5 (Fla. 4th DCA 1967).   In this vein, the Court may review the original contracting parties' post-contract course of performance of the agreement to interpret their intent.  *See Treasure Salvors, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 556 F. Supp. 1319, 1336 (S.D. Fla. 1983)(citing Restatement (Second) of Contracts (1981) § 202(4), which provides "[w]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement"); *Downs v. United States*, No. 06-20861-CIV, 2010 WL 3222140, at *4, n. 6 (S.D. Fla. Aug. 16, 2010)(citing *Lalow v. Codomo*, 101 So.2d 390, 393 (Fla.1958) ("[T]he actions of the parties may be considered as a means of determining the interpretation that they themselves have placed upon the contract.")(also citing 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32:14 (4th ed. 1999) ("Given that the purpose of judicial interpretation is to ascertain the parties' intentions, the parties' own practical interpretation of the contract—how they actually acted, thereby giving meaning to their contract during the course of performing it—

can be an important aid to the court."). The course of performance analysis is not cast aside when a contract is assigned. "The more accepted view espoused by courts seems to be that course of performance by predecessors-in-interest to a contract is relevant in interpreting the meaning of a contract, especially when that course of performance is undisputed." *Pathmark Stores, Inc. v. Gator Monument Partners, LLP*, No. CIV.A 08-3082, 2009 WL 5184483, n. 5 (E.D. Pa. Dec. 21, 2009)

This maxim is especially a propos here because Defendant and Plaintiffs dispute the implications of the absence of a specific contract term expressly stating resignation waiting list members do or do not have continuing Club access.[15] It is undisputed that Ritz granted Club access to members on the resignation waiting list, considered their memberships active, and billed those members for dues, fees, and charges, which they paid. The Florida Supreme Court has adopted the principle of contract construction, which allows the Court to look to the parties' conduct in performing their contract to resolve the absence of a provision on access, finding,

Where the terms of a written agreement are in any respect doubtful or uncertain, or if the contract contains no provisions on a given point, or if it fails to define with certainty the duties of the parties with respect to a particular matter or in a given emergency, and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction will be adopted by the court, upon the principle that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract.

*Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 407 (Fla. 1974).

Evidence of post-contract performance is not precluded by the parol evidence rule for two reasons. First, Defendant and Plaintiffs are disputing the interpretation of the language in a form contract (the Membership Agreement and incorporated membership documents), which all Class Members executed (DE 124 at 8). "Such a writing is interpreted wherever reasonable as treating

---

[15] *See* Trial Tr. Vol. I, at 83,125, 157, 196-97; Vol. II at 126, 169.

24

alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing." *In re Checking Account Overdraft Litig*., 286 F.R.D. At 654 (quoting Restatement (Second) Contracts § 211(2)).  Second, under Florida law, the parol evidence rule precludes admission of *prior or contemporaneous oral statements* that vary or contradict the terms of a written contract which is clear, unambiguous and fully integrated. *Ungerleider v. Gordon*, 214 F.3d 1279 (11th Cir.2000)(Emphasis added).[16] Course of performance is not parol evidence because although extrinsic to the contract "it identifies the parties' post-agreement conduct rather than their actions prior or contemporaneous to contract formation." *Kinesoft Dev. Corp. v. Softbank Holdings Inc.,* 139 F. Supp. 2d 869, 890 (N.D. Ill. 2001) (Citing E. Allen Farnsworth, Farnsworth on Contracts, § 7.3, at 228 (2d ed.1998).  Hence, evidence showing Ritz's and Class Members' course of performance of the Membership Agreement is not precluded by the parol evidence rule as Defendant suggested during trial, because consistent with the rule, Class Members simply acknowledged that they were not "relying upon any *oral* representations *in acquiring the membership* in the club," which does not speak to the course of post-contract performance evidencing the intent of the contracting parties (Trial Tr. Vol. I at 31, 108, 150, 202; Vol. II at 75, 82)(Emphasis added).

---

[16] *See also* *Bird Lakes Dev. v. Meruelo*, 626 So.2d 234, 237 (Fla. 3d DCA 1993) ("Under the parol evidence rule the terms of a valid written contract cannot be varied by a verbal agreement or other extrinsic evidence…*before or at the time of the contract's execution*.")(Emphasis added); 11 Williston on Contracts § 33:1 (4th ed.)(Westlaw)("The rule may be stated in these terms: The parol evidence rule is a substantive rule of law that prohibits the admission of evidence of prior or contemporaneous oral agreements, or prior written agreements, whose effect is to add to, vary, modify, or contradict the terms of a writing which the parties intend to be a final, complete, and exclusive statement of their agreement."); Black's Law Dictionary (10th ed. 2014)(defining "Parol-Evidence Rule" as "[t]he common-law principle that a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing").

Nor is course of performance negated by general cautions in the Plan about relying on statements outside the Plan, which Defendant questioned witnesses about at trial (Plaintiffs' Trial Ex. 10 at R000000953). The section of the Plan Defendant relied on only addresses providing information and making representations, not actual conduct and performance of the obligations of the Membership Agreement relating to resignation waiting list members and permission to use Club facilities (Trial Tr. Vol. I at 152, 203)(discussing Plaintiffs' Trial Ex. 7). Accordingly, the Court may consider the contract performance of Ritz and Class Members to determine the intent of the Membership Agreement, which is a form document, whose preprinted terms apply across the board to Class Members and is to be interpreted as treating those alike as similarly situated.

### 4. Multiple Contract Documents Should Be Construed Together and Reconciled if Possible.

The Court should construe the Membership Agreement and Plan together attempting to give meaning to each and their respective texts. *See Berkowitz v. Delaire Country Club, Inc.*, 126 So. 3d 1215, 1220 (Fla. 4th DCA 2012). "It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *OBS Co. v. Pace Construction Corp.*, 558 So.2d 404, 406 (Fla.1990). Every provision in an agreement should be given meaning and effect and apparent inconsistencies reconciled where possible. *U.S.B. Acquisition Co. v. Stamm*, 660 So. 2d 1075, 1080 (Fla. 4th DCA 1995). Provisions in the membership documents in the Membership Agreement, Plan, and Rules on the same subjects should thus be harmonized, where possible. Likewise, when interpreting multiple provisions in contracts, courts "will not interpret a contract in such a way as to render provisions meaningless when there is a reasonable interpretation that does not do so. Instead, courts must strive to interpret a contract in such a way as to give meaning to all provisions while doing violence to none."

*Bethany Trace Owners' Ass'n, Inc. v. Whispering Lakes I, LLC*, 155 So. 3d 1188, 1191 (Fla. 2d DCA 2014), reh'g denied (Jan. 23, 2015) (internal citations and quotations omitted); *see also City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000) ("[W]e rely upon the rule of construction requiring courts to read provisions of a contract harmoniously in order to give effect to all portions thereof.").

With the foregoing principles in mind, the Court further concludes as follows:

### B.  Club Members on the Resignation Waiting List Retained Status as Club Members with Club Access.

To become Club members, Class Members executed the Membership Agreement in which they acknowledged they would abide by the Plan and Rules.  Prior to Defendant's purchase of the Club, Class Members submitted their names for placement on the resignation waiting list in accordance with the procedure called for under these documents.   Taken together these membership documents, the contracting parties' interpretation of them, and the evidence at trial, show members on the list retained active memberships affording them continued Club access.

### 1.  Intent of the Contracting Parties: Payment of Dues

The Court starts with review of the relevant text of the membership documents.  Under the Plan, Class Members were obligated to pay dues while on the resignation waiting list.  Defendant's questioning at trial emphasized this part of the Plan to attempt to support its position that Class Members were obligated to pay dues for years even though they would have no permission to access the Club (Trial Tr. Vol. I at 154, 208-209).   But to be part of a binding contract, "dues" ordinarily are payments made to be a member of some organization or to have some right for which the dues are consideration.  They are not payments made with no reasonable exchange or consideration in return.  They are not a gift to a for-profit club or organization.

Accordingly, "dues" can be defined "as a regular payment that you make to be a member of an organization;"[17] a "fee or charge required for membership, affiliation, initiation, use, subscription;" or a "charge or fee for membership, as in a club or organization." *Murray v. Amalgamated Transit Union*, No. CV 14-378 (JEB), 2014 WL 11281392, at *7 (D.D.C. Dec. 19, 2014), *reconsideration denied,* 99 F. Supp. 3d 149 (D.D.C. 2015)(citing Webster's Third New International Dictionary 699 (1981) and American Heritage Dictionary 553 (5th ed. 2011)).  Along these lines, at trial, Ritz former employee Tuzi testified that dues meant paying a certain amount "for…membership in order to be able to use the club" (Trial Tr. Vol. I at 39). Defendant's general manager testified that the consideration for paying dues to the Club was access to the Club facilities according to the category of membership (Trial Tr. Vol. I at 50).  Eric Trump confirmed by his testimony that the "two ingredients" of membership were permission to use the Club in return for dues (Trial Trans. Vol. II at 151).  In like manner, Defendant's PSA lawyer and corporate representative testified that membership provides members permission to use Club facilities; indeed "the fundamental ingredient" of membership is Club access, without which no membership would exist; membership buys the right to use the Club according to one's membership category (Trial Tr. Vol. II at 23-24].  Consistent with the common definition of "dues," he also acknowledged that "dues" by definition constituted "a regular payment that you make *to be a member of an organization*" (Id. at 36) (Emphasis added).

The Membership Agreement specifically recites the exchange of consideration contained in the ordinary meaning of "dues."  The payment of dues and deposits for membership including Club access supports the contractual relationship between Class Members and the Club confirmed

---

[17] http://www.merriam-webster.com/dictionary/dues (defining "Dues") (accessed August 11, 2016).

by their on-going performance while on the resignation waiting list.  By paying dues and deposits, Club members acquired revocable licenses to use Club facilities.  A license, in this context, is simply a permit to access and use Club property and services. *See Brevard Cty. v. Blasky*, 875 So. 2d 6, 12 (Fla. 5th DCA 2004).  Under the heading, "Purchase of Membership," each agreement provided in relevant part, that applying members "agree[d] *to pay to the Club the membership deposit and the membership dues…* for the category of membership selected, on or before the Closing Date, *at which time [the members would] have use of the Club Facilities* provided for under this Agreement.*"* (Emphasis added). Under the Membership Agreement, therefore, dues and deposits are the sums members pay for their licenses affording them continuing Club access according to their membership categories.  Harmonizing the Plan's requirement that list members pay on-going dues with the Membership Agreement's statement of consideration—dues in exchange for access— the Court interprets "dues" under the Plan to be the payment Club members make in exchange for permission to use the Club.  Because resignation waiting list members are required to be dues, they are and were entitled to Club access in exchange.

The Court rejects Defendant's contrary interpretation that under the Membership Agreement members on the resignation waiting list were and are not members, thus had and have no legal right to Club access but had a continued legal obligation to continue to pay dues. This interpretation of the membership documents would lead to an absurd result contrary to the intent of the contracting parties manifested in the express language on consideration and basic contract principles. *See Feldkamp*, 773 F. Supp. 2d at 1281 (citing *Am. Med. Int'l, Inc. v. Scheller*, 462 So.2d 1, 7 (Fla. 4th DCA 1984)).  "It is a fundamental principle of contract law that a promise must be supported by consideration to be enforceable." *Office Pavilion S. Florida, Inc. v. ASAL Products, Inc*., 849 So. 2d 367, 370 (Fla. 4th DCA 2003)(citing Restatement (Second) of Contracts

29

§ 17 (1981)).  When one promises to pay money in exchange for a service and the service is not provided, the consideration fails and the payment obligation is discharged. *See Rose Printing Co. v. Haggerty*, 584 So.2d 606, 608 (Fla. 1st DCA 1991) (quoting *Binz v. Helvetia Fla. Enter*., 156 So.2d 703, 704 (Fla. 3d DCA 1963)).  As Eric Trump testified, "[i]f you are current on dues, you are allowed access to a club" (DE 240-2 at 3).  According to his testimony, paying dues but having no Club access, "would violate a fundamental principle of life" (Trial Trans. Vol. II at 161; DE 240-2 at 3). The violation of the fundamental principle is all the more palpable here because under Defendant's view, Class Members or anyone else on the resignation waiting list would be required to pay dues indefinitely but have absolutely no Club access, their cumulative dues eventually swallowing up and exceeding their refund amounts, negating any "special benefit" of the refundable memberships and eventually converting the "refundable" deposit into a non-refundable deposit. By Defendant's logic, when the members joined the club, signing the Membership Agreement, and agreeing to the payment of a refundable deposit, the parties were actually agreeing to a non-refundable deposit.  In addition to agreeing to pay a non-refundable deposit for a "Refundable Membership," the members were also agreeing to a long period of dues payments to the Club during which they would have no access and which they would be compelled to make to avoid the Club's bringing a collection action against them.  Once might ask, would any of the members have ever signed the Membership Agreement, and paid the "refundable" deposit, to be a Club member if this was the "special benefit"?  To interpret the Membership Agreement as Defendant proposes, whereby resignation list members having no access must pay dues for years indefinitely, would make the Club owner's promise of membership access in return for a deposit and dues—of Club membership in essence— illusory for lack of mutuality and consideration. *See Feldkamp v. Long Bay Partners, LLC*, 773 F.Supp.2d 1273, 1283 (M.D.Fla.2011). Based on

Defendant's own testimony, access is an indispensable ingredient of Club membership and dues are the consideration paid in exchange for permission to access and use the Club on an on-going basis. The Membership Agreement memorializes this exchange of promises. It is a contract with mutuality and bargained for exchange —dues paid in exchange for access throughout the contract period. This along with the refundable deposit is the fundamental exchange of promises supporting the contract.

Moreover, the resignation process did not allow for the full refund to which members on the list were entitled, immediately. The process, according to the membership documents, was that the members on the list were obligated to continue to pay for their continued permission to use the club consistent with their respective membership categories for a lengthy time while awaiting reissuance of their memberships, which could be ten or more years. If the Club's promises and obligations cease yet the members' continue indefinitely ten years or more, a failure of consideration would occur, rendering the contract unenforceable, contrary to the parties' intent. *See Holm v. Woodworth*, 271 So. 2d 167, 169 (Fla. 4th DCA1972)("failure of consideration is the neglect, refusal or failure of one of the parties to perform or furnish the consideration agreed on"); *Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc*., 162 F.3d 1290, 1311 (11th Cir. 1998)(("It is a fundamental principle of contract law that a promise is not enforceable unless it is supported by consideration.")(citing See Restatement (Second) of Contracts § 17 (1981)). The Court will not interpret the Membership Agreement and other membership documents in this manner. *See Prestige Rent-A-Car, Inc. v. Advantage Car Rental & Sales, Inc. (ACRS)*, 656 So. 2d 541, 545 (Fla. 5th DCA 1995)(interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect); *see also* 11 Williston on Contracts § 32:11 (4th

ed.)(interpretations rendering contract valid and lawful preferred over ones rendering it invalid, unlawful, impossible to perform).

### 2.   Intent of the Contracting Parties: Payment of Fees and Charges

The Plan further provides that resignation waiting list members were required to pay fees and charges, further supporting the interpretation and the contracting parties intent that Class Members maintained active rights and permission to use the Club.  Members on the resignation waiting list were entitled to a "pro rata portion of any dues and other fees paid in advance *for which services have yet to be rendered*" (Plaintiffs' Trial Ex. 10 at R000000970)(Emphasis added).   The evidence at trial indicated that fees and charges were directly associated with actual Club access and use (Trial Tr. Vol. I at 39-40, 54, 95, 170, 172, 191; Plaintiffs' Trial Ex. 10 at R000000970,R000000982]. Members would incur no fees and have no services rendered for them, if they were not entitled to Club access. A person having no access would in fact never incur a fee (Trial Tr. Vol. II at 95).   The Plan's requirement that waiting list members pay fees and charges thus confirms that individuals on the resignation waiting list contractually retained continuing permission to use the Club.  Otherwise, the requirement that they pay fees and charges would be useless and superfluous.   The interpretation that this requirement indicates list members are intended to have on-going Club access makes this requirement meaningful and is consistent with the evidence presented at trial concerning the payment of dues, fees, and charges in exchange for Club access and status as an active member. The Court adopts this interpretation of the Plan, which gives meaning to the requirement that list members pay fees and charges. *See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Ass'n*, 117 F.3d 1328, 1338 (11th Cir.1997) ("[A]n interpretation which gives a reasonable meaning to all provisions of a contract is preferred

to one which leaves a part useless or inexplicable.")(internal marks and citation omitted construing Florida law).

### 3.  Intent of the Contracting Parties: The "Desire" to Resign

Furthermore, under the language of the Plan, Club members including Plaintiffs and Class Members simply expressed to Ritz a "desire" to resign by giving written notice to the Club, rather than immediate surrender of their memberships and all associated privileges, including access (Plaintiffs' Trial Ex. 10 at R000000967).   Ritz in turn placed them on a "waiting list" for membership re-issuance, while specifically acknowledging that the membership remained active and allowing the member to have full access to the facilities, contingent on payment of fees, dues, and charges (Id.). "Desire" and "waiting list" are not defined in the Club documents. But the plain meaning of "Desire" is  "to express a wish for."[18] The plain meaning of a "waiting list" is "[a] roster of people *who have requested something that is not currently available but either will be or might be in the future*." Black's Law Dictionary (10th ed. 2014)(Emphasis added).  By these terms, the Plan reasonably indicates by submitting their names and expressing a "desire" to be placed on the "waiting list," Club members including Plaintiffs and Class Members did and do not immediately effectuate a resignation as Club members or indicate they have relinquished all rights and obligations with respect to their Club memberships. The list according to the interpretation of the contracting parties and the text of the Plan simply represented their *wish to* resign their membership status and rights when the membership was ultimately reissued.

### 4.  Intent of the Contracting Parties: Their Conduct

Membership in the Club permits a member to use the Club Facilities consistent with that member's membership category.  Nothing in the membership documents revokes that permission

---

[18] http://www.merriam-webster.com/dictionary/desire (accessed August 9, 2016).

upon a request for placement on the resignation waiting list. The contracting parties' conduct also supports the conclusion that contracting parties intended that list members were active members having continued permission to use the Club.  Witnesses at trial equated membership with permission to use the Club facilities.  That members on the resignation waiting list remain active was in fact the only interpretation and on-going performance of the agreement by the contracting parties, which both understood, accepted, and practiced.  Ritz as a matter of course allowed members on the resignation waiting list continued Club access and Defendant knew of this routine practice before purchasing the Club.  The Court finds that the contracting parties' performance of the contract demonstrates they intended that the members on the list be active Club members with permission to use the Club.  Therefore, reading the language of the Plan and Membership Agreement in conjunction with the contracting parties' conduct, the Court concludes that under the Membership Agreement and Plan members on the list retained active memberships affording them Club access according to their membership categories.

### 5.  The PSA

The Court is not persuaded by Defendant's interpretation alluded to at trial that the sale of the club facilities as an asset sale, rather than a stock sale, means that Defendant is not bound by the intent of the contracting parties.   Defendant was aware of the Club's policies and contract performance and treatment of members on the resignation waiting list when it purchased the Club. Defendant even continued to employ Ritz employees who were familiar with these policies, the membership documents, and the members. "The law is well settled that an assignee succeeds to his assignor's rights under the assignment of a contract and takes it with all the burdens to which it is subject in the hands of the assignor." *Shreve Land Co. v. J & D Fin. Corp.*, 421 So. 2d 722, 724 (Fla. 3d DCA 1982).  The PSA did not extinguish Ritz's obligations and intent manifested by

34

its conduct.  It confirmed them.  If Defendant as assignee had intended to avoid the intent and practices of the assignor Ritz and its implications for the contractual obligations it was assuming, it could have done so, but it did not.  Instead, Defendant has expressly broadly assumed both the financial and non-financial obligations of Ritz concerning Class Members and the membership documents,[19] expressly assuming the "right, title, interest and obligations of Seller [Ritz]"  in the "Membership Agreements…relating to a Club Member's right to use the Club and obligations of Club Members, and obligations of Seller [Ritz] with respect to refund of a Club Member's deposits…" (Plaintiffs' Trial Ex. 1 at R000000007); *see  Pathmark Stores, Inc. v. Gator Monument Partners, LLP*, No. CIV.A 08-3082, 2009 WL 5184483, at 7 (E.D. Pa. Dec. 21, 2009)(collecting cases stating that course of performance carries over to bind the successor assignee).

        The Court also finds that, based on the text of the sales documents Defendant executed, Defendant has specifically agreed that Plaintiffs and Class Members were and are Club members in its purchase of the Club and the Purchase and Sale Agreement ("PSA"), which is consistent with the intent of the contracting parties as demonstrated by their contract performance and text of the Membership Agreement. Schedule T to the PSA was the Member Matrix. Indeed, in the PSA, Defendant and Ritz define "Club Members" as "those Persons who have purchased or been provided a license to use the Club and are currently a member of the Club, whether as a delinquent member or a member in good standing, *listed on the attached Schedule T*…" (Plaintiffs' Trial Ex. 1 at R000000004)(Emphasis added). Each Plaintiff and each Class Member was listed in Schedule

---

[19] "In an asset purchase, the liabilities and responsibilities of each party would be set forth in the parties' agreement."  *Corp. Exp. Office Prod., Inc. v. Phillips*, 847 So. 2d 406, 412 (Fla. 2003). Even with an asset purchase (which Defendant's lawyer testified this transaction was), "[a]n express agreement, or one that can be implied, to assume the other company's debts and obligations" renders the assignee entity liable for the debts and liabilities of the assignor entity." *See Phillips*, 847 So. 2d at 412-13 (citing William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations, § 7122 (perm.ed. rev.vol.1990)); *see also* Trial Tr. Vol. II at 10.

T as a then current and active member when Defendant took over, despite his or her being on the resignation waiting list. Defendant therefore cannot avoid the contracting parties' intent that Class Members be treated as active Club members and that Class Members were to be considered active Club members although they remained on the resignation waiting list. Defendant has specifically agreed they were.

Based on the evidence, text of the relevant membership documents, and the interpretation and conduct of the contracting parties, the Court concludes treating Club members on the resignation waiting list as active members with Club access is what the contracting parties intended. The Court concludes that members on the resignation waiting list maintained status as active Club members, entitling them to permission to use the Club in exchange for a deposit and their on-going payments of dues, fees, and charges. Class Members on the resignation waiting list as of December 31, 2012, were thus Club members legally entitled to permission to use the Club commensurate with their member categories, and they have the right to claim that Defendant recalled their membership after Defendant's purchase of the Club and subsequent implementation of Club policy that those remaining on the list would no longer be permitted to use the Club after January 1, 2013.

### C. Defendant Recalled the Memberships of Class Members Entitling them to Refunds.

The Membership Agreement paragraph containing the refund rights upon "recall" expressly allows Defendant "in its discretion" to recall memberships "at any time for any or no reason whatever…" Plaintiffs questioned Defendant's PSA lawyer about this phrase at trial, which is in close proximity in the Membership Agreement to the phrase for refunds upon membership recall at issue here (Trial Tr. Vol. II at 66-68]. Defendant's PSA counsel acknowledged at trial that Defendant had the right to recall a membership for *any* reason (Trial Tr. Vol. II at 67-68). The

word, "any," means "one or another without restriction or exception[.]" *Dows v. Nike, Inc*., 846 So. 2d 595, 601 (Fla. 4th DCA 2003). Based on this testimony, the breadth of the word "any," and reconciling the Membership Agreement language with the Plan provisions mentioning recall,[20] the Court concludes that Defendant's reasons and methods of recall are not circumscribed in the membership documents and could and did include the recall of memberships Plaintiffs alleged in this action.

Defendant's PSA counsel also acknowledged at trial that "recall" generally meant to "cancel" the membership (Trial Tr. Vol. II, at 64). Merriam-Webster defines "recall" as "cancel" or "revoke." Merriam-Webster, http://www.merriam-webster.com/dictionary/recall (last visited September 25, 2016). The New Oxford American Dictionary defines "recall" as "revoke" or

_____

[20] At trial (Trial Tr. Vol. II at 63-65), Defendant's PSA counsel posited that there are only three methods of "recall" permitted under the Membership Agreement. Citing only the text of the Plan (but not the Membership Agreement), Defendant's PSA counsel testified that "recall" was limited solely to instances when the Club recalls an associate membership (Id. at 63-64); when a member sells a home in the Club community (Id. at 65); or when a member refuses an equity membership (Id. at 65; Plaintiffs Trial Ex. 10 at R000000959, R000000968, R000000974). But none of these Plan provisions addresses membership refunds or status of memberships that comprise the subject of this dispute. There is no conflict in the language on recall in the Plan versus the Membership Agreement. *See Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1106 (11th Cir. 2014)("…the general interpretive canon that resolves conflicting specific and general provisions by making the specific provision control does not apply when, as here, there is no conflict"). The Plan simply refers to three instances when the Club "may" permissively recall a membership or when their memberships "will be subject to recall," not that that the Club "shall" do so exclusively in the three instances mentioned. *See Shands Teaching Hosp. & Clinics, Inc. v. Sidky*, 936 So. 2d 715, 721 (Fla. 4th DCA 2006)("The word 'may' when given its ordinary meaning denotes a permissive term rather than the mandatory connotation of the word 'shall.'"). The term "subject to" is inherently ambiguous and does bind Defendant to recall memberships in any fashion or circumstance. *See Affinity Internet, Inc. v. Consol. Credit Counseling Servs., Inc.*, 920 So. 2d 1286, 1288 (Fla. 4th DCA 2006)("The words 'subject to 'usually indicate a condition to one party's duty of performance and not a promise by the other.'")(citation omitted); *Orthopedic Specialists v. Allstate Ins. Co.*, 177 So. 3d 19, 24 (Fla. 4th DCA 2015), review granted, No. SC15-2298, 2016 WL 282060 (Fla. Jan. 20, 2016)(following lower court interpretation of "subject to" as inherently ambiguous and noting "subject to" has multiple meanings, including "liable, subordinate, inferior, obedient to; governed or affected by; provided; answerable")(citations omitted).

"annul."  Defendant's letter intentionally communicated that if Class Members remained on the resignation waiting list as of December 31, 2012, they would no longer be Club members, effectively and intentionally revoking their memberships and licenses to access and use Club facilities.  Despite Defendant's currently held position that members on the resignation list were already non-members, had there been no membership and access to revoke, there would have been no reason for stating "you're out."  Obviously, for a member to be "out," they must have been "in."  The letter, sent to all members including resignation waiting list members, therefore undermines Defendant's position that members on the list were not members, and their memberships could not be recalled (Trial Tr. Vol. I at 11).

The cumulative trial evidence compellingly demonstrates that Defendant put the revocation stated in the letter in practice from January 1, 2013, forward.  The evidence further demonstrated that Club membership equated to permission to use the Club. The basic purpose of the Membership Agreement was to afford persons lawful permission to use and access the Club (i.e.—a license to enter Club property to use the Club facilities) in exchange for payment of a deposit, dues, fees, and charges.  With access removed from this equation, a person would have no Club membership. In other words, without a right to Club access, no membership would exist and this essential purpose of the membership contract would be nullified.

## CONCLUSION

Consequently, the Court concludes that by categorically denying Class Members all rights to Club access because they remained on the resignation waiting list as of December 31, 2012, Defendant revoked or cancelled their memberships, thus recalling their memberships, which under their Membership Agreements entitled them to refunds of their deposits within 30 days of that date, which to date Defendant has failed to provide. Because Defendant did not refund Class Members' deposits by January 30, 2013, it committed a material breach of the Membership

Agreement going to the essence of the membership bargain, and causing Class Members damages measured by the amounts of their refundable deposits plus accruing interest. The Court further concludes that Defendant's denial of club access and consequent recall of their memberships excused Class Members' payments of any further dues or mandatory minimum charges, or fees, accruing on or after January 1, 2013. *See Indemnity Ins. Corp. of DC v. Caylao*, 130 So. 3d 783, 786 (Fla. 1st DCA 2014) ("material breach by one contracting party excuses the performance by the other party").

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.     Judgment shall be entered in favor of Plaintiffs and Class Members and against Defendant by separate order of the Court.

2.     Judgment shall be entered in favor of Plaintiffs and Class Members on the breach of contract claim (count two), finding that Defendant Jupiter Golf Club, LLC is indebted to Plaintiffs and Class Members in the aggregate principal sum of $4,849,000.00, which shall accrue post-judgment interest at the statutory rate of 4.84% per annum from the date of entry. Thereafter, on January 1, or each succeeding year until the judgment is paid, the interest rate will adjust in accordance with Section 55.03, Florida Statutes.

3.     Judgment shall be entered in favor of Plaintiffs and Class Members on the declaratory relief (count one) and injunctive relief (count three) claims, declaring that that Plaintiffs and Class Members have no indebtedness to Defendant Jupiter Golf Club, LLC for any dues, fees, charges, or other amounts arising on or after December 31, 2012; and enjoining Defendant from collecting further dues and mandatory minimum charges from Plaintiffs and Class Members and reporting them to reporting agencies as delinquent for those sums from that date forward.

4.   Judgment shall be entered in favor of Plaintiffs and Class Members finding that Defendant Jupiter Golf Club, LLC is indebted to Plaintiffs and Class Members for taxable costs.

5.   On or before 30 days after the date of this Order,

a.   Plaintiffs shall apply to the Court for determinations of taxable costs and attorney's fees; and,

b.   Defendant may apply to the Court for a determination of any set offs it may have against the amount of any Class Member's refund;

6.   Entry of a final judgment shall follow the determinations of set offs, taxable costs, and attorney's fees.

Dated:  October 13, 2016                      Respectfully submitted,

*/s/ Seth M. Lehrman*
Steven R. Jaffe (Fla. Bar No. 390770)
E-mail: steve@pathtojustice.com
Mark S. Fistos (Fla. Bar No. 909191)
E-mail: mark@pathtojustice.com
Seth M. Lehrman (Fla. Bar No. 132896)
E-mail: seth@pathtojustice.com
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 N. Andrews Ave., Suite 2
Fort Lauderdale, Florida 33301
Telephone:  (954) 524-2820
Facsimile:  (954) 524-2822

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send notification to all attorneys of record.

*/s/ Seth M. Lehrman*
Seth M. Lehrman