UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-80456-CIV-MARRA/MATTHEWMAN

NORMAN HIRSCH, MATTHEW DWYER,
and RALPH WILLARD, individually
and on behalf of all others similarly situated,

       Plaintiffs,

v.

JUPITER GOLF CLUB LLC, a Delaware
LLC d/b/a TRUMP NATIONAL GOLF
CLUB JUPITER and RBF, LLC d/b/a
THE RITZ-CARLTON GOLF CLUB &
SPA JUPITER,

       Defendants.

_____/

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]**

This matter was tried before the Court. Based upon the evidence presented during the bench trial, the record in this matter, the argument of counsel,[2] and otherwise being duly advised in the premises, the Court issues these findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.  INTRODUCTION

Plaintiffs Norman Hirsch, Matthew Dwyer and Ralph Willard ("Plaintiffs") purchased refundable memberships in the Ritz-Carlton Golf Club & Spa Jupiter, n/k/a Trump National Golf Club Jupiter ("Club").  The underlying dispute arises out of Plaintiffs' contention that the current

_____

[1] The timing of the issuance of this decision was based on the Court's docket and other case related obligations, and was not in any way based upon recent historical events.

[2] The Court has determined it does not require additional oral argument from the parties.

Club owner—Defendant, Jupiter Golf Club, LLC d/b/a Trump National Golf Club Jupiter ("Defendant")—failed to refund their membership deposits under the terms of the agreements they executed to become Club members.[3]

## II.   FINDINGS OF FACT

Plaintiffs are members of the Class ("Class Members") that the Court certified and whose rights to refunds the parties tried before the Court. (DE 227 at 4). The Class contains sixty-five identified members including Plaintiffs. (*Id*. at 4-5).

Class Members purchased Club memberships and became Club members of the Club by executing the Ritz Membership Agreement. That agreement defined the members' relationship with the Club, it established the categories of membership and granted them access to the Club. (Trial Tr. Vol. I at 18-19, 25-27, 29-30; Trial Tr. Vol. II at 9; Plaintiffs' Trial Ex. 10 at R000000958; Ex. 6, Ex. 7-9 and Ex. 59-61). The membership categories the Class Members purchased were either Full Golf, Fractional Golf, or Social and Spa. (DE 146 at 17; Plaintiffs' Trial Ex. 7-9 and Ex. 59-61). These categories of memberships were "Refundable Memberships," entitling them to a refund of the membership deposit they made when joining the Club. (*Id*.; Plaintiffs' Trial Ex. 10 at R000000958; DE 227 at 4). The deposit amount each Class Member paid with respect to the member's category of membership is uncontested. (DE 227 at 4).

---

[3] The former Club owner, RBF, LLC d/b/a Ritz-Carlton Golf Club & Spa Jupiter ("RBF" or "Ritz"), was originally a co-defendant is this action. (DE 1).  Plaintiffs later settled with RBF (DE 184), which the Court approved granting dismissal of RBF with prejudice in accordance with Plaintiffs' and RBFs' stipulation of dismissal. (DE 187 at 3).

The Refundable Memberships entitled the members to use the Club facilities according to their membership categories (Trial Tr. Vol. I at 39, 50; Vol. II at 24), and expressly granted them "a revocable license to use the Club Facilities in accordance with the terms and conditions of the Membership Plan and Rules and Regulations…" (Trial Tr. Vol. II at 20-21, 23; Plaintiffs' Trial Ex. 7 at R0000008174-8175; Ex. 8 at R0000001216; Ex. 9 at R0000001199-1200; Ex. 56 at TMP 000005; Ex. 58 at TMP 000155; Ex. 59 at TMP 000148; Ex. 60 at TMP 000265; Ex. 61 at TMP 000254).

In addition to executing a Membership Agreement, the Club provided Membership Plans ("Plan") and Rules and Regulations ("Rules") to the Plaintiffs and the Class Members upon their admission to membership. (Trial Tr. Vol. I at 30-31). Under Section V of the Membership Agreement, a member agreed not only to be bound by the Membership Agreement, but also to be bound by the terms and conditions of the [Ritz] Membership Plan and Rules and Regulations. (Plaintiffs' Trial Ex. 7 at R0000008175; Ex. 8 at R0000001216; Ex. 9 at R0000001200; Ex. 56 at TMP 000005; Ex. 58 at TMP 000156; Ex. 59 at TMP 000149; Ex. 60 at TMP 000266; Ex. 61 at TMP 000255).

*The Dispute*

The documents governing operation of the Club provide four circumstances which would entitle those members with Refundable Memberships the right to a return of their deposit within 30 days: [1] termination of the Membership Plan, [2] termination of any category of membership, [3] recall of the membership or [4] the discontinuance of operation of all or substantially all of the Club Facilities…" (Plaintiffs' Trial Ex. 7 at R0000008174; Ex. 8 at R0000001216; Ex. 9 at R0000001199; Ex. 56 at TMP 000005; Ex. 58 at TMP 000155-56; Ex. 59

3

at TMP 000149; Ex. 60 at TMP 000266; Ex. 61 at TMP 000255; DE 146 at ¶¶ 17, 36, 80d, 103-104; DE 216 at 6, 9).

In the present case, the Court determined, as a matter of law, that there was no showing by Plaintiffs that the first, second or fourth circumstances occurred.  The Court also concluded that a genuine issue of material fact existed as to whether Defendant recalled the memberships of Plaintiffs and the Class members entitling them to a return of the membership deposits within 30 days. (DE 124).

*Defendant's Assumption of Ritz's Obligations*

Defendant purchased the Club through a Purchase and Sale Agreement ("PSA") dated November 14, 2012.  (Plaintiffs' Trial Ex. 1, 7-9, 59-61; Trial Tr. Vol. II at 5; DE 141 at ¶¶ 24, 26; DE 227 at 5). In the Membership Agreement, Club members agreed, "[i]n the event that the Club Facilities are sold and the buyer assumes liability for the repayment of the membership deposit, the[y]…shall look solely to the new owner for repayment of the membership deposit and the seller of the Club Facilities shall be released from all liability for the repayment thereof." (Plaintiffs' Trial Ex. 7 at R0000008174; Ex. 8 at R0000001216; Ex. 9 at R0000001199; Ex. 56 at TMP 000005; Ex. 58 at TMP 000155; Ex. 59 at TMP 000148; Ex. 60 at TMP 000265; Ex. 61 at TMP 000254).

Plaintiffs and the Class Members paid a total of $4,849,000 in refundable membership deposits.  In the PSA, Defendant assumed the obligation to repay the membership deposits according to the terms and conditions of the Delivered Club Documents. (DE 227 at 5-6). As previously indicated, one of the obligations Defendant assumed provides: "In the event of termination of the Membership Plan, termination of any category of membership, recall of the membership or the discontinuance of operation of all or substantially all of the Club Facilities,

4

the members affected will be entitled to a refund of the membership deposit paid within 30 days." (Plaintiffs' Trial Ex. 7 at R0000008174; Ex. 8 at R0000001216; Ex. 9 at R0000001199; Ex. 56 at TMP 000005; Ex. 58 at TMP 000155-56; Ex. 59 at TMP 000148; Ex. 60 at TMP 000265; Ex. 61 at TMP 000254; DE 146 at ¶¶ 17, 36, 80d, 103-104; DE 216 at 6, 9).

### Fees and Charges

In addition to the payment of dues and refundable deposits, Club members, including Plaintiffs and the Class Members, were obligated by the governing Club documents to pay fees and charges. (Trial Tr. Vol. I at 36-37, 39-40, 54, 125, 142, 154, 172). Fees and charges were and are associated with actual use of the Club facilities and were and are paid in consideration for some form of actual Club usage. (Trial Tr. Vol. I at 39-40, 54, 169-170, 172, 191; Plaintiffs' Trial Ex. 10 at R000000959-0960, R000000962). A person having no access to the Club facilities would not incur a fee owed to the Club. (Trial Tr. Vol. II at 95). Examples of usage fees include cart, caddie, range, greens, and guest fees. (Trial Tr. Vol. I at 39-40, 54, 112, 125-126; Plaintiffs' Trial Ex. 10 at R000000959-0960). Examples of usage charges include charges for use of the ballroom, spa, or for consumption for food and beverages at the Club. (Trial Tr. Vol. I at 54, 126, 142, 169-171).

### Membership Status While on the Resignation Waiting List

The Membership Plan described the refundable deposit as a "Special Benefit" for members joining the Club. (Trial Tr. Vol. I at 53; Plaintiffs' Trial Ex. 10 at R000000952).

The Plan provides, "[s]hould a member desire to resign from the Club, the member shall be required to give written notice to the Club, which notice must be signed by all parties on the membership application." (Plaintiffs' Ex. 10 at R000000967). Prior to Defendant's acquisition of the Club, Club members could and did express a desire to resign their Club memberships by

informing Ritz in writing of their desire to resign. (Trial Tr. Vol. I at 19-20, 22-23; Plaintiffs' Trial Ex. 10 at R000000966, R000000967; Ex. 14 at TMP 001135, Ex. 18, Ex. 21, Ex. 22a-22f). In return, the Club placed their "Refundable Membership[s]…on a waiting list." The Club responded to the notice of the member's submission of an intention to resign with a standard form letter advising the member of the placement and the standard resignation procedures, including that they would be notified upon reissuance of their memberships and in the meantime their memberships remained active. (Trial Tr. Vol. I at 23-24, 37-38, 40; Plaintiffs' Trial Ex. 10 at R000000967; Plaintiffs' Trial Ex. 22a-22f; DE 141 at ¶¶ 11-13).

Under the Plan, if the Club had memberships available for sale in a category of membership, then every fifth membership sold in that category would come from the resignation waiting list. (Plaintiffs' Trial Ex. 10 at R000000953, R000000967; Trial Tr. Vol. II at 172; D. Trump Dep. at 14). Reissuance of a membership from the resignation waiting list can and could under Ritz and Defendant take ten years or more (Trial Tr. Vol. I at 127-28; Vol. II at 176; Plaintiffs' Trial Ex. 11 at R000017415).[4] Once the member reached the top of the list, his or her membership deposit would be refunded (DE 141 at ¶¶ 11-13).

Under the Plan, members on the resignation waiting list remained obligated "to continue to pay dues, fees and other charges" until reissuance of their membership. (Trial Tr. Vol. I at 40; Plaintiffs' Trial Ex. 10 at R000000970, R000000982). Failure to pay dues or other amounts owed to the Club could lead to termination or suspension of the member's membership (Trial Tr. Vol. I at 99; Plaintiffs' Trial Ex. 10 at R000000999). The Plan further specified, "[i]f a membership [wa]s reissued during a membership year, the resigned member shall be entitled to a

---

[4] However, members who signed "Vesting Addendums" could benefit from a "1 in 2" rather than a "1 in 5" basis of reissuance (Defendant's Trial Ex. 2). These addendums were not referenced in any of the governing documents; they were simply amendments agreed to between an individual member and the Club under Ritz (Trial Tr. Vol. II at 102-103).

refund of a pro rata portion of any dues and other fees paid in advance for which services have yet to be rendered." (Plaintiffs' Trial Ex. 10 at R000000970).

*Defendant's New Club Policies and Operations*

After closing on its purchase of the Club (DE 141 at ¶ 24), Defendant held a town-hall-style meeting on December 14, 2012, to discuss amendments to Club Documents and changes to aspects of operation of the Club. (Trial Tr. Vol. I at 55, 173; D. Trump Dep. at 11-12). At all times material to this lawsuit, Donald J. Trump[5] held the top position of authority at Defendant's company. (Trial Tr. Vol. II at 47). After the December 14, 2012 meeting, under Mr. Trump's authority, Defendant disseminated a letter to all Club members including those on the resignation waiting list. (Trial Tr. Vol. I at 55-56; DE 227 at 7; D. Trump Dep. at 16). The letter was dated December 17, 2012, and bore the signature of Donald J. Trump, as owner of the Club. (Trial Tr. Vol. I at 55-56; Plaintiffs' Trial Ex. 11; D. Trump Dep. at 16, 24).

The letter communicated to Plaintiffs and the Class Members three options that they must choose by December 31, 2012: opt-in; opt-out; or remain on the resignation waiting list, but pay no Club dues and have no Club access. (Trial Tr. Vol. I at 57-62, 64, 145; Vol. II at 46-49; D. Trump Dep. at 19, 25-26, 35; Plaintiffs' Trial Ex. 11).

Those members who opted in were afforded a reduction in Club dues for three years and reciprocity with the other Trump-owned clubs, in exchange for forfeiting their rights to refunds. (Trial Tr. Vol. I at 56-57, 63-64, 198; Vol. II at 38; Plaintiffs' Trial Ex. 11; D. Trump Dep. at 17).  Those members who opted out kept their rights to refunds and Club access, but could not be on the resignation waiting list and would incur an increase in Club dues with no cap on the

---

[5] At all times relevant to this lawsuit, Donald J. Trump was a private citizen.  As a result, the Court will refer to him as such in this decision.  In doing so, the Court means no disrespect to him or to the esteemed position he now holds.

amount of Club dues. (Trial Tr. Vol. I at 58-61, 64; D. Trump Dep. at 18; Plaintiffs' Trial Ex. 11). Plaintiffs and the Class Members fell into the third category communicated by the December 17, 2012 letter. (Trial Tr. Vol. II at 52-56; Plaintiffs' Trial Ex. 13 at R000017421-7422). Because they chose to remain on the resignation waiting list, Plaintiffs and the Class Members were denied permission to use the Club in exchange for a release of the obligation to pay dues. (Trial Tr. Vol. II at 24, 151). In the letter, Mr. Trump, on behalf of Defendant, stated to Plaintiffs and the Class Members "as the owner of the club, I do not want them to utilize the club nor do I want their dues. In other words…if you choose to remain on the resignation list, you're out." (Trial Tr. Vol. I at 56, 62, 64, 67, 69-70, 76, 135, 145; Vol. II at 50; D. Trump Dep. at 25-26; Trial Tr. Vol. II at 45, 50-51; Plaintiffs' Trial Ex. 11 at R000017416, and Ex. 27-28, 36, 43).[6] Defendant's general manager testified that it was clear from the letter that members remaining on the resignation waiting list were out of the Club after December 31, 2012. (Trial Tr. Vol. I at 46, 62, 64; Plaintiffs' Trial Ex. 11).  Defendant's director of memberships likewise testified that the message expressed to Plaintiffs and the Class Members in Defendant's letter was clear: that if they remained on the resignation waiting list, as of December 31, 2012, they would no longer be Club members and would no longer have access to the Club. (Trial Tr. Vol. I at 173, 175, 183, 200; Plaintiffs' Trial Ex. 11, Ex. 33 at TMP 000396).

After December 31, 2012, Defendant denied Plaintiffs and the Class Members access to the Club. (Trial Tr. Vol. I at 70, 76, 175, 187-88; Vol. II at 53; Plaintiffs' Trial Ex. 27-28, 36, 43).  Defendant consistently and clearly delivered the letter's message to Plaintiffs and the Class Members that if they chose to remain on the resignation waiting list, they were out of the Club

---

[6] Plaintiff Dwyer separately retained access to the Club based on his fractional timeshare interest in property in the development. (Trial Tr. Vol I at 80, 133-36).  However, because he remained on the resignation waiting list, Defendant deprived him of the access to the golf course he had based on his Club membership. (Trial Tr. Vol I at 135; Plaintiffs' Trial Ex. 31).

and no longer had membership in the Club. (Trial Tr. Vol. I at 175, 183-84, 187-88, 200). Starting January 1, 2013, Defendant did not allow Plaintiffs and the Class Members access to the Club solely because they remained on the resignation waiting list, rather than because they failed to pay dues[7] or because of some other violation of Club rules or regulations.[8] (Trial Tr. Vol. I at 148, 159-160, 163, 175-176, 183-84, 194-195, 211, 215; Vol. II at 56, 61-62, 147, 149-150, 165; Plaintiffs' Trial Ex. 31).

After January 2013, however, Defendant's policy on dues payments from Plaintiffs and the Class Members changed from what had been stated in Defendant's December 17, 2012 letter. Initially, Defendant asserted that while Plaintiffs and the Class Members would not have access, they would not be obligated to pay dues. (Trial Tr. Vol. I at 70, 74; Plaintiffs' Trial Ex. 32-33, 38, 41). As of February 2013, Defendant charged Plaintiffs and the Class Members annual Club dues according to their respective categories of membership (which had formerly dictated their type and extent of Club usage), even though they were denied access to the Club. (Trial Tr. Vol. I at 75 77-79, 81, 89, 95, 97, 200, 213; Vol. II at 69, 79; Plaintiffs' Trial Ex. 16-17, 43, 50-53, 93-94).

### III. QUESTIONS PRESENTED

1. Under the governing Club documents, does a member of the Club who has notified the Club of an intention to resign have a continuing right to use the Club facilities until the membership is reissued to a new member, assuming the member otherwise remains in good standing?

---

[7] Defendant's membership director at the time it took ownership of the Club testified that the denial of access to resignation waiting list members after January 1, 2013, was a direct consequence of being on the list, as opposed for nonpayment of dues. (Trial Tr. Vol. I, at 175-176]. Eric Trump testified to the same effect (Trial Tr. Vol. II, at 165).

[8] Because of the December 17, 2012 letter, Plaintiffs stopped paying dues after December 31, 2012. (DE 216 at 5 n. 7).

**2.** If the answer to the first question is yes, did Defendant's actions in denying Plaintiffs and the Class Members access to the Club facilities because of their expressed intention to resign from the Club constitute a "recall" of their memberships?

## IV. CONCLUSIONS OF LAW

The Court has jurisdiction over the parties and this action based on diversity of citizenship. Club membership, as defined by the Membership Agreement and related documents, gives rise to contractual rights and obligations. (DE 227 at 5). *See Feldkamp v. Long Bay Partners, LLC*, 773 F. Supp. 2d 1273 (M.D. Fla. 2011), *aff'd*, 453 Fed. Appx. 929 (11th Cir. 2012). All counts of the Second Amended Complaint are premised on Plaintiffs' allegation that Defendant breached the Membership Agreement, which by its terms is to be construed under Florida law.

"The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." *Merin Hunter Codman, Inc. v. Wackenhut Corr. Corp.*, 941 So. 2d 396, 398 (Fla. 4th DCA 2006) (internal quotations and citations omitted). The Membership Agreement is a valid contract, and the parties have not contended otherwise. Save for any prejudgment interest, the amount of potential damages—Class Members' membership deposits – – is uncontested (DE 227 at 5-6).

While the Plan documents expressly provide that a member on the resignation list must continue to pay dues, fees and other charges until the membership is reissued, they do not expressly state whether a member on the resignation list, who is otherwise in good standing, is entitled to continue to use the Club facilities. As a result, the Court must interpret the Plan documents to determine their meaning and the intent of the parties.

### 1. The Plain Meaning of Contract Terms Apply.

Under Florida law, contract interpretation begins with plain meaning of words used, and words are "to be given their natural, ordinary meaning." *See Ferox, LLC v. ConSeal Int'l, Inc.*, 175 F. Supp. 3d 1363, 1371 (S.D. Fla. 2016). "In order to determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001). Where the contract is unambiguous, it must be interpreted in accordance with its plain meaning so as to give effect to the contract as a whole. *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So.3d 943, 948 (Fla.2013). The Court may draw reasonable inferences from unambiguous contract language to determine what the parties intended. *Bombardier Capital Inc. v. Progressive Mktg. Grp., Inc.*, 801 So. 2d 131, 134 (Fla. 4th DCA 2001).

### 2. Intent of the Contracting Parties Controls.

"It is well-established that the parties' intent governs contract construction and interpretation." *Whitley v. Royal Trails Prop. Owners' Ass'n*, 910 So.2d 381, 383 (Fla. 5th DCA 2005); *Royal Oak Landing Homeowner's Ass'n, Inc. v. Pelletier*, 620 So.2d 786, 788 (Fla. 4th DCA 1993). "A court should strive to give effect to the intent of the parties in accord with reason and probability as gleaned from the whole [membership] agreement and its purpose." *Feldkamp*, 773 F. Supp. 2d at 1280–81 (citation omitted); *see also Maines v. Davis*, 491 So. 2d 1233, 1235 (Fla. 1st DCA. 1986)(citing *Blackshear Mfg. Co. v. Fralick*, 88 Fla. 589, 102 So. 753, 754 (Fla.1925)). The contracting parties are Ritz and Club members, including Plaintiffs and Class Members. Therefore, the Court should endeavor to determine their intent, which will in turn direct the Court's interpretation.

### 3. The Parties' Interpretation and Course of Contract Performance Evidence Intent.

"Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."  *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118 (1913). Contract interpretation begins with a review of the plain language of the agreement because the contract language is the best evidence of the parties' intent at the time of the execution of the contract. *Royal Oak Landing Homeowner's Ass'n, Inc. v. Pelletier*, 620 So.2d 786, 788 (Fla. 4th DCA 1993).  But "'Intention', as the term is used in connection with contracting parties…when not clearly expressed, may be demonstrated by conduct." *Smart v. Brownlee*, 195 So. 2d 4, 5 (Fla. 4th DCA 1967).   In this vein, the Court may review the original contracting parties' post-contract course of performance of the agreement to interpret their intent.  *See Treasure Salvors, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 556 F. Supp. 1319, 1336 (S.D. Fla. 1983)(citing Restatement (Second) of Contracts (1981) § 202(4), which provides "[w]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement"); *Downs v. United States*, No. 06-20861-CIV, 2010 WL 3222140, at *4, n. 6 (S.D. Fla. Aug. 16, 2010)(citing *Lalow v. Codomo*, 101 So.2d 390, 393 (Fla.1958) ("[T]he actions of the parties may be considered as a means of determining the interpretation that they themselves have placed upon the contract.")(also citing 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32:14 (4th ed. 1999) ("Given that the purpose of judicial interpretation is to ascertain the parties' intentions, the parties' own practical interpretation of the contract—how they actually acted, thereby giving meaning to their contract during the course of performing it—can be an important aid to the court.").  The course

of performance analysis is not cast aside when a contract is assigned. "The more accepted view espoused by courts seems to be that course of performance by predecessors-in-interest to a contract is relevant in interpreting the meaning of a contract, especially when that course of performance is undisputed." *Pathmark Stores, Inc. v. Gator Monument Partners, LLP*, No. CIV.A 08-3082, 2009 WL 5184483, n. 5 (E.D. Pa. Dec. 21, 2009)

The Florida Supreme Court has adopted the principle of contract construction, which allows the Court to look to the parties' conduct in performing their contract to resolve the absence of a provision on access, finding,

Where the terms of a written agreement are in any respect doubtful or uncertain, or if the contract contains no provisions on a given point, or if it fails to define with certainty the duties of the parties with respect to a particular matter or in a given emergency, and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction will be adopted by the court, upon the principle that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract.

*Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 407 (Fla. 1974).

Evidence of post-contract performance is not precluded by the parol evidence rule for two reasons. "Such a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing." *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 654 (S.D. Fla. 2012) (quoting Restatement (Second) Contracts § 211(2)). Second, under Florida law, the parol evidence rule precludes admission of *prior or contemporaneous oral statements* that vary or contradict the terms of a written contract which is clear, unambiguous and fully integrated. *Ungerleider v. Gordon*, 214 F.3d 1279 (11th Cir.2000)(Emphasis added).[9] Course of

---

[9] *See also Bird Lakes Dev. v. Meruelo*, 626 So.2d 234, 237 (Fla. 3d DCA 1993) ("Under the parol evidence rule the terms of a valid written contract cannot be varied by a verbal agreement or other extrinsic evidence…*before or at the time of the contract's execution*.")(Emphasis

performance is not parol evidence because although extrinsic to the contract "it identifies the parties' post-agreement conduct rather than their actions prior or contemporaneous to contract formation." *Kinesoft Dev. Corp. v. Softbank Holdings Inc.,* 139 F. Supp. 2d 869, 890 n.9 (N.D. Ill. 2001) (citing E. Allen Farnsworth, Farnsworth on Contracts, § 7.3, at 228 (2d ed.1998).

Accordingly, the Court may consider the contract performance of Ritz and the Class Members to determine the intent of the Membership Agreement, which is a form document, whose preprinted terms apply across the board to Plaintiffs and the Class Members, and is to be interpreted as treating those alike as similarly situated.

### 4. Multiple Contract Documents Should Be Construed Together and Reconciled if Possible.

The Court should construe the Membership Agreement and Plan together attempting to give meaning to each and their respective texts. *See Berkowitz v. Delaire Country Club, Inc.*, 126 So. 3d 1215, 1220 (Fla. 4th DCA 2012).  "It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing."  *OBS Co. v. Pace Construction Corp.*, 558 So.2d 404, 406 (Fla.1990).  Every provision in an agreement should be given meaning and effect and apparent inconsistencies reconciled where possible. *U.S.B. Acquisition Co. v. Stamm*, 660 So. 2d 1075, 1080 (Fla. 4th DCA 1995). Provisions in the

---

added); 11 Williston on Contracts § 33:1 (4th ed.)(Westlaw)("The rule may be stated in these terms: The parol evidence rule is a substantive rule of law that prohibits the admission of evidence of prior or contemporaneous oral agreements, or prior written agreements, whose effect is to add to, vary, modify, or contradict the terms of a writing which the parties intend to be a final, complete, and exclusive statement of their agreement."); Black's Law Dictionary (10th ed. 2014)(defining "Parol-Evidence Rule" as "[t]he common-law principle that a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing").

membership documents in the Membership Agreement, Plan, and Rules on the same subjects should thus be harmonized, where possible.  Likewise, when interpreting multiple provisions in contracts, courts "will not interpret a contract in such a way as to render provisions meaningless when there is a reasonable interpretation that does not do so. Instead, courts must strive to interpret a contract in such a way as to give meaning to all provisions while doing violence to none." *Bethany Trace Owners' Ass'n, Inc. v. Whispering Lakes I, LLC*, 155 So. 3d 1188, 1191 (Fla. 2d DCA 2014), *reh'g denied* (Jan. 23, 2015) (internal citations and quotations omitted); *see also City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000) ("[W]e rely upon the rule of construction requiring courts to read provisions of a contract harmoniously in order to give effect to all portions thereof.").

With the foregoing principles in mind, the Court further concludes as follows:

## A. Club Members on the Resignation Waiting List Retained Status as Club Members with Club Access.

To become Club members, Plaintiffs and the Class Members executed the Membership Agreement in which they acknowledged they would abide by the Plan and Rules.  Prior to Defendant's purchase of the Club, Plaintiffs and the Class Members submitted their names for placement on the resignation waiting list in accordance with the procedure called for under these documents.  Taken together, these membership documents, the contracting parties' interpretation of them, and the evidence at trial, show members on the list retained active memberships affording them continued Club access.

### 1. Intent of the Contracting Parties: Payment of Dues

The Court starts with review of the relevant text of the membership documents.  Under the Plan, Plaintiffs and the Class Members were obligated to pay dues while on the resignation waiting list.   "Dues" can be defined "as a regular payment that you make to be a member of an

organization;"[10] a "fee or charge required for membership, affiliation, initiation, use, subscription;" or a "charge or fee for membership, as in a club or organization." *Murray v. Amalgamated Transit Union*, No. CV 14-378 (JEB), 2014 WL 11281392, at *7 (D.D.C. Dec. 19, 2014), *reconsideration denied*, 99 F. Supp. 3d 149 (D.D.C. 2015)(citing Webster's Third New International Dictionary 699 (1981) and American Heritage Dictionary 553 (5th ed. 2011)).

Under the heading, "Purchase of Membership," each agreement provided in relevant part, that applying members "agree[d] *to pay to the Club the membership deposit and the membership dues…* for the category of membership selected, on or before the Closing Date, *at which time [the members would] have use of the Club Facilities* provided for under this Agreement.*"* (emphasis added). By paying dues and deposits, Club members acquired revocable licenses to use Club facilities.  A license, in this context, is simply a permit to access and use Club property and services. *See Brevard Cty. v. Blasky*, 875 So. 2d 6, 12 (Fla. 5th DCA 2004).  Under the Membership Agreement, therefore, dues and deposits are the sums members pay for their licenses affording them continuing Club access according to their membership categories. Harmonizing the Plan's requirement that members on the resignation list pay on-going dues, with the Membership Agreement's statement of consideration—dues in exchange for access— supports the interpretation that "dues" under the Plan is the payment Club members make in exchange for permission to use the Club.

As Eric Trump testified, "[i]f you are current on dues, you are allowed access to a club." (DE 240-2 at 3).  According to his testimony, paying dues but having no Club access, "would violate a fundamental principle of life." (Trial Trans. Vol. II at 161; DE 240-2 at 3). Based on Defendant's own testimony, access is an indispensable ingredient of Club membership and dues

---

[10]  http://www.merriam-webster.com/dictionary/dues (defining "Dues") (accessed August 11, 2016).

are the consideration paid in exchange for permission to access and use the Club on an on-going basis.

### 2. Intent of the Contracting Parties: Payment of Fees and Charges

The Plan further provides that resignation waiting list members were required to pay fees and charges. Members on the resignation waiting list were entitled to a "pro rata portion of any dues and other fees paid in advance *for which services have yet to be rendered*" (Plaintiffs' Trial Ex. 10 at R000000970)(Emphasis added).   The evidence at trial indicated that fees and charges were directly associated with actual Club access and use. (Trial Tr. Vol. I at 39-40, 54, 95, 170, 172, 191; Plaintiffs' Trial Ex. 10 at R000000970,R000000982]. Members would incur no fees and have no services rendered for them, if they were not entitled to Club access. A person having no access would in fact never incur a fee (Trial Tr. Vol. II at 95).   The Plan's requirement that resignation list members pay fees and charges further supports an interpretation that individuals on the resignation list retained the continuing contractual right to use the Club.  If you could not use the Club facilities, you could not incur fees or charges.  If you could not continue to use the Club facilities, there would be no reason to include a requirement in the Plan documents that members on the resignation list be obligated to pay those fees and charges.   Such an interpretation gives meaning to the requirement that list members pay fees and charges. *See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Ass'n*, 117 F.3d 1328, 1338 (11th Cir.1997) ("[A]n interpretation which gives a reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable.")(internal marks and citation omitted construing Florida law).

### 3. Intent of the Contracting Parties: The "Desire" to Resign

Furthermore, under the language of the Plan, Club members including Plaintiffs and Class Members simply expressed to Ritz a "desire" to resign by giving written notice to the Club, rather than immediate surrender of their memberships and all associated privileges, including access. (Plaintiffs' Trial Ex. 10 at R000000967).  Ritz in turn placed them on a "waiting list" for membership re-issuance. (*Id.*).  The plain meaning of "Desire" is "to express a wish for."[11] The plain meaning of a "waiting list" is "[a] roster of people *who have requested something that is not currently available but either will be or might be in the future*." Black's Law Dictionary (10th ed. 2014)(Emphasis added).  The use of these terms also supports an interpretation of the Plan documents that a member providing notice of a "desire" to be on the resignation list did not deprive the Club member of continued use of the Club facilities.

### 4.  Intent of the Contracting Parties: Their Conduct

The contracting parties' conduct also supports the conclusion that it was intended that contracting members on the resignation list were entitled to continue to use the Club facilities. Ritz, as a matter of course, allowed members on the resignation waiting list continued Club access and Defendant knew of this routine practice before purchasing the Club.

In view of all of the foregoing, the Court concludes that the Plan documents, as properly interpreted, were intended to provide Club members on the resignation list with a continuing right to use the Club facilities until their membership was reissued to a new member, provided the Club member was otherwise in good standing with the Club.

### B. Defendant Recalled the Memberships of Class Members Entitling them to Refunds.

Having determined that the Plan documents give a member on the resignation list the contractual right to continue to use the Club facilities while in good standing, the Court must

---

[11] http://www.merriam-webster.com/dictionary/desire (accessed August 9, 2016).

now determine whether Defendant "recalled" the membership of Plaintiffs and the Class Members. The provision of the Membership Agreement containing the refund rights upon "recall" expressly allows Defendant "in its discretion" to recall memberships "at any time for any or no reason whatever…" The word, "any," means "one or another without restriction or exception[.]" *Dows v. Nike, Inc*., 846 So. 2d 595, 601 (Fla. 4th DCA 2003). In view of this language, the Court rejects Defendant's contention that a "recall" can only occur when the Club recalls an associate membership (Trial Tr. Vol. II at 63-64); when a member sells a home in the Club community (Id. at 65); or when a member refuses an equity membership. (Id. at 65; Plaintiffs Trial Ex. 10 at R000000959, R000000968, R000000974).

Merriam-Webster defines "recall" as "cancel" or "revoke." Merriam-Webster, http://www.merriam-webster.com/dictionary/recall (last visited September 25, 2016). The New Oxford American Dictionary defines "recall" as "revoke" or "annul." Defendant's letter communicated that if Plaintiffs and the Class Members remained on the resignation waiting list as of December 31, 2012, they would no longer be Club members. Defendant's testimony at trial was consistent with that stated intention. Defendant acted in accordance with its interpretation of the Plan documents that if you were on the resignation waiting list, you no longer had a right to use the Club. Thus, such members had their membership "revoked" or "cancelled" or, for purposes of this case, "recalled."

The cumulative trial evidence compellingly demonstrates that Defendant put the revocation stated in the letter in practice from January 1, 2013, forward. The evidence further demonstrated that Club membership equated to permission to use the Club. The basic purpose of the Membership Agreement was to afford persons lawful permission to use and access the Club (i.e.—a license to enter Club property to use the Club facilities) in exchange for payment of a

deposit, dues, fees, and charges.  With access removed from this equation, a person would have no Club membership. In other words, without a right to Club access, no membership would exist and this essential purpose of the membership contract would be nullified.

## CONCLUSION

Consequently, the Court concludes that by categorically denying Class Members all rights to Club access because they remained on the resignation waiting list as of December 31, 2012, Defendant revoked or cancelled their memberships, thus recalling their memberships. Under their Membership Agreements, Plaintiffs and the Class Members were entitled to refunds of their deposits within 30 days of that date, which to date Defendant has failed to provide. Because Defendant did not refund Class Members' deposits by January 30, 2013, it committed a material breach of the Membership Agreement going to the essence of the contract, causing Plaintiffs and the Class Members damages measured by the amounts of their refundable deposits plus accruing interest. The Court further concludes that Defendant's denial of club access and consequent recall of their memberships excused Class Members' payments of any further dues, mandatory minimum charges, or fees, accruing on or after January 1, 2013.  *See Indemnity Ins. Corp. of DC v. Caylao*, 130 So. 3d 783, 786 (Fla. 1st DCA 2014) ("material breach by one contracting party excuses the performance by the other party").

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.     Judgment shall be entered in favor of Plaintiffs and Class Members and against Defendant by separate order of the Court.

2.      Judgment shall be entered in favor of Plaintiffs and Class Members on the breach of contract claim (count two), finding that Defendant Jupiter Golf Club, LLC is indebted to Plaintiffs and Class Members in the aggregate principal sum of $4,849,000.00.[12]

3.      Judgment shall be entered in favor of Plaintiffs and Class Members on the declaratory relief (count one), declaring that that Plaintiffs and Class Members have no indebtedness to Defendant Jupiter Golf Club, LLC for any dues, fees, charges, or other amounts arising on or after December 31, 2012.[13]

4.      The Clerk shall close this case and all pending motions are denied as moot.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida this 1st day of February, 2017.

KENNETH A. MARRA
United States District Judge

---

[12] In a diversity case, the interest rate to be applied is determined by state law. *Venn v. St. Paul Fire and Marine Ins. Co.*, 99 F.3d 1058, 1066, 1068 n.14 (11th Cir. 1996); *American Dredging Co. v. Lambert*, 153 F.3d 1292, 1297 (11th Cir. 1998). Where a claim sounds in contract, the prevailing party is entitled to prejudgment interest from the date the cause of action accrued at the Florida statutory rate. *Venn*, 99 F.3d at 1067, 1068. Unlike the rate for prejudgment interest, in all cases in federal court, including diversity cases, the post-judgment interest rate to be applied is determined by federal law pursuant to 28 U.S.C. § 1961. *G.M. Brod & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1542 (11th Cir. 1985).

The Florida statutory prejudgment interest is set by Fla. Stat. Section 55.03. The statutory rate of interest for 2013 through the first quarter of 2016 was 4.75% per annum. The statutory rate for the second quarter of 2016 was 4.78% per annum; 4.84% per annum for the third quarter of 2016; 4.91% per annum for the fourth quarter of 2016 and 4.97% for the first quarter of 2017. The Court has calculated the prejudgment interest at these rates for the applicable timeframes to be $925,010.00. The federal post-judgment rate of interest as of the date of the judgment is 0.81% per annum.

[13] In view of this ruling, the Court sees no need to grant injunctive relief to Plaintiffs and the Class Members (count three).